Filed: 2/28/2022 6:03 PM
Clerk
Monroe County, Indiana
Monroe Circuit Court 6

STATE OF INDIANA    )      IN THE MONROE COUNTY SUPERIOR COURT
                    )  SS:  CIVIL DIVISION, ROOM NO. ___
COUNTY OF MONROE  )      CAUSE NO. <u>53C06-2202-PL-000361</u>

INDIANA UNIVERSITY CHAPTER       )
OF TURNING POINT USA, and         )
                                      )
KYLE REYNOLDS,                   )
                                      )
             Plaintiffs,       )
                                      )
      vs.                        )
                                      )
CITY OF BLOOMINGTON, INDIANA,   )
ADAM WASON, in his official capacity as  )
Director of Public Works for the City of    )
Bloomington, and KYLA COX DECKARD, )
BETH H. HOLLINGSWORTH and DANA   )
HENKE in their official capacities as       )
members of the Board of Public Works of  )
the City of Bloomington, Indiana,        )
                                      )
            Defendants.      )
                                      )

## **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

The Plaintiffs, Indiana University Chapter of Turning Point USA, and Kyle Reynolds, by counsel, allege:

### **INTRODUCTION**

1.    This case is an as-applied civil rights action brought pursuant to state law and 42 U.S.C. §§ 1981 and 1983 challenging the legality under both the state and federal constitutions of a denial by the City of Bloomington, Indiana ("Bloomington" or the "City") and the City's officials of Plaintiffs' application to paint an "All Lives Matter" street mural on East Kirkwood Avenue in front of the

1

Von Lee building on the campus of Indiana University ("IU" or the "University") at Bloomington as approved by IU officials.

2.     IU is a publicly funded state university located within the City.

## THE PARTIES

3.     Plaintiff, Indiana University Chapter of Turning Point USA ("Turning Point USA" or "TPUSA") is a recognized, on-campus student organization at IU.

4.     Plaintiff, Kyle Reynolds ("Mr. Reynolds"), is an authorized agent of Turning Point USA and its campus coordinator, and a current resident of Bloomington, Indiana.

5.     Defendant City of Bloomington is an Indiana municipal corporation and is a corporate entity capable of suing and being sued.

6.     Defendant Adam Wason is the Director of Public Works of the City and in that capacity is a policymaking official. He is sued in his official capacity as the City's Director of Public Works.

7.     Defendant Kyla Cox Deckard is a member of the City's Board of Public Works and in that capacity is a policymaking official. She is sued in her official capacity as a member of the Board of Public Works.

8.     Defendant Beth H. Hollingsworth is a member of the City's Board of Public Works and in that capacity is a policymaking official. She is sued in her official capacity as a member of the Board of Public Works.

9.     Defendant Dana Henke is a member of the City's Board of Public Works and in that capacity is a policymaking official. She is sued in her official

capacity as a member of the Board of Public Works.

## **JURISDICTION & VENUE**

10.     This action arises under Article 1, Section 9 and Article 1, Section 23 of the Indiana Constitution and under 42 U.S.C. §§ 1981 and 1983 and the First and Fourteenth Amendments to the United States Constitution.

11.     Indiana "trial courts, as courts of general jurisdiction, have jurisdiction concurrent with the federal courts in enforcing rights conferred by the Constitution and laws of the United States." *Petition of Ackerman*, 409 N.E.2d 1211, 1222 (Ind. Ct. App. 1980).

12.     The Monroe Circuit and Superior Courts have original and concurrent jurisdiction in all civil cases. IC 33-28-1-2 (Circuit Court); IC 33-29-1.5-2 (Superior Court).

13.     The Monroe Circuit and Superior Courts have authority to issue declaratory relief pursuant to IC 34-14-1-1 *et seq*.

14.     The Monroe Circuit and Superior Courts have authority to issue injunctive relief pursuant to IC 34-26-1-3.

15.     This Court has authority to award costs, attorneys' fees and expert witness fees under 42 U.S.C. § 1988(b) and (c).

16.     Preferred venue is present in Monroe County under Trial Rule 75 because it is the County where the defendant governmental organization to which the claim relates is located.

## FACTUAL ALLEGATIONS

**A.**    **Maintenance of Public Streets in the City of Bloomington**

17.    Pursuant to the Bloomington Municipal Code the chief administrative body of Bloomington is the Board of Public Works (the "Board of Public Works" or the "Board"), which has control of the day-to-day operation of the City's Department of Public Works. *See* Bloomington Municipal Code, Chapter 2.09, § 2.09.030.

18.    The Board consists of three members appointed by the Mayor of Bloomington. *See* Bloomington Municipal Code, Chapter 2.09, § 2.09.010.

19.    The Department of Public Works is the general administrative department of the City with responsibility for street maintenance and the management of all physical facilities of the City, with the sole exception of property managed by the utility service board or the board of parks commissioners. *See* Bloomington Municipal Code, Chapter 2.10, § 2.10.000.

20.    The head of the Department of Public Works is the "Director of Public Works," who is appointed by the Mayor with approval of the Board and serves at the pleasure of the Mayor. *See* Bloomington Municipal Code, Chapter 2.10, § 2.10.010.

21.    Mr. Adam Wason ("Director Wason") has at all times relevant to this matter been the City's Director of Public Works.

22.    In this capacity Director Wason has full powers and duties of a City Department Head, "administrative responsibility for the divisions, boards, commissions, councils and physical facilities" falling under the purview of the Board

4

and the Department of Public Works, and "is subject to any rules promulgated by the Mayor and Board of Public Works which do not conflict with state law." *See* Bloomington Municipal Code, Chapter 2.10, § 2.10.020.

**B.      Board of Public Works' Encroachment Policy**

23.     As explained below, The Board of Public Works has adopted a policy and practice of approving expressive activity which encroaches on public rights-of-ways.

24.     For instance, the Board of Public Works has approved at least three street murals painted on City streets. All three street murals in the City contain the phrase, "Black Lives Matter."

25.     While two of the street murals on City streets in Bloomington were erected by the City, as explained below, the Black Lives Matter Street Mural was erected on a public right-of-way on the IU campus by IU students and other volunteers.

26.     The Board (at the City' council's urging) approved these two murals as "encroachments" on the City's right of way.

*See* https://bloomington.in.gov/onboard/meetingFiles/download?meetingFile_id=8674 at 48; https://bloomington.in.gov/onboard/meetingFiles/download?meetingFile_id=7660 at 36.

27.     The Board of Public Works has approved other types of expressive activity encroaching on public rights-of-way, including an Indiana University homecoming parade and a student organization showcase.

28.   In September 2021, the Board of Public Works approved Middle Way House, an emergency shelter and advocacy group for survivors of sexual violence, to wrap handmade blankets around trees and lamp posts along public rights-of-way. The Board approved these encroachments in public rights-of way to be displayed for six months, until March 2022.

29.   These examples illustrate that the City through the Board has created a practice or policy of allowing encroachments which contain messages with which the City agrees.

30.   The Board of Public Works' Encroachment Policy contains no concrete standards which guide or confine the exercise of discretion in approving encroachments in public rights-of-way.

31.   Rather, as explained below, the Board of Public Works has employed its Encroachment Policy in standardless fashion permitting some expressive activity and denying other expressive activity encroaching on rights-of-way based upon the view point expressed or to be expressed in the encroachment.

32.   As explained below, the Board of Public Works' Encroachment Policy allows for encroachments through murals which express view points they like.

C.   **"Black Lives Matter" Street Mural Jointly Approved by Indiana University and The Board of Public Works**

33.   As explained below, a "Black Lives Matter" street mural (the "BLM Street Mural" or the "Black Lives Matter Street Mural" or the "BLM Mural") was painted on Bloomington's Jordan Avenue (now Eagleson Avenue) on the campus of IU during July 3 – 5, 2021, and officially announced by IU on July 8, 2021.

34.     There exist no written standards that were followed relating to the manner in which the BLM Street Mural, which was an encroachment on the City's public right-of-way, was approved.

35.     Prior to July 3, 2021, when erection of the BLM Street Mural commenced, the BLM Street Mural was verbally authorized by the City's Director of Public Works after the location and content of the street mural had received the approval of the IU Administration.

36.     As a result, those working to erect the BLM Street Mural were able to paint the mural on a City street without prior official approval by the Board of Public Works.

37.     Funding for the BLM Street Mural came primarily from the IU Funding Board and this funding was derived from student fees distributed to student organizations on the IU campus by the IU Funding Board.

38.     The BLM Street Mural was envisioned by IU students Joa'Quinn Griffin and Tiera Howleit, and officially sponsored by Black Collegians, an IU student group led by IU student Tiera Howleit.

39.     Tiera Howleit worked closely with Thomas Morrison, IU Capital Planning and Facilities Vice President, to identify a location for the mural and secure the University's support for locating the mural at one of the Black Collegians' favored sites.

40.     Tiera Howleit also communicated with the City administration, including Public Works Director Adam Wason, on the mural project.

41.     IU campus leadership approved the location of the BLM Street Mural and approval from the City was received from Public Works Director Wason.

42.     About a month after the street mural was painted, on August 3, 2021, the Board of Public Works ratified the earlier decision to approve the BLM Street Mural.

43.     The BLM Street Mural is located on a public right-of-way of the City which runs through the IU campus.

44.     This public right-of-way, like all public roads in the City, is under the control and supervision of the Department of Public Works, which is under the supervision of the Board of Public Works.

45.     Sometime on or before July 3, 2021, when work erecting the BLM Street Mural commenced, Director Wason approved the Black Collegians' plan for the BLM Street Mural, and he approved the location for that mural which he understood had been identified through a collaboration between IU student Tiera Howleit and IU Capital Planning and Facilities Vice President, Thomas Morrison.

46.     Director Wason did not obtain approval from the Board of Public Works before authorizing Tiera Howleit and the Black Collegians group to commence painting the BLM Street Mural on Jordan (now Eagleson) Avenue, a public right-of-way under the management and authority of the City.

47.     In reliance upon authorization from Director Wason, work commenced on the BLM Street Mural on or about July 3, 2021 and was completed on or about July 5, 2021.

48.     Here is a bird's eye photo of the BLM Street Mural on Eagleson

Avenue on the IU campus as it looked soon after the completion of the mural on or

about July 5, 2021:



49.     Painting the BLM Street Mural, which was accomplished largely

through the active involvement of student volunteers, required temporary closure of

Eagleson Avenue as depicted in the following photo:



50.     The BLM Street Mural occupies a prominent location on the IU campus between the Neal Marshall Black Culture Center and the IU Groups Building, as depicted by this photo:



51.     Completion of the BLM Street Mural was met by an approving tweet from the IU Provost on July 6, 2021, who commented, "[t]he Black Collegians finished the amazing Black Lives Matter mural on Jordan Ave. If you're on the @IUBloomington campus, check it out between @NMBCC_IU and @IU_Groups buildings!"

52.     Similarly, on July 8, 2021, IU's official twitter feed said: "Black Lives Matter. Thank you to the Black Collegians group for bringing this mural to life on our campus."

**D.    "All Lives Matter" Street Mural Approved by Indiana University but Rejected by the City of Bloomington**

53.    On July 20, 2021, Kyle Reynolds, in his capacity as a representative of multiple IU student organizations, including the IU Chapter of Turning Point, USA, wrote to IU's Provost and Vice President Morrison stating, in part:

> [W]e would like a space on campus to represent our views with an All Lives Matter mural. Ideally, this would be on a large street, such as the one utilized for the BLM mural, however, any large space with high visibility on campus should be adequate.
>
> Assuming we need a permit for such an undertaking, I would like to get that process started as soon as possible. If you, the recipients of this email, are not the correct parties to contact for this matter, would it be possible for you to direct me to the appropriate party?

54.    After a couple of follow-ups from Mr. Reynolds, a representative of IU's Student Involvement and Leadership organization responded:

> We believe Vice President Morrison will be following up soon on the logistics for painting a street on campus. Similarly to the Black Lives Matter mural, you as leader and member of a student organization can request funding from the IU Funding Board for this project.

55.    The following morning (July 27, 2021) IU Vice President Morrison reached out to Kyle:

> Good morning Mr. Reynolds. Apologies for not responding sooner but I am just returning from a vacation. I will address the facility related questions posed in your email. Please realize that the Black Lives Matter street mural was not placed on Indiana University property nor the Campus. The BLM mural was created on a street owned by the City of Bloomington. Thus, the City was entity that ultimately approved the mural.
>
> As information, the students who proposed this mural did request of IU to place the mural a several proposed locations on the IU Campus. Each of those proposed locations was not approved. IU

12

does not permit mural type art on the Bloomington Campus. The students did propose the location ultimately chosen and were directed to the City for approval.

Please know that we did offer the students advice on facility related logistics (types of paint, colors, temperatures, surface preparation, sizing, etc.). We would provide that expertise to you or any student or group who inquired. We did not pass any judgement on the art itself.

Should you desire to propose a street mural, I would direct you to the City of Bloomington. Thank you for the inquiry.

56.    The same day, Mr. Reynolds responded to Mr. Morrison, saying:

Thank you so much for getting back to me. I suspected that the permit would have to be issued by the city, but I figured I'd contact university leadership first to see what level of control, if any, IU has over the streets on campus. If you wouldn't mind, I would greatly appreciate any advice you have on facility related logistics such as paint type or surface preparation.

Additionally, if you could direct me to the appropriate city official, I would be extremely grateful.

57.    Mr. Morrison then directed Kyle as follows:

Kyle, my recommendation would be to begin with the Board of Public Works at the City. I believe they have a published process and staff who can assist. If your project advances, please do feel free to reach out to me and we will be glad to provide logistical advice.

58.    As recommended by V.P. Morrison, that same day, July 27, 2021,

Mr. Reynolds reached out to the City's Public Works Department, stating:

I represent two student organizations at IU . . . we would like a road on campus to represent our views with an All Lives Matter mural. Ideally, this would be on a large and highly visible street, although we are relatively open with regard to the mural's location. With the Fall semester starting in less than a month, we would like to get this process started as soon as possible.

13

59.     On August 2, 2021, Director Wason, responded to Kyle and explained the City's practice and policy, illustrated through working with the Black Collegians group (*i.e.*, the "other group" referred to in Wason's email), of the City deferring to IU for approval of street murals "for placement" on City streets located within the IU campus. Director Wason instructed Kyle as follows:

> Kyle,
>
> You'll need to work with the IUB President's Office, *as did the other group*, in order to get the concept for any murals approved for placement on any streets on campus.[1]

60.     Having been directed back to IU by the City to "get the concept for [his] mural[] approved for placement on any streets on campus," on the afternoon of August 2, 2021, Mr. Reynolds emailed Karen Adams, Chief of Staff to IU President Pamela Whitten, copying President Whitten and Mr. Morrison. Mr. Reynolds wrote:

> Dear Ms. Adams,
>
> I was informed by Adam Wason, the director of the Bloomington Public Works Department, that I'll "need to work with the IUB President's Office, as did the other group, in order to get the concept for any murals approved for placement on any streets on campus." Supposedly, nothing else can be done until I receive approval from the president's office.

61.     V.P. Morrison responded to Kyle's email two hours later, saying:

> Good afternoon Mr. Reynolds. Sounds like you have made proper contact with the City and have been routed back to me. In the City sending you the to the IU Presidents office, your request actually is then delegated to me, *as it was with the BLM group*. It is the City's ultimate approval. However, they do consult with us as an adjacent property owner, as they probably would with any owner. IU did not object to the BLM location on Jordan. Please let me (or the City) know your proposed location, size, design, etc. I am glad to review.

---

[1] Italics added.

*As with BLM, I cannot promise that IU will approve of your initial requested location, but we are open to exploring options.* Thanks.

Tom[2]

62.    Shortly thereafter, Kyle Reynolds responded to V.P. Morrison:

Well it's good to know that I am finally in contact with the right person. I will start by listing a few possible locations. Potential locations, in order of preference, are E 7th St in front of the Union, E 10th St in front of Hodge Hall, E Kirkwood Ave in front of Von Lee, or Indiana Ave in front of Franklin Hall. The size of the mural will be approximately 15' x 145'. I have attached the mural design below. As you can see, in addition to simply stating "All Lives Matter," the mural will also offer support to first responders with a variation of the traditional thin blue line and thin red line iconography.

Thank you for your help thus far, and I look forward to hearing your response.

63.    Kyle Reynolds attached to his August 2, 2021, email to Mr. Morrison the following full color representation of the All Lives Matter ("ALM") Street Mural design proposed by Kyle and the Turning Point USA student organization:



64.    The next day Mr. Morrison responded:

Kyle, thank you for the proposed graphic, sizing, and potential locations. *The graphic and sizing look good on my end.* On the locations, allow me to provide the following feedback:
E7th north of the IMU – IU would not permit any public street art at this location as this portion of 7th Street is University owned property. In fact, the students who worked on the BLM mural

---

[2] Italics added.

requested the same location and it was not approved for the same
reasons.

E-10th Street at Hodge Hall – IU would not be in favor of this
location due to the separation in the street by the traffic safety
islands and the need to keep the dedicated turn lanes
marked and prominent.

East Kirkwood in front of the Von Lee - IU would not have any
objection to this location.

Indiana Avenue in front of Franklin Hall – IU would not be in favor
of this location due to its proximity to the Sample Gates. For
similar reasons to the E 7th location, we object to any permanent
displays at this location.

Thanks for the proposal. *You can relay to the City that IU is ok with
the East Kirkwood location.* Please reach out with any further
questions.[3]

65.     Having received IU's approval of both the "graphic and sizing" of the

proposed ALM Street Mural and of "the East Kirkwood location" for the ALM Street

Mural, Kyle Reynolds wrote DPW Director Wason on August 3:

Our concept for a 15' x 145' "All Lives Matter" mural was approved
by the IUB President's Office, specifically by IU Vice President for
Capital Planning and Facilities Thomas Morrison, for placement on
E Kirkwood Ave in front of the Von Lee building. I have attached
the design for the mural below.

66.     A copy of the above graphic design of the ALM Street Mural was

attached to Kyle Reynolds' August 3, 2021, email to Mr. Wason.

67.     Kyle Reynolds' request for approval of the ALM Street Mural was sent

to Director Wason on the very day that Director Wason submitted a staff report to

---

[3] Italics added.

the Board recommending ratification of the earlier decision to approve the design,

content, location, and placement of the BLM Street Mural on the IU campus.

68.     Director Wason's staff report was placed on the "consent agenda" of the

Board for its August 3, 2021, meeting. His report stated:

> The City of Bloomington Economic & Sustainable Development
> Department, Office of the Mayor, Community Family Resources
> Department, and the Public Works Department endorse the
> painting of a Black Lives Matter mural on Jordan Avenue adjacent
> to the IU Neil Marshall Black Cultural Center *in partnership with
> the IU Provost's Office and the Black Collegians student group*. This
> community project is requesting the Board of Public Works to
> permit this use of a public right of way and *join in this public
> display of support for our Black and Brown residents* who have been
> fighting for justice. This request is coming to the Board of Public
> Works after the project was completed due to an oversight by staff
> as City personnel transitioned out of the organization. Intentions
> were always to work with IU and this student group, and have this
> before the Board in early June. Due to the oversight, we are
> requesting after the fact approval.[4]

69.     Director Wason's proposal for the Board to ratify the BLM Street

Mural and the Department of Public Works' "partnership with the IU Provost's

Office and the Black Collegians student group" was approved by the Board at its

August 3, 2021, meeting, just seven (7) days *after* Kyle Reynolds had first reached

out to Director Wason asking the City to approve Turning Point USA's All Lives

Matter Mural and on the very day that the IU Administration approved the All

Lives Matter Mural.

70.     Nevertheless, it would take Director Wason another week and multiple

prompts from Kyle Reynolds to respond to Kyle's follow up request.

---

[4] Italics added.

71.     After three follow up inquiries from Kyle Reynolds, Director Wason

finally responded on August 10, 2021. At that time, Director Wason passed Kyle

Reynolds off to the City Attorney, writing:

> Mr. Reynolds,
>
> City Legal is who you can speak with. Mr. Morrison's office is also
> not in agreement with your take on IU "giving permission".
>
> Take care and be well,
>
> Adam

72.     Kyle Reynolds dutifully reached out that same day, August 10, 2021, to

the Bloomington City Attorney, Mike Rouker. Mr. Reynolds' email to City Attorney

Rouker explained:

> I represent . . . two student organizations at Indiana University. . . .
> [W]e would like a road on campus to represent our views with an
> All Lives Matter mural.
>
> After speaking with the director of the public works department,
> Adam Wason, we were informed that we would first need
> permission from the IU President's Office before such a project
> could proceed. The president's office then delegated the project to
> Thomas Morrison, the vice president for capital planning and
> facilities at IU. After submitting our proposed design, sizing, and
> locations to Mr. Morrison, we were told that graphic and sizing
> "look good" and that the university would "not have any objection
> to" a 15' x 145' mural on E Kirkwood in front of the Von Lee
> building. We were then told by Mr. Morrison to "relay to the City
> that IU is ok with the East Kirkwood location."
>
> After again contacting Mr. Wason and informing him of IU's
> approval, we were told that we would have to contact the city's legal
> department. I have CC'd everyone that appears to be involved in
> the decision making process on this email in the hope of moving
> this project forward.

73.    Kyle Reynolds waited another week on City Attorney Rouker to respond before again initiating follow up requests. Mr. Reynolds sent Mr. Rouker follow-up emails on August 17, August 18, and August 19, 2021, but still received no response.

74.    Finally, on August 23, 2021, City Attorney Rouker wrote to Kyle Reynolds' as follows:

> Mr. Reynolds:
>
> The City of Bloomington's Board of Public Works approves the placement of art in the public right of way. The City does not take recommendations for art in its right of way from individuals, and, at this time, the City is not considering adding additional art within its right of way.

75.    By referring Kyle Reynolds to Mr. Rouker for the above communication, the Board of Public Works, through its Director Mr. Wason, denied Mr. Reynolds and TPUSA's request to place an All Lives Matter mural in the City's public right-of-way.

76.    Despite the response by Mr. Roukers on behalf of the Board and Mr. Wason, the City had recently taken recommendations for art encroaching in its right-of-way from individuals associated with the Black Collegians group and from the IU administration and had officially ratified taking such recommendations within the precise time frame in which Turning Point USA's request to the City was made, including the Board's official action to ratify the erection of the BLM Street Mural taken *after* Turning Point USA's request was received by the City.

77.     In response, Kyle Reynolds immediately wrote City Attorney Rouker, noting Mr. Reynold's concern that the Board of Public Works was engaging in viewpoint discrimination through approving the "Black Lives Matter" message while rejecting the "All Lives Matter" message. Kyle said:

> Dear Mr. Rouker,
>
> I would like to point out that the city approved a BLM piece of art only a few months ago, and I and the organizations I represent will be pursuing legal action against the city if this mural doesn't receive approval. As an attorney, I'm sure I don't need to inform you that governmental entities cannot discriminate in the viewpoints they allow to be expressed.

78.     At the time, Kyle Reynolds was unaware that the Board had only officially approved the BLM Street Mural for the first time on August 3, 2021, just hours after Kyle's follow up request to Director Wason had been made.

79.     Neither City Attorney Rouker, nor anyone else from the Board has responded to Kyle Reynolds' August 23, 2021, communication stating that the City was engaging in viewpoint discrimination.

**E.  The IU Chapter of Turning Point USA and Kyle Reynolds Have Been Injured by the City's Viewpoint Discrimination and Are Entitled to a Declaratory Judgment and Nominal Damages**

80.     Plaintiffs have been injured by the City's approval and preference for the BLM Street Mural because a message with which they disagree has been preferred over their message, they have been prevented from communicating their message through the proposed ALM Street Mural, they are unable to bring as much attention to their message because they have lost the highly effective communication vehicle of placing a street mural bearing their message on the IU

20

Campus, and they have incurred the time, inconvenience, costs and expense of this litigation.

81.     Plaintiffs are entitled to injunctive relief to address the discriminatory actions of the Board of Public Works and Director Wason.

82.     Plaintiffs are entitled to a declaratory judgment declaring that the Board of Public Works and Director Wason have violated their legal rights as further described below.

83.     Plaintiffs are entitled to nominal damages for the violation of their rights.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF

**Violation of the Free Speech Clause of the First Amendment
to the United States Constitution – Viewpoint Discrimination**

84.     The foregoing allegations in paragraphs 1 through 83 above are incorporated herein by reference into this First Claim for relief as if fully set forth.

85.     The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

86.     The Free Speech Clause of the First Amendment applies to the City through the Due Process Clause of the Fourteenth Amendment. *Near v. Minnesota*, 283 U.S. 697, 628 (1931).

87.     The First Amendment protects free speech in part by shielding citizens

from discriminatory government regulation. *Rosenberger v. Rector & Visitors of*

*Univ. of Va.*, 515 U.S. 819, 828–29, (1995).

88.     The public ways where Plaintiffs and others attempted to

communicate their message are traditional public fora. Traditional public fora such

as streets and sidewalks "have immemorially been held in trust for the use of the

public and, time out of mind, have been used for purposes of assembly,

communicating thoughts between citizens, and discussing public questions."

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 152 (1969) (internal citations

omitted).

89.     Plaintiffs' speech and expressive activity is protected by the First

Amendment. "Commenting on matters of public concern" is a classic form of speech

lying at the heart of the First Amendment. *Schenck v. Pro-Choice Network of*

*Western New York*, 519 U.S. 357, 377 (1997).

90.     The First Amendment emphatically prohibits the government from

discriminating against ideas based on the content or viewpoint of protected speech.

The government, "including a municipal government vested with state authority,

has no power to restrict expression because of its message, its ideas, its subject

matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)

(cleaned up).

91.     Content-based laws, including the application of otherwise

constitutional laws in a content-based manner, "are presumptively unconstitutional

and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (cleaned up).

92.     Policies, practices or the actions of municipal officials that discriminates on the basis of viewpoint are presumed unconstitutional.

93.     Plaintiffs and others were impermissibly prohibited from communicating their message when Defendants prohibited Plaintiffs from painting their message on the public streets but permitted similar messages by others to be painted on the public streets or to otherwise encroach on public right-of-ways. The Board's enforcement of its Encroachment Policy to censor the message of Plaintiffs is impermissibly content and viewpoint based. The application of the Board's Encroachment Policy to Plaintiffs therefore unconstitutionally discriminates against Plaintiffs' speech based on its content and Plaintiffs' viewpoint.

94.     By prohibiting Plaintiffs from communicating their message in their desired way, the Defendants' actions also constitute an impermissible prior restraint.

95.     There are no guidelines governing the unbridled discretion of City officials and prohibiting them from discriminating against viewpoints when enforcing the Encroachment Policy.

96.     The application of the Encroachment Policy to Plaintiffs serves no legitimate, or compelling, government interest, and Defendants lack any evidence or sufficient evidence to demonstrate the existence of such an interest.

97.     The application of the Encroachment Policy to Plaintiffs is not narrowly tailored to further any government interest, and is not the least restrictive means of achieving any alleged government interest.

98.     The application of the Encroachment Policy to Plaintiffs suppresses substantially more speech than is necessary to further any alleged government interest.

99.     Plaintiffs do not have any, much less ample, alternative channels to communicate their desired message.

100.    City officials acted under color of state law when enforcing the Encroachment Policy against the Plaintiffs.

101.    The City and its Board of Public Works have a policy and practice of enforcing the Encroachment Policy against speech it disagrees with and not enforcing it against speech it prefers.

102.    The Encroachment Policy is unconstitutional as applied to Plaintiffs' speech under any applicable standard of scrutiny.

103.    Accordingly, Defendant's enforcement of the Encroachment Policy against Plaintiffs violates the First Amendment of the United States Constitution.

104.    Therefore, Defendants' enforcement of the Encroachment Policy against Plaintiffs' speech unconstitutionally infringes on Plaintiffs' rights, thereby entitling Plaintiffs to the belief requested below under 42 U.S.C. § 1983.

105.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

24

## SECOND CLAIM FOR RELIEF

**Violation of Article 1, Section 9 of the Indiana Constitution – Freedom of Thought, Opinion, Speech, Writing, and Printing on Any Subject**

106.    The foregoing allegations in paragraphs 1 through 105 above are incorporated herein by reference into this Second Claim for relief as if fully set forth.

107.    Article 1, Section 9 of the Indiana Constitution provides:

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

108.    Like the Free Speech Clause of the U.S. Constitution, Article 1, Section 9, applies not only to legislative activity but to the activities of all branches and levels of Indiana government. *Cantrell v. Morris*, 849 N.E.2d 488, 492-93 (Ind. 2006). Accordingly, Article 1, Section 9 applies to the City and the actions of its Board of Public Works and Director of Public Works.

109.    Article 1, Section 9 sets forth free speech protections that are in some respects broader than the free speech clause of the First Amendment to the U.S. Constitution. *See, e.g., Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 471 (1999) ("Article I, section 9, is even more emphatic than the First Amendment in prohibiting any law 'restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever'") (Boehm, J., concurring); *Price v. State*, 622 N.E.2d 954, 958 (Ind. 1993) (Indiana's

25

disorderly conduct statute was not unconstitutional under federal constitution but conviction under it could not be supported under Indiana Const. Art. 1, Sec. 9).

110.    As Section 9 "extends to 'any subject whatever' . . . it is difficult to imagine a topic it does not cover." *Whittington v. State*, 669 N.E.2d 1363, 1368 (Ind. 1996). And, Section 9 "reaches every conceivable mode of expression." *Id*.

111.    Unlike the First Amendment, Indiana's "right to speak clause articulates a liberty interest, not an equality interest. It protects against *restriction* of expressive activity, not *discrimination* because of content or viewpoint." *Whittington*, 669 N.E.2d at 1368 (emphasis original).

112.    "The right to speak clause focuses on the restrictive impact of state action on an individual's expressive activity. At a minimum, the clause is implicated when the state imposes a direct and significant burden on a person's opportunity to speak his or her mind, in whatever manner the speaker deems most appropriate." *Whittington*, 669 N.E.2d at 1368.

113.    "The right to speak is qualified . . . by § 9's responsibility clause, which provides that 'for the abuse of that right, every person shall be responsible[;]' . . . [t]he responsibility clause expressly recognizes the state's prerogative to punish expressive activity that constitutes an 'abuse' of the right to speak." *Whittington*, 669 N.E.2d at 1368.

114.    "[I]f a claimant demonstrates that the right to speak clause is implicated, he or she retains the burden of proving that the State could not

reasonably conclude that the restricted expression was an 'abuse.'" *Whittington*, 669 N.E.2d at 1369.

115.   "One way a claimant can try to meet this burden is to show that his or her expressive activity was political. If a claimant succeeds in that attempt, the State must demonstrate that its action has not materially burdened the claimant's opportunity to engage in political expression." *Whittington*, 669 N.E.2d at 1369.

116.   "This approach reflects [Indiana's] recognition that political expression is often beyond the scope of the delegated police power." *Whittington*, 669 N.E.2d at 1369.

117.   Article 1, "§ 9 enshrines pure political speech as a core value." *Price*, 622 N.E.2d at 963.

118.   Therefore, Article 1, Section 9 forbids the City from "impos[ing] a material burden upon the free exercise of political speech." *Price,* 622 N.E.2d at 963.

119.   However, Article 1, Section 9 is not limited to speech characterized as political as it extends to "any subject whatever" and "reaches every conceivable mode of expression." *Whittington*, 669 N.E.2d at 1368.

120.   Importantly, a municipal government is without authority to burden its residents' speech merely because some may be offended by it.

121.   Applying Article 1, Section 9, the Indiana Supreme Court has observed:

> Whenever the state dictates the means by which political opinion may be voiced . . . it teeters on the edge of its authority. The machinery of democracy produces a sonorous cacophony, not a drone. . . 'you cannot limit free speech to polite criticism, because

27

> the greater a grievance the more likely men are to get excited about
> it.' . . . the efficacy of political speech often depends upon its ability
> to jar and galvanize.

*Price*, 622 N.E.2d at 963 (citations omitted).

122. The All Lives Matter Street Mural to be erected on East Kirkwood Avenue in front of the Von Lee Building as approved by the IU administration was Plaintiffs' chosen mode of expression.

123. By interfering with Plaintiffs' chosen method of expression and restricting them from erecting the street mural approved by the IU administration the City imposed a material burden upon Plaintiffs' expression and by imposing a permitting requirement on Plaintiffs the City engaged in prior restraint.

124. The City is unable to demonstrate that its actions have not materially burdened the Plaintiffs' opportunity to engage in political expression.

125. Further, regardless of whether the Plaintiffs' street mural is considered political expression, the City is unable to demonstrate that Plaintiffs' expression constituted an "abuse" or that the steps taken by the City to prevent Plaintiffs' from erecting the street mural was a legitimate exercise of the City's police power because the City did not reject, but approved, the street mural proposed by other similarly situated individuals.

126. Accordingly, the City's signage rules, as applied to Plaintiffs, place an intolerable material burden on Plaintiffs' free speech rights in violation of Article 1, Section 9 of the Indiana Constitution.

127.    WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

### THIRD CLAIM FOR RELIEF

### Violation of Article 1, Section 23 of the Indiana Constitution – Equal Privileges and Immunities

128.    The foregoing allegations in paragraphs 1 through 127 above are incorporated herein by reference into this Third Claim for relief as if fully set forth.

129.    Article 1, Section 23 of the Indiana Constitution provides:

> The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.

130.    "The requirements of Article 1, Section 23 'govern not only state statutes, but also the enactments and actions of county, municipal, and other governmental agencies and their equivalents.'" *Paul Stieler Enterprises, Inc. v. City of Evansville*, 2 N.E.3d 1269 (Ind. 2014) (citation omitted); *see also Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 199 (2016) (Section 23 "applies to municipal ordinances as well as state statutes").

131.    For instance, an early application of Section 23 was to invalidate a City of Rushville municipal ordinance which attempted to "grant privileges to the citizens of Rushville, which are not equally and upon the same terms open to all citizens." *Graffty v. City of Rushville*, 8 N.E. 609, 612 (Ind. 1886).

132.    More recently, the Indiana Supreme Court relied upon Section 23 to invalidate "an Evansville ordinance expanding the city's smoking ban to bars and restaurants but exempting its only riverboat casino." *Stieler*, 2 N.E. 3d at 1271.

133.   Therefore, Article 1, Section 23 applies to the City and to the actions of the City, the Board and the Director of Public Works.

134.   Article 1, Section 23 of the Indiana Constitution has been given robust application to ensure that *equal* privileges and immunities be extended to Indiana citizens in a long line of Indiana cases, and Indiana's assurance of equal privileges and immunities has in many cases extended far beyond the due process and equal protection guarantees in the federal constitution.

135.   "There are striking textual differences between [Article 1, Section 23 of the Indiana Constitution and the Fourteenth Amendment to the U.S. Constitution]. The Fourteenth Amendment prohibits laws which "abridge" privileges or immunities, whereas Section 23 prohibits laws which "grant" unequal privileges or immunities." *Collins v. Day*, 644 N.E.2d 72, 74 (Ind. 1994).

136.   The Indiana Supreme Court has therefore concluded that "Section 23 should be given independent interpretation and application" from the Fourteenth Amendment. *Collins*, 644 N.E.2d at 75.

137.   Indiana's "independent state privileges and immunities jurisprudence . . . extend[s] protection to all Indiana citizens in addition to that provided by the federal Fourteenth Amendment." *Collins* 644 N.E.2d at 81.

138.   In *Collins v. Day* the Indiana Supreme Court recognized at least three independent lines of cases arising from Article 1, Section 23, to include:

> (1)   "cases which have applied federal equal protection methodology to state Section 23 issues,"

(2)  cases "focus[ing] upon the nature of the classifications of citizens upon which the legislature is basing its disparate treatment" and requiring "that the basis of such classification must 'inhere in the subject matter'" and

(3)  cases focusing upon "the need for uniformity and equal availability of the preferential treatment for all persons similarly situated." *Collins*, 644 N.E.2d at 78-79.

139.   Unlike under the Fourteenth Amendment, "[t]he resolution of Section 23 claims does not require an analytical framework applying varying degrees of scrutiny for different protected interests." *Collins*, 644 N.E.2d at 80.

140.   Instead, "[t]he protections assured by Section 23 apply fully, equally, and without diminution to prohibit any and all improper grants of unequal privileges or immunities, including not only those grants involving suspect classes or impinging upon fundamental rights but other such grants as well." *Collins*, 644 N.E.2d at 80.

### Disparate treatment resulting from a classification must be reasonably related to inherent characteristics which distinguish the unequally treated classes

141.   Under Section 23, where the government "singles out one person or class of persons to receive a privilege or immunity not equally provided to others, such classification must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing

characteristics." *Collins*, 644 N.E.2d at 78-79; *accord Myers v. Crouse-Hinds Div. of Cooper Industries, Inc.*, 53 N.E.3d 1160, 1165 (2016); *Paul Stieler Enterprises, Inc. v. City of Evansville*, 2 N.E.3d 1269, 12775 (Ind. 2014).

142.   The City allowed Joa'Quinn Griffin, Tiera Howleit, the Black Collegians, and others associated with them (the "BLM Street Mural Group") to paint a street mural on a public right-of-way of the City on the IU campus.

143.   However, the City refused to permit Kyle Reynolds and the IU chapter of Turning Point USA and others associated with them (the "ALM Street Mural Group") to paint a street mural on a public right-of-way of the City on the IU campus.

144.   There exist no permissible distinctive, inherent characteristics which rationally distinguish the BLM Street Mural Group from the ALM Street Mural Group or which justify the BLM Street Mural Group having the privilege of painting a street mural and the ALM Street Mural Group being denied that privilege.

**Preferential treatment must be uniformly applicable and equally available to all persons similarly situated**

145.   A separate and independent requirement of Section 23 is that, "any privileged classification must be open to any and all persons who share the inherent characteristics which distinguish and justify the classification, with the special treatment accorded to any particular classification extended equally to all such persons." *Collins*, 644 N.E.2d at 79.

146.   The City created a privileged classification of students and/or a student group or groups from IU who were permitted to paint a street mural on a public right-of-way on the IU campus upon approval of the planned mural by the IU administration.

147.   Turning Point USA and Kyle Reynolds lacked no relevant and inherent characteristics which distinguished and justified the special treatment given the BLM Street Mural Group.

148.   However, Defendants refused to allow Plaintiffs Turning Point USA and Kyle Reynolds to paint a street mural on a public right-of-way on the IU campus after approval of the planned mural by the IU administration.

149.   The City is unable to demonstrate a sufficiently compelling reason to reject the street mural proposed by similarly situated individuals of other races.

150.   Accordingly, for the foregoing reasons the City's actions violated Article 1, Section 23 of the Indiana Constitution.

151.   WHEREFORE, Plaintiffs respectfully request that the Court grant the relief set forth hereinafter in the prayer for relief.

## IRREPARABLE INJURY ALLEGATIONS

152.   "The loss of First Amendment freedoms ... unquestionably constitutes irreparable injury." *New Hope Family Servs, Inc. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020) (internal quotation marks omitted).

153.   Likewise, the loss of other freedoms and liberties guaranteed by the state and federal constitutions constitutes irreparable injury.

154.    As a result of Defendants' policies, practices, procedures, deliberate actions, failures and omissions, Turning Point USA and Kyle Reynolds have suffered and will continue to suffer immediate and irreparable injury in the form of deprivation of their constitutional rights.

155.    Turning Point USA and Kyle Reynolds have no plain, adequate, and complete remedy at law to redress the wrongs described herein.

156.    Monetary damages are not sufficient to compensate for continuing violation of their Constitutional rights, restriction of their speech and denial of the equal protection of the law.

157.    Turning Point USA and Kyle Reynolds will continue to suffer irreparable injury unless the Court promptly grants the injunctive relief requested.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff requests that the Court grant the following relief:

1.    Declaring that Defendants Encroachment Policy violates the free speech protections of the state and federal constitutions;

2.    Declaring that the Defendants' Encroachment Policy constitutes a prior restraint forbidden under the state and federal constitutions;

3.    Declaring Defendant violated the First and Fourteenth Amendments to the U.S. Constitution by failing to permit Plaintiffs to paint a street mural depicting "All Lives Matter" in Bloomington, Indiana, on East Kirkwood Avenue in front of the Von Lee building on the Indiana University campus as approved by Indiana University officials;

4.    Declaring Defendant violated Article I, Section 9 and Article 1, Section 23 of the Indiana Constitution by failing to permit Plaintiffs to paint a street mural depicting "All Lives Matter" in Bloomington, Indiana, on

East Kirkwood Avenue in front of the Von Lee building on the Indiana University campus as approved by Indiana University officials;

5.    Issuing Preliminary and Permanent Injunctions requiring Defendant to permit Plaintiffs to paint a street mural depicting "All Lives Matter" in Bloomington, Indiana, on East Kirkwood Avenue in front of the Von Lee building on the Indiana University campus as approved by Indiana University officials;

6.    Issuing Preliminary and Permanent Injunctions enjoining Defendants from enforcing their Encroachment Policy in a content- and viewpoint-discriminatory manner;

7.    Awarding Plaintiffs nominal and/or punitive damages for the violations of their constitutional rights;

8.    Awarding the Plaintiffs their costs, expert witness fees, and attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable authority; and

9.    Awarding all other just and proper relief.

Dated: February 23, 2022

Respectfully submitted,

**KROGER, GARDIS & REGAS, LLP**

/s/ William Bock, III
William Bock, III, Atty. No. 14777-49

ATTORNEY FOR PLAINTIFFS

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000