**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **INDIANA UNIVERSITY CHAPTER OF TURNING POINT USA, and KYLE REYNOLDS,**<br><br>   **Plaintiffs,**<br><br> **vs.**<br><br>**CITY OF BLOOMINGTON, INDIANA, ADAM WASON, in his official capacity as Director of Public Works for the City of Bloomington, and KYLA COX DECKARD, BETH H. HOLLINGSWORTH and DANA HENKE in their official capacities as members of the Board of Public Works of the City of the Bloomington, Indiana,**<br><br>   **Defendants.** | **Cause No. 1:22-cv-00458-SEB-TAB** |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**

**MOTION FOR PRELIMINARY INJUNCTION**

## CONTENTS

Table of Authorities ..................................................................................................iii

Introduction ............................................................................................................ 1

Background .............................................................................................................. 2

Legal Standard ....................................................................................................... 7

Argument ................................................................................................................. 7

    I.   Plaintiffs have a likelihood of success on the merits of their claims. ........... 7

        A.   Defendants engaged in viewpoint discrimination by allowing the Black Collegians' BLM mural but not Turning Point USA's "All Lives Matter" mural ............................................................................... 8

        B.   Defendants' right-of-way art policy grants officials unbridled discretion to discriminate based on viewpoint. ..................................... 10

        C.   Defendants' right-of-way art policy violates Indiana's Equal Privileges and Immunities Clause. ........................................................ 13

    II.  Plaintiffs meet the remaining requirements for a preliminary injunction.. 16

Conclusion ............................................................................................................. 17

TABLE OF AUTHORITIES

## Other Authorities

*City of Lakewood v Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988) ................................................................ 10, 11, 12

*Collins v. Day,*
    644 N.E.2d 72 (Ind. 1994) ........................................................ 2, 14, 15

*DeBoer v. Village of Oak Park,*
    267 F.3d 558 (7th Cir. 2001) .................................................. 11, 12, 13

*Forsyth Cnty. v. Nationalist Movement,*
    505 U.S. 123 (1992) ............................................................................ 11

*Iancu v. Brunetti,*
    139 S. Ct. 2294 ................................................................................ 9, 15

*Ind. Family and Soc. Servs. Admin. v. Walgreen Co.,*
    769 N.E.2d 158 (Ind. 2002) .............................................................. 7, 9

*Joelner v. Vill. of Wash. Park, Ill.,*
    378 F.3d 613 (7th Cir. 2004) ............................................................... 16

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers,*
    994 F.3d 602 (7th Cir. 2021) ......................................................... 1, 8, 9

*McGuire v. State,*
    132 N.E.3d 438 (Ind. Ct. App. 2019) .................................................. 15

*Myers v. Crouse-Hinds Div. of Cooper Indus., Inc.,*
    53 N.E.3d 1160 (Ind. 2016) ..................................................... 14, 15, 16

*Paul Stieler Enters., Inc. v. City of Evansville,*
    2 N.E.3d 1269 (Ind. 2014) ................................................................... 14

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ............................................................................ 8, 9

*Planned Parenthood of Ind. v. Carter,*
    854 N.E.2d 853 (Ind. Ct. App. 2006) ............................................... 7, 16

*Roach v. Stouffer,*
    560 F.3d 860 (8th Cir. 2009) ............................................................... 12

*Rosenberger v. Rector and Visitors of the University of Virginia,*
515 U.S. 819 (1995) ............................................................................ 1, 9, 10

*Sadler v. State ex rel. Sanders,*
811 N.E.2d 936 (Ind. Ct. App. 2004) .......................................................... 16

*Shuttlesworth v. City of Birmingham, Ala.,*
394 U.S. 147 (1969) ................................................................................ 2, 11, 12

*Southworth v. Bd. of Regents of Univ. of Wisc. Sys.,*
307 F.3d 566 (7th Cir. 2002) ........................................................................ 10

*Sperry v. Hutchinson Co. v. State,*
122 N.E. 584 (Ind. 1919) ............................................................................... 14

## **Regulations**

Article 1, Section 23 of the Indiana Constitution ........................................... 2, 13, 14

Note:  This is Plaintiff's refiled Memorandum in Support of Motion for Preliminary Injunction that was originally filed in the State court proceedings on February 23, 2022 and served on Defendants on February 25, 2022 prior to removal.

### INTRODUCTION

The government cannot discriminate against the speech of private actors based on a speaker's viewpoint. *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995). Viewpoint neutrality applies whether the speech takes place in a street, sidewalk, park, or even on "public property which is . . . open only for selective access." *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021). But last summer, the City of Bloomington did just that. The City granted permission for a "Black Lives Matter" mural but denied permission for a virtually identical "All Lives Matter" mural.

Plaintiff Indiana University Chapter of Turning Point USA ("TPUSA") seeks to identify, educate, train, and organize students to promote principles of freedom, free markets, and limited government. In July 2021, TPUSA and its campus coordinator, Kyle Reynolds, tried to create a mural stating, "All Lives Matter" on one of the city-owned streets running through Indiana University (the "University"). Plaintiffs submitted this request shortly after other students at the University designed, painted, and funded a "Black Lives Matter" mural on a street running through campus. Defendants sent Plaintiffs through a bureaucratic morass with shifting requirements that ultimately ended in a denial. Worse, during this same time period Defendants granted permission for the nearly-identical BLM mural so quickly that they did not officially approve the mural until a month after it was completed. The First Amendment forecloses such viewpoint discrimination.

Viewpoint-neutrality also requires Defendants to restrain the discretion of officials through "narrow, objective, and definite standards." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969). But here, Defendants have virtually no standards to prevent them from imposing different requirements based on a speaker's views. That Defendants fast-tracked the BLM mural under one set of standards but sent Plaintiffs in circles under conflicting requirements shows this.

Finally, Article 1, Section 23 of the Indiana Constitution prohibits the government from unequally granting benefits to private persons. *Collins v. Day*, 644 N.E.2d 72, 80 (Ind. 1994). But that is what Defendants are doing here by allowing some citizens to express their views on government property but not others.

For these reasons, more fully described below, Plaintiffs seek an order preliminarily enjoining Defendants from enforcing the right-of-way art policy against Plaintiffs, thus permitting them to paint their desired "All Lives Matter" mural.

## BACKGROUND

### A.   The City approves a Black Lives Matter mural and other expressive activity on its property under its right-of-way Encroachment Policy

In early July 2021, the City approved a "Black Lives Matter" street mural. The students worked with Thomas Morrison, the Indiana University Capital Planning and Facilities Vice President, to choose a location for the BLM mural. Exs. 1B, 1D. But the students sought ultimate approval from the City. Ex. 1B. Director Wason, with the University's approval, authorized the students to paint the BLM mural on Jordan Avenue (now Eagleson Avenue), which runs through the

University campus. Eagleson Avenue is under the control and supervision of the City's Board of Public Works. Compl. ¶¶ 52–54.

Students at the University and the Black Collegians student group designed, painted, and funded the BLM mural. Ex. 3A at 1–2. "The mural was mostly funded through the IU Funding board," which in turn takes money from mandatory student fees. *Id.* at 2. On July 5, 2021, the Black Collegians expressed their excitement to start creating their mural: "Construction begins for our Black Lives Matter Street Mural on Jordan Avenue this Morning. What an exciting time! #BlackCollegiansInc #blacklivesmatter." Ex. 3E. The students worked directly with "artists Katie Scott, Olivia Roath and Ronny Booker to bring an all-inclusive Black Lives Matter mural to IU Bloomington's campus." Ex. 3D at 2. After the students finished the mural, the University promoted the students' work on its website and official Twitter feed. Ex. 3F ("Thank you to the Black Collegians group for bringing this mural to life on our campus."); Ex. 3D. The University's Provost tweeted, "[t]he Black Collegians finished the amazing Black Lives Matter mural on Jordan Ave. If you're on the @IUBloomington campus, check it out between @NMBCC_IU and @IU_Groups buildings!" Ex. 3G. Several news articles also detailed the students' efforts and leadership to make their idea a reality. Exs. 3A, 3B, 3C, 3D.

Nearly one month after students completed the BLM mural, Director Wason submitted an official request to the Board of Public Works ("the Board") for a permit for the BLM mural's "[e]ncroachment" on the "use of a public right of way." Ex. 2C at 29. Director Wason urged the Board to approve it to show "support for our Black

and Brown residents who have been fighting for justice." *Id.* He also noted that the request should have been "before the Board" at least one month before the BLM mural was completed. *Id.* The Board then retroactively approved the BLM mural as an encroachment. Ex. 2D at 2.

The City has a policy and practice of approving expressive activity like the BLM mural on public rights-of-way. Under this right-of-way art policy, the City has approved many types of expressive activity, including two other "Black Lives Matter" murals on other streets, Ex. 2A at 8–10, Ex. 2B at 8–13, and a University homecoming parade and student organization showcase, Ex. 2C at 17–28, Ex. 2E at 4–23. Last September, the Board even allowed Middle Way House, an emergency shelter and advocacy group for survivors of sexual violence, to wrap handmade blankets around trees and lamp posts along public rights-of-way. Ex. 2C at 7–1. The Board approved these blankets to be displayed in public rights-of-way for six months, until March  022. Ex. 2C at 15-16

## B.    Plaintiffs seek to create an All Lives Matter mural

On the heels of the BLM mural, Plaintiffs Kyle Reynolds and TPUSA sought to create a similar mural which stated, "All Lives Matter." Turning Point USA is a national organization that seeks to identify, educate, train, and organize students to promote principles of freedom, free markets, and limited government. Ex. 5 at 1. Among these principles is the belief that all lives matter. *Id.*; Ex. 1A. Plaintiffs also believe that the "Black Lives Matter" statement is contradictory to Plaintiffs' core

principles. Ex. 1A. Thus, Plaintiffs sought to express their own view that "All Lives Matter" by creating a similar mural. *Id.*

On July 20, Plaintiff Reynolds reached out to the University to get permission for the mural. Ex. 1A. A week later, the office directed him to Vice President Thomas Morrison. *Id.* Plaintiff Reynolds asked Morrison about a permit to create the ALM mural. *Id.*; Ex. 1B. Morrison replied that the "BLM mural was created on a street owned by the City of Bloomington. Thus, the City was the entity that ultimately approved the mural," and Morrison "direct[ed] [Reynolds] to the City of Bloomington" for further inquiry. Ex. 1B.

Plaintiff Reynolds then e-mailed Director Wason, expressing his and TPUSA's desire to create the ALM mural and requesting a permit to do so. Ex. 1D. Director Wason routed Reynolds back to Vice President Morrison. *Id.* Morrison explained that because Wason told Reynolds to "work with the IUB President's Office," Reynolds' request for the ALM mural was now "delegated to [Morrison]," in the same way "as it was with the BLM group." Ex. 1B. Vice President Morrison asked Reynolds to send some location ideas and a graphic for the ALM Mural. *Id.*

As requested, Reynolds sent Vice President Morrison the proposed graphic for the ALM mural and some ideas for potential locations. *Id.*; Ex. 1F. Morrison told Reynolds, "the graphic and sizing look good on my end," for the ALM mural and recommended Reynolds "relay to the City that IU is ok with the East Kirkwood location," a public right-of-way running through the University, for the ALM mural. *Id.* Morrison also added that "[it] is the City's ultimate approval" that mattered and

5

that his input mattered only because the City "consults with us as an adjacent property owner." *Id.*

### C.    The City denies Plaintiff's All Lives Matter mural

On August 3, Reynolds e-mailed Director Wason, explaining that the ALM mural "was approved by the IUB President's Office, specifically . . . Thomas Morrison." Ex.  1D. That same day, the Board approved Director Wason's request to treat the "Black Lives Matter" mural as a permissible encroachment. Ex. 2C at 29; Ex. 2D at 2.

But one week later, Director Wason responded, "City Legal is who you can speak with." Ex. 1D. Wason added that "Mr. Morrison's office is also not in agreement with your take on IU 'giving permission.'" *Id.* Reynolds then contacted City Attorney Michael Rouker, explaining his conversations with Director Wason and Vice President Morrison. Ex. 1E.

Nearly two weeks later, and after Plaintiff Reynolds sent two follow-up emails, City Attorney Rouker gave a terse denial: "Mr. Reynolds: The City of Bloomington's Board of Public Works approves the placement of art in the public right of way. The City does not take recommendations for art in its right of way from individuals, and, at this time, the City is not considering adding additional art within its right of way." *Id.*

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show by a preponderance of the evidence that (1) the "remedies at law were inadequate, thus causing irreparable harm," (2) he has "at least a reasonable likelihood of success at trial by establishing a *prima facie* case," (3) his "threatened injury outweighed the potential harm to [Defendant] resulting from the granting of an injunction"; and (4) "the public interest would not be disserved" by granting an injunction. *Ind. Family and Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind. 2002). "Where the action to be enjoined is unlawful, . . . . the plaintiff need not make a showing of irreparable harm or a balance of the hardship in his favor." *Planned Parenthood of Ind. v. Carter*, 854 N.E.2d 853, 863–64 (Ind. Ct. App. 2006) (citations omitted).

## ARGUMENT

### I.   Plaintiffs have a likelihood of success on the merits of their claims

Defendants' right-of-way art policy and discriminatory enforcement of that policy violate the First Amendment in two ways. First, the City engaged in viewpoint discrimination by permitting University students to paint the "Black Lives Matter" mural on a city street running through the University's campus while simultaneously denying the same permission to students who desire to create a similar "All Lives Matter" mural. The City fast-tracked one mural and approved it after it was painted, but during the same time period sent Plaintiff Reynolds in a bureaucratic circle and gave him contradictory standards before ultimately denying

his request. This is more than enough to show a prima facie case of viewpoint discrimination.

Second, the City's policy also fails to be viewpoint-neutral because it has virtually no standards to prevent City officials from discriminating against students based on viewpoint. That officials here treated the BLM mural differently from the ALM mural and did so under the guise of inconsistent and ever-shifting requirements proves this.

The policy also violates Indiana's Equal Privileges and Immunities Clause because Defendants' policy discriminates against students like Plaintiffs who express disfavored viewpoints.[1]

### A.    Defendants engaged in viewpoint discrimination by allowing the Black Collegians' BLM mural but not Turning Point USA's "All Lives Matter" mural

Defendants have a policy and practice of approving and authorizing expressive activity on public rights-of-way. But Defendants denied Plaintiffs access to this forum because of Plaintiffs' viewpoint. The First Amendment unequivocally prohibits this discrimination.

"The amount of access to which the government must give the public for expressive activities, and the standards by which a court will evaluate limitations on those rights, depends on the nature of the forum at issue." *John K. MacIver Inst.*, 994 F.3d at 609 (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S.

---

[1] For purposes of their motion for preliminary injunction, Plaintiffs limit their arguments to their First Amendment claims (Counts I & II) and their Indiana Equal Privileges and Immunities claim (Count VI).

37, 44 (1983)). To this end, courts recognize three types of forums: the traditional public forum, the public forum created by government designation, and the non-public forum. *Id.* Traditional public forums include "[s]treets, sidewalks, and parks, and the quintessential soap box in the public square." *Id.* Designated public forums are "public property that the state has opened for members of the public to use as a place of expressive activity." *Id.* Courts look to "the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.* at 565–66 (cleaned up). In either of these forums, restrictions on speech must not be based on the content of the speech or the viewpoint of the speaker, and content-neutral regulations must be "narrowly tailored to serve a significant governmental interest and [leave] ample alternative channels of communication." *Id.*

But even in non-public forums, "public property which is . . . open only for selective access," *id.*, the government may not engage in viewpoint discrimination: "regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. This is because viewpoint discrimination is "an egregious form of content discrimination," *id.* and is "poison to a free society," *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (Alito, J., concurring).

Here, Defendants created at least a designated public forum through their right-of-way art policy by allowing citizens to express themselves on public property, including other public rights-of-way. *See* Facts Sec. A, *supra.*

9

But regardless of forum, Defendants violated the First Amendment because they engaged in viewpoint discrimination. Most notably, Defendants treated the BLM mural and Plaintiffs' ALM mural with clear inconsistency. The statements, "Black Lives Matter" and "All Lives Matter" represent different viewpoints on the realities and harms of racism. Defendants approved one viewpoint and denied the other even though both sets of speakers were students, sought access to similar city streets running through the University campus, sought to paint murals of similar size and design, and sought to express their viewpoints on racism. The First Amendment does not tolerate this. As *Rosenberger* explained, "[i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." 515 U.S. at 832. Defendants directly defied these words from the Supreme Court by excluding Plaintiffs' views on racism through their "All Lives Matter" mural.

## B. Defendants' right-of-way art policy grants officials unbridled discretion to discriminate based on viewpoint

Defendants also violate the prohibition against viewpoint discrimination because their right-of-way art policy grants unbridled discretion to City officials. As the Seventh Circuit has explained, "the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement." *Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002).

Under this standard, a policy must not leave the "determination of who may speak and who may not . . . to the unbridled discretion of a government official." *City of Lakewood v Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988). This is

required for viewpoint-neutrality because, "without standards governing the exercise of discretion, a government official may decide who may speak and who may not based on the content of the speech or viewpoint of the speaker." *Id.* This causes speakers to self-censor and makes it exceedingly difficult "to distinguish, as applied, between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power." *Id.* at 758.

If a permit scheme involves the "appraisal of facts, the exercise of judgment, and the formation of an opinion," then "the danger of censorship . . . is too great to be permitted." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). (cleaned up). Rather, the restriction must have "narrow, objective, and definite standards." *Shuttlesworth*, 394 U.S. at 151. Regulations that fail to contain such restrictions "vest[ ] the government with virtually unlimited authority" *DeBoer v. Village of Oak Park*, 267 F.3d 558, 572 (7th Cir. 2001) and are "forbid[den]" by the First Amendment. *City of Lakewood*, 486 U.S. at 770.

Defendants' policy falls well short of this standard. Defendants' discriminatory treatment between the two groups of students and their contradictory assertions to Plaintiff Reynolds prove this. Again, Defendant Wason was so eager to grant approval he did not even obtain the necessary permission from the Board of Public Works beforehand. Ex. 2C at 29. Wason also delegated approval of the mural to the University. Ex. 1D. But when Reynolds asked permission for the "All Lives Matter" mural, Defendants ran him around for over a month with broad, conflicting, and confusing requirements, including that he obtain

permission from the Board of Public Works. During the game of bureaucratic hot

potato between Defendants and the University,

> (1)    the University said that the City gives "ultimate approval," Ex. 1A;
>
> (2)    Director Wason said that Reynolds "need[ed] to work with the IUB President's office, as did the other group, in order to get the concept for any murals approved for placement on any streets on campus," Ex. 1D;
>
> (3)    Vice President Morrison said that the City "consult[s] with [IUB] as an adjacent property owner," Ex. 1B;
>
> (4)    Director Wason told Reynolds that he needed "to speak to City Legal" about approval for the mural, Ex. 1D;
>
> (5)    City Attorney Rouker told Reynolds that the "City's Board of Public Works approves the placement of art," Ex. 1E;
>
> (6)    City Attorney Rouker told Reynolds that "the City does not take recommendations for art from individuals, *id.*; and
>
> (7)    City Attorney Rouker told Reynolds "the City is not considering adding additional art within its right of way," *id.*

These fall short of the "narrow, objective, and definite standards" that the

First Amendment requires. *Shuttlesworth*, 394 U.S. at 151. Nor did the City impose

these obstacles on the students seeking the BLM mural. These ever-shifting and

contradictory requirements show that the City has "virtually unlimited authority"

to approve or deny murals. *DeBoer*, 267 F.3d at 572. This policy is even worse than

the regulation struck down in *City of Lakewood*, which allowed the mayor to impose

"other terms and conditions as deemed necessary and reasonable." 486 U.S. at 769.

Instead, the policy here "provides no standards or guidelines whatsoever," *Roach v.*

*Stouffer*, 560 F.3d 860, 869 (8th Cir. 2009), so the City can add, subtract, or modify any conditions it desires.

*DeBoer* also forecloses Defendants' contradictory requirements. There, the Seventh Circuit found that officials wielded unbridled discretion by invoking "confusing and conflicting" requirements to deny the plaintiff access to Village Hall, a government facility, for a prayer assembly. 267 F.3d at 574. The Court found that the policies governing access to Village Hall, particularly the requirement that an activity "benefits the public as a whole," "provide[d] no concrete standards or guideposts by which Village officials c[ould] gauge" compliance with the policy. *Id.* at 573. Nor did the policies contain "further definition[s]" to "give assistance to the officials who must interpret its meaning." *Id.* And when asked by the Court to explain the requirements in the policies, the Court determined that the Village officials offered five different "confusing and conflicting answers." *Id.* at 574. As a result, the Court found that the Village "engage[d] in unconstitutional viewpoint discrimination." *Id.*

In the same way, Defendants offered Plaintiffs seven different "confusing and conflicting" requirements to obtain permission for the ALM mural. Defendants sent Reynolds in circles, passing him to different officials who had different requirements while they simultaneously approved the BLM mural.

## C. Defendants' right-of-way art policy violates Indiana's Equal Privileges and Immunities Clause

Article 1, Section 23 of the Indiana Constitution promises that the Indiana government "shall not grant to any citizen, or class of citizens, privileges or

immunities, which, upon the same terms, shall not equally belong to all citizens." To comply with Section 23, the government action must satisfy two requirements: "First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated class. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Collins*, 644 N.E.2d at 80. This promise applies not only to "state statutes, but also the enactments and actions of county, municipal, and other governmental agencies and their equivalents." *Paul Stieler Enters., Inc. v. City of Evansville*, 2 N.E.3d 1269 (Ind. 2014) (citation omitted).

Section 23 also applies "fully, equally, and without diminution" to all types of privileges and immunities and "does not require an analytical framework applying varying degrees of scrutiny for different protected interests." *id.* at 80. Thus, this Clause protects a broad range of classes and interests. To illustrate, it has invalidated diverse government actions, including an "ordinance expanding the city's smoking ban to bars and restaurants but exempting its only riverboat casino," *Stieler*, 2 N.E.3d at 1271, a statute of limitations for products liability that applied only to a subset of employees injured by asbestos, *Myers v. Crouse-Hinds Div. of Cooper Indus., Inc.*, 53 N.E.3d 1160, 1165–66 (Ind. 2016), and a prohibitory licensing fee that applied only to selling stamps, *Sperry v. Hutchinson Co. v. State*, 122 N.E. 584 (Ind. 1919). *See also Collins*, 644 N.E.2d at 78 (collecting cases). Section 23 also applies even where the government "singles out one person." *Id.* at 78.

Defendants' right-of-way art policy gives preferential treatment to students who express the City's preferred viewpoints, so it fails both prongs of the Section 23 analysis. First, allowing some students to express certain viewpoints but not others through murals is not "reasonably related to inherent characteristics which distinguish the unequally treated class." *Collins*, 644 N.E.2d at 80. There is no rational basis to engage in viewpoint discrimination because a "law that discriminates on the basis of viewpoint collides with the First Amendment." *McGuire v. State*, 132 N.E.3d 438, 442 (Ind. Ct. App. 2019) (quoting *Iancu*, 139 S. Ct. at 2299). And "[v]iewpoint discrimination is poison to a free society." *Iancu*, 139 S. Ct. at 2302 (Alito, J., concurring).

Second, the City has not made access to creating murals "uniformly applicable and equally available to all persons similarly situated." *Collins*, 644 N.E.2d at 80. The City opened up at least some of its property for citizens to paint murals, but it is giving preferential treatment to some of those citizens. In particular, the University students who initiated, painted, and funded the BLM mural are "similarly situated," *Myers v. Crouse-Hinds Div. of Cooper Indus., Inc.*, 53 N.E.3d 1160, 1166 (Ind. 2016), in all relevant respects to Plaintiffs. Both speakers were students, both sought to paint a mural on a street running through the University's campus of similar size and design, and both sought to express viewpoints on the issue of racism in the summer of 2021. Yet the City fast-tracked the BLM mural and, after a lengthy game of political hot potato, denied the ALM mural. The City thus "create[d] a preference, and establishe[d] an inequality among

15

a class of citizens all of whom are equally meritorious, and therefore violate[d] the second *Collins* factor." *Id.*

## II.   Plaintiffs meet the remaining requirements for a preliminary injunction

Since Plaintiffs have shown a reasonable likelihood of success, they also satisfy the remaining factors to obtain a preliminary injunction. First, an "unlawful act constitutes *per se* 'irreparable harm,'" so a plaintiff "need not make a showing of irreparable harm or a balance of the hardship in his favor." *Carter*, 854 N.E.2d at 864 (citation omitted); *accord Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor."). This rule applies here, since Plaintiffs have alleged that the City's policies violate both the Indiana and United States Constitutions.

Likewise, it is always in the public interest to uphold Indiana and United States law. Indiana Courts consistently recognize that "the public interest is not disserved by the issuance of an injunction that requires only that the [Defendants] comply with the clear dictates of the law." *Sadler v. State ex rel. Sanders*, 811 N.E.2d 936, 955–56 (Ind. Ct. App. 2004); *accord Joelner*, 378 F.3d at 620 ("Surely, upholding constitutional rights serves the public interest.") (citation omitted).

CONCLUSION

For the reasons above, the Court should grant Plaintiffs' Motion for

Preliminary Injunction.

Dated: March 10, 2022

Respectfully submitted,

**KROGER, GARDIS & REGAS, LLP**

/s/ William Bock, III
William Bock, III, Atty. No. 14777-49

ATTORNEY FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2022, I filed the foregoing *Plaintiff's*

*Memorandum in Support of Motion for Preliminary Injunction* electronically with

the Clerk of the Court.  Notice of this filing will be sent to the following by operation

of the Court's electronic filing system.  Parties may access this filing through the

Court's system.

Liberty L. Roberts
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
lroberts@cchalaw.com

/s/ William Bock, III
William Bock, III

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000