UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA UNIVERSITY CHAPTER<br>OF TURNING POINT USA, and<br>KYLE REYNOLDS,<br><br>        Plaintiffs,<br>  v.<br><br>CITY OF BLOOMINGTON, INDIANA,<br>ADAM WASON, in his official capacity as<br>Director of Public Works for the City of<br>Bloomington, and KYLA COX DECKARD,<br>BETH H. HOLLINGSWORTH and DANA<br>HENKE in their official capacities as members<br>of the Board of Public Works of the City of<br>the Bloomington, Indiana,<br><br>        Defendants. | Case No. 1:22-cv-00458-SEB-TAB |

**DEFENDANTS' BRIEF IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## I.  Introduction

Since mid-2020 our country has engaged in a national conversation about racial justice and equity. Cities across the country joined in that conversation by painting murals, installing and removing public art, and renaming streets (among other things). The City of Bloomington ("the City") is no exception. Beginning in May 2020, the City passed a resolution condemning racism. In furtherance of that resolution, the City worked with local groups and volunteers to paint Black Lives Matter murals on the surface of three city streets. The City endorsed the use of public art to convey the City's message that it condemns all forms of bigotry, racism and hatred.

This Court should deny Plaintiffs' request for a preliminary injunction because the City's refusal to allow Plaintiffs to paint its own street mural is not a violation of the United States Constitution or the Indiana Constitution. The Black Lives Matter street mural project was

1

government speech. When the government speaks, it is not required by the First Amendment's Free Speech Clause to remain viewpoint neutral. Rather, the government may express its own policy preferences. Additionally, the Privileges and Immunities Clause of the Indiana Constitution is inapplicable to this case as there is no act of the General Assembly that is at issue in this case and Plaintiffs are not similarly situated to the artists who were selected to design and paint the Black Lives Matter street murals.

Plaintiffs' fail to demonstrate the key element to a First Amendment preliminary injunction case – a strong likelihood of success on the merits. Plaintiffs' Motion for Preliminary Injunction should be denied.

## II. Relevant Facts Not in Plaintiffs' Brief

On May 6, 2020, the City passed a resolution "denounce[ing] and condemn[ing] hate based on racial, social, and cultural bias and hold[ing] up values of peace, respect, inclusivity, and equity." [Exhibit 100 – Resolution 20-06]

On July 10, 2020, a group of City employees and appointees to a City advisory council known as the Banneker Community Center Advisory Committee, or the BCCAC[1], met to discuss the feasibility of developing Black Lives Matter street murals at the Banneker Community Center[2] and other locations in the City. [Exhibit 115 – Affidavit of Erik Pearson, ¶ 4-5] That July 10, 2020, group discussion was based on a suggestion that came from BCCAC members, specifically members Ja Quita Roberts and Nichelle Whitney. [Exhibit 115, ¶ 7] As of July 10, 2020, several City of Bloomington Departments – including the Office of the Mayor, Department of Public

---

[1] The members of the BCCAC are appointed by the City of Bloomington Board of Park Commissioners.
[2] The Banneker Community Center is a building owned by the City of Bloomington and used by the City's Parks and Recreation Department for City programs and Services. facility, which is owned by the City of Bloomington.

2

Works, Street Department, Community and Family Resources, Safe and Civil City, and Economic and Sustainable Development – had offered support for and endorsement of a Black Lives Matter street mural project. [Exhibit 115, ¶ 8]

On July 10, 2020, that group of City employees and appointees to the City's Advisory Council decided it was important for the City to commission and install multiple murals around Bloomington to recognize historical Black spaces (like the Banneker Community Center) and in other areas of increased public visibility to serve as a visual message to the non-BIPOC (Black, Indigenous, and people of color) community. [Exhibit 115, ¶ 9] It was decided that the City of Bloomington needs to "own" the projects in funding and purpose to show the BIPOC community its commitment to equity and justice. [Exhibit 115, ¶ 10] The goal was to engage the BCCAC members and the Enough is Enough (a protest organization) to ensure that the projects were done correctly and with respect for the BIPOC community. [Exhibit 115, ¶ 11] At that initial meeting, three locations for the Black Lives Matter street murals were discussed, namely (1) Elm Street in front of the Banneker Community Center gymnasium; (2) Kirkwood Avenue/the Courthouse square area (with particular attention to the area near People's Park to recognize the firebombing of The Black Market in 1968); and (3) Jordan Avenue. [Exhibit 115, ¶ 12]

In the July 10, 2020 meeting, discussion was had as to how the City should share information with the public about the project, and the it was determined that the City should issue press releases about the Black Lives Matter street mural project and that those press releases should coincide with two other key events that were anticipated or in process, namely, (1) the City's

formal policy actions in support of equity and justice for Black residents, and (2) the renaming of Jordan Avenue[3]. [Exhibit 115, ¶14]

The Black Lives Matter street mural near the Banneker Community Center was selected to be the first mural to be created. [Exhibit 115, ¶15] The group discussed the need to use a certain type of paint, and the need to take into consideration the level of traffic and design type to determine whether high traffic paint or exterior paint would be used. [Exhibit 115, ¶16] At the conclusion of the meeting, the City employees and the members of the City's Advisory Council were assigned action items to move the Black Lives Matter street mural project forward, including exploring funding sources, paint types, local artists, and communicating with IU administration, student groups at IU, and engaging other community partners in the project. [Exhibit 115, ¶ 17]

Over the next several months, the BCCAC took the lead in developing the project's next steps; determining the locations for the murals (focusing on Elm Street, Kirkwood Avenue /the Courthouse square area, and Jordan Avenue); developing a timeline for the project; determining the type of paint and the paint's impact on the design of the mural; the proposed content for the City's press release announcing the project; and the policy initiatives the BCCAC wanted to recommend to provide a more equitable and justice-driven environment for BIPOC residents. [Exhibit 115, ¶ 21-23]

---

[3] The City renamed Jordan Avenue south of 17th Street as "Eagleson Avenue." The name "Eagleson" was honor four generations of the Eagleson family, starting with Halson Vashon Eagleson who was born a slave in 1851, and who arrived in Bloomington in the 1880s and became a prominent barber, his five children attended Indiana University, and opened a home for "colored" orphans in Unionville. The Eagleson name was used to replace the "Jordan" family name. Jordan Avenue was previously named in honor of David Starr Jordan, whose "views on eugenics and racial differences conflict []with the City's commitment to promote inclusion and equity in the community...." [Exhibit 3C (submitted with Plaintiffs' Brief)]

As part of the Black Lives Matter street mural project development phase, the project was presented to the Parks Department and the Parks Board, where there was detailed discussion of the project. [Exhibit 102, Exhibit 103, and Exhibit 104 p. 4-5] The Board discussed that the City "needs to take the onus of funding [the Black Lives Matter street mural project] to show the BIPOC community its commitment to equality and justice." [Exhibit 104, p. 5] During that meeting, Sean Strarowitz, City of Bloomington Assistant Arts Director, explained the goal was to have three Black Lives Matter street murals, and noted that there were on-going conversations to Enough is Enough and with Indiana University in an effort to select a location and artist for the third mural. [Exhibit 104, p. 5] The Parks Board recognized that the "funding mechanism is a bit of a challenge" and a member of the BCCAC express that she felt there were "many hoops to jump through" and "the process in general is a big hurdle." [Exhibit 104, p. 5] After the detailed discussion, the Parks Board unanimously approved the Black Lives Matter street mural project. [Exhibit 104, p. 6]

On September 23, 2020, the City passed a resolution "endors[ing] the painting of two Black Lives Matter murals – one on Elm Street in front of the Banneker Center, or at such other nearby location as the City and the Banneker Community Center Advisory Council agree is appropriate, and one at a downtown location to be determined, and support[ing] the City's use of existing funds to pay the artist(s) hired to design and paint the mural." [Exhibit 105 – Resolution 20-16] That Resolution "call[ed] on the Board of Public Works to permit th[e] use of a public right of way and join in th[e] public display of support for [] Black and Brown residents who have been fighting for justice and equality for far too long." [Exhibit 105]

On September 29, 2020, Sean Starowitz, the Assistant Director of Arts for the City of Bloomington, presented the Board of Works with Resolution 2020-50 for a right-of-way encroachment for the painting of a Black Lives Matter mural on the surface of Elm Street between

7th and 8th Streets. [Exhibit 106, p. 2] Starowitz explained that the Black Lives Matter street mural project was "a collaboration between the Board of Parks Commissioners, Banneker Community Center Advisory Council, Bloomington Arts Commission, the Office of the Mayor, Community and Family Resources Department and Bloomington Common Council." [Exhibit 106, p. 2] Starowitz explained that in addition to the encroachment he was requesting at that time, the City was "also planning an additional mural somewhere downtown, pending public engagement." [Exhibit 106, p. 2] He further explained, the "interdepartmental project [was] requesting the Board of Public Works to permit [the] use of a public right of way and join in this public display of support for our Black and Brown residents who have been fighting for justice and equality for far too long." [Exhibit 106, p. 2] Resolution 2020-50 noted the Black Lives Matter street mural project was an "effort to demonstrate [the City's] animosity to all forms of racism. [Exhibit 7] The Board of Works unanimously approved Resolution 2020-50 allowing for the encroachment for the first Black Lives Matter street mural. [Exhibit 106, p. 3]

On April 13, 2021, Starowitz presented another proposal to the Board of Works for the painting of the second Black Lives Matters mural on a city street. [Exhibit 108 – Board of Works Staff Report] As this was the second mural submitted for approval, and it was part of the same project previously approved, the Staff Report, and the requested Resolution for the encroachment of the right-of-way for the second mural, were addressed as part of the Board of Works consent agenda. [Exhibit 109, p 1, Consent Agenda item 4 – Board of Works Minutes April 13, 2021]. Like the first Black Lives Matters street mural, the second one was an "interdepartmental project" for the City of Bloomington to display support for "Black and Brown residents who have been fighting for justice and equality for far too long." [Exhibit 108 – Staff Report April 13, 2021] On

6

April 13, 2021, the Board of Works approved Resolution 2021-10, and the Staff Report for the second Black Lives Matter street mural, without further discussion. [Exhibit 109, p. 1]

In June 2021, Starowitz began transitioning out of his position as the Assistant Arts Director for the City, which created a temporary vacancy in that position until a new Assistant Director was hired in September 2021. [Exhibit 114, ¶6-7 – Affidavit of Adam Wason]. In June and July (during the time that Straowitz was transitioning out of his position and when the position was vacant), the City continued working on the third and final Black Lives Matter street mural. [Exhibit 114, ¶ 8] The third mural was to be installed on Jordan Avenue – one of the initial locations discussed in July 2020 – and was in partnership with IU (as was also originally discussed in July 2020). [Exhibit 114, ¶ 10; Exhibit 115a – July 10, 2020 Meeting summary; Exhibit 115b].

As noted in Plaintiffs' Brief, the City worked with Indiana University and the Black Collegians to bring to life the third Black Livers Matter street mural which was approved for Jordan Avenue/Eagleson Avenue; and the City approved the painting of that mural on Jordan Avenue/Eagleson Avenue and the work was completed on July 5, 2021. Starowitz had presented the Staff Reports to the Board of Works on the first two Black Lives Matter street murals, but because he was transitioning out of his position, he did not prepare the Board of Works Staff Report for the third (Jordan Avenue/Eagleson Avenue) mural prior to the mural's installation. [Exhibit 114, ¶ 13-14] Instead, Adam Wason prepared the staff report and presented it to the Board of Works on August 3, 2021. That Staff Report noted the oversight in not presenting the project to the Board of Works for approval prior to the completion of the project. [Exhibit 111 – Staff Report August 2, 2021] The Staff Report advised the Board of Works that, the "[i]ntentions were always to work with IU and this student group, and have this before the Board in early June," [but] [d]ue to the oversight, [the staff was] requesting after the fact approval." [Exhibit 112] It further noted

7

that like the first two Black Lives Street Murals, this third mural was endorsed by "[t]he City of Bloomington Economic & Sustainable Development Department, Office of the Mayor, Community Family Resources Department, and the Public Works Department." [Exhibit 112] The Staff Report showed that the mural was completed in "partnership with the IU Provost's Office and the Black Collegians student group," which was consistent with Starowitz's original stated plan as of July 28, 2020, of working with IU and other groups (such as Enough is Enough) to complete the anticipated third mural. [Exhibit 104, p. 5, Exhibit 111]

The Staff Report for the third mural was addressed as part of the Board of Works consent agenda (just as the Staff Report for the second mural was addressed). [Exhibit 112, p 1, Consent Agenda item 7 – Board of Works Minutes August 3, 2021] Like the first two Black Lives Matter street murals, the third one was an interdepartmental project for the City as a "public display of support for [] Black and Brown residents who have been fighting for justice and equality for far too long." [Exhibit 111 – Staff Report August 3, 2021] On August 3, 2021, the Board of Works approved the Black Lives Matter street mural's encroachment on Jordan Avenue/Eagleson Avenue. [Exhibit 112, p. 2]

As shown in Plaintiffs' Brief, Plaintiffs found the third Black Lives Matter mural to be "highly divisive and not representative of all groups on campus." [Exhibit 1C] Plaintiffs began sending emails on in late July 2021 requesting approval to paint "All Lives Matter" on the surface of a city street; Plaintiffs did not submit a proposal for the Black Lives Matter street mural project. [Exhibit 1A, Exhibit 1B, Exhibit 1C, and Exhibit 1D] The Black Lives Matter street mural project took months to develop and approve and nearly a full year to complete the installation. [Exhibit 115a & Exhibit 114, ¶ 11]. The individuals who led the effort on the Black Lives Matter street mural project expressed frustration that they had "many hoops to jump through" and that "the

8

process in general [was] a big hurdle." [Exhibit 103, p. 5] Plaintiffs expressed frustration that emails about the proposed "All Lives Matter" street mural were not answered within a week because they wanted to start the project within days of the initial request to the City. [Exhibit 1C]

### III.  Preliminary Injunction Standard

A request for a preliminary injunction requires the Court to weigh the following factors: (1) whether the movant has a reasonable likelihood of success on the merits; (2) whether the movant's traditional remedies at law are inadequate, thus causing a threat of irreparable harm pending the resolution of the substantive action if the request for injunctive relief is denied; (3) whether the threatened injury to the movant outweighs the threatened harm the granting of an injunction may inflict on the respondent; and (4) whether the public interest would be disserved by the granting of an injunction. *See Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 265, 374 (2008)).

### IV.     Argument

The City resolved to display its condemnation for racism and its support of Black and Brown residents who had been fighting for justice for too long. The City opted to display message of support by selecting artists to paint two or three "Black Lives Matter" street murals. The murals were initially proposed in July 2020 and through a complex interdepartmental collaboration and work with local artist the murals were completed in October 2020, April 2021, and July 2021.

Under the government speech doctrine, the City's selection and installation of three Black Lives Matter street murals is a form of government expression that is not subject to First Amendment scrutiny. Moreover, although inapplicable in this case, a forum analysis would show that the pavement or surface of a public street is not a public forum, limited or designated forum. And even if the pavement or surface of a public street was a traditional public forum.

1. **Plaintiffs will not prevail on the merits of their claim because the government speech not subject to the Free Speech Clause of the First Amendment.**

Black Lives Matter street murals are public art expressing the City's position or policy on racism and white supremacy. The First Amendment's Free Speech Clause restricts government regulation of private speech. *See* U.S. Const. Amendment 1, cl. 2 ("Congress shall make no law … abridging the freedom of speech.") However, the First Amendment protection guaranteeing an individual's right to speak is inapplicable to the government's own speech. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467, 129 S. Ct. 1125, 1131, 172 L. Ed. 2d 853 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). "A government entity has the right to 'speak for itself.'" *Id.* "[I]t is entitled to say what it wishes, and to select the views that it wants to express." *Id.* (internal citations omitted). "It is the very business of government to favor and disfavor points of view." *National Endowment for Arts v. Finley*, 524 U.S. 569, 598, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (SCALIA, J., concurring in judgment). It does not matter if the government makes its "favored point of view by achieving it directly (having government-employed artists paint pictures, for example, or government-employed doctors perform abortions); or by advocating it officially (establishing an Office of Art Appreciation, for example, or an Office of Voluntary Population Control); or by giving money to others who achieve or advocate it (funding private art classes, for example, or Planned Parenthood)." *Id.* "None of this has anything to do with abridging anyone's speech." *Id.*

> As the U.S. Supreme Court has explained,
>
> were the Free Speech Clause interpreted otherwise, government would not work. How could a city government create a successful recycling program if officials, when writing householders asking them to recycle cans and bottles, had to include in the letter a long plea from the local trash disposal enterprise demanding the contrary? How could a state government effectively develop programs designed to

10

>encourage and provide vaccinations, if officials also had to voice the perspective of those who oppose this type of immunization? "[I]t is not easy to imagine how government could function if it lacked th[e] freedom" to select the messages it wishes to convey.

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207–08, 135 S. Ct. 2239, 2246, 192 L. Ed. 2d 274 (2015).

Applying the reasoning of the U.S. Supreme Court in *Walker v. Texas Div., Sons of Confederate Veterans, Inc.* and *Pleasant Grove City, Utah v. Summum*, a three-part test is used to determine whether speech is government speech. Applying that test, this Court should consider: (1) whether the forum or medium in which the speech occurs has historically been used for government speech, (2) whether the public would interpret the speech as being conveyed by the government, and (3) whether the government has maintained control over the speech. *See Walker*, 135 S.Ct. at 2247–49; *Summum*, 555 U.S. at 470–72, 129 S.Ct. 1125; *See also Pulphus v. Ayers*, 249 F. Supp. 3d 238, 247 (D.D.C. 2017).

The first factor supports a finding of the Black Lives Matter murals being government speech. Here, the forum or medium at issue here is a painting on the surface of a city street. [The Black Lives Matter murals are painted messages on city streets. Likewise, the mural proposed by Plaintiffs would have been a painted message on a city street.] *See Penkoski v. Bowser*, 548 F. Supp. 3d 12, 22–23 (D.D.C. 2021) (determining the forum or medium was too broadly defined as "an artistic display," too narrowly defined as "colorful paint on the asphalt of 16th Street to convey political messages," and appropriately defined as "painted messages on city streets.") Painted messages on city streets are traditionally forums or mediums for government speech, not private speech. *See Women for Am. First v. de Blasio*, 520 F. Supp. 3d 532, 543 (S.D.N.Y. 2021) ("[T]he surfaces of public streets are not traditional public fora for the dissemination of private speech.") Painting on city streets is traditionally for government messages only. Paintings on city streets are

traditionally related to traffic-related messages; i.e. "School Zone," "Bus Lane," "Stop," "Slow," pedestrian crosswalks, etc. Generally, private messages – that is, messages not developed or sponsored by the government – are not painted on the surface of city streets. While a public street has been characterized as a place of assembly for citizens to share messages and communicate, the pavement or surface of a public street has never been characterized as a traditional forum for communicating private speech without an assembly, event, or person present and actively communicating the message. *See Women for Am. First v. de Blasio*, 520 F. Supp. 3d 532, 543 (S.D.N.Y. 2021) ("The United States Supreme Court's characterization of a public street as a place of assembly where citizens can communicate, *Summum*, 555 U.S. at 469, 129 S.Ct. 1125, is undeniably distinct from an endorsement of the use of the face of a street – usually reserved for transportation-related guidance – as a message board for private speech.")

The second factor also supports a finding that the Black Lives Matter murals are government speech. Here, the public would interpret the speech as being conveyed by the government. In May 2020, the City passed a resolution condemning "all forms of bigotry, racism and hatred," and announcing that "the City proudly stands for individual dignity and against all those who would seek to propagate hate, fear and intimidation, or incite fear and violence targeting any human being." [Exhibit 100] Four months later, the City passed another resolution prompted by the killings of George Floyd in Minneapolis, and Breanna Taylor in Louisville, among others deaths that fueled the Black Lives Matter movement in the summer of 2020. [Exhibit 105 – Resolution 20-16]

In that Resolution 20-16, the City declared that it "wholeheartedly endorse[d] th[e] use of public art to express its stated position and especially to support and honor a movement fighting to bring justice and equality to Black and Brown members of our community and beyond." [Id.]

Further, the resolution declared that the City "endorse[d] the painting of two Black Lives Matter murals – one on Elm Street in front of the Banneker Center, or at such other nearby location as the City and the Banneker Community Center Advisory Council agree is appropriate, and one at a downtown location to be determined." [Id.]

The September Resolution was the result of months long public meeting discussions about several City departments collaborating for two to three Black Lives Matter street murals. The City publicly stated that it was authorizing the street murals as public art on the public right-of-way. While the location of the second and third murals were not determined until 2021, they were part of the overall message of the City. Two to three murals were contemplated from the beginning, and the City publicly promoted and joined with local black and brown artists and volunteers to install each of the three murals. The City issued press releases announcing its decision to install the Black Lives Matter murals. [Exhibit 116, Exhibit 117, and Exhibit 118] As shown by the numerous ways the City advised the public of its intention to send a message condemning racism and supporting the City's Black and Brown residents – via minutes of public meetings, resolutions, official press releases, etc. – the public would necessarily understand that the murals were government speech; that is, the City was using public art to convey its message of support for Black and Brown residents.

The third and final factor supports a finding that the Black Lives Matter murals are government speech. The City maintained control of the location, content, medium, and artwork for each mural. [Exhibit 102; Exhibit 115] The City's Advisory Council considered the proposals, artist submissions, and designs. [Exhibit 101; Exhibit 119; Exhibit 120; Exhibit 121; Exhibit 122; and Exhibit 123] The City determined the location of each mural and maintained control over the design and material used on the murals. [Exhibit 115; Exhibit 119-123]

As shown by the City's public documents – minutes of meetings, staff reports, and resolutions – the City was speaking for itself and advancing its policy and point of view when it engaged in a collaborative effort to create and install the Black Lives Matter street murals. Pursuant to the government-speech doctrine, the City's message condemning racism, as displayed in the Black Lives Matter murals, is the City's own speech, which is exempt from scrutiny under the Free Speech Clause of the First Amendment. Plaintiffs cannot maintain a claim against the City for violation of the First Amendment because the Black Lives Matter murals were government speech not subject to the First Amendment restrictions on viewpoint discrimination.

**2. Plaintiffs will not prevail on the merits of their Indiana Constitution's Equal Privileges and Immunities Clause is inapplicable to City's decision to approve certain public art.**

Plaintiffs claim that the City's alleged "disparate treatment" of Plaintiffs (who proposed an All Lives Matters street mural) and the Black Collegians (who proposed a Black Lives Matter mural) violates Article 1, Section 23 of the Indiana Constitution. Article 1, Section 23 of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." Plaintiffs' argument is fatally flawed for three reasons.

First, there is no statute or act of the General Assembly at issue here. Plaintiffs complain of a policy decision of the City to install Black Lives Matter murals in furtherance of the City's stated policy of seeking to condemn racism and show support for the Black and Brown residents of the City. The City's policy, and even its resolutions explaining the policy, are not acts of the General Assembly.

Second, Plaintiffs' Brief argues that the City "has not made access to creating murals 'uniformly applicable and equally available to all persons similarly situated,'" but the Plaintiffs

are not similarly situated to the Black Collegians. The City was specifically seeking proposals for artists and volunteers to create and install three Black Lives Matter street murals. The Black Collegians – along with other artists – designed and proposed Black Lives Matter street murals before the third and final mural was selected. The Plaintiffs did not; they did not submit any proposal for a mural before the third mural, nor did they submit a proposal for a Black Lives Matter mural. Rather, they submitted an unsolicited proposal for an "All Lives Matter" mural, which was not public art the City was seeking to install.

Third, every artist's submission was required to be a "Black Lives Matter" mural. To be considered for one of the three street murals, every submission had to include a proposed Black Lives Matter mural design. That requirement applied regardless of the artist's race. Thus, that feature of the street mural submission applied equally to all persons submitting proposals; it applied to the Black Collegians and to Plaintiffs.

Because the requirement that all proposals be a "Black Lives Matter" street mural applied equally to all candidates and because Plaintiffs did not submit a proposal for a Black Lives Matter street mural, Article 1, Section 23 is inapplicable to the present case.

**B. All other factors relevant to a request for a preliminary injunction analysis**

As shown above, Plaintiffs are not likely to prevail on the merits of their claim. The other factors do not weigh in Plaintiffs' favor, either.

Plaintiffs will not suffer irreparable harm. Plaintiffs have plenty of other means of expressing their view that "All Lives Matter." A street mural is just one means of expression. Plaintiffs have not shown that they will be irreparably harmed by expressing their position that "All Lives Matter" by using other modes of public communication, which can reach the same, similar, or bigger audience.

The balancing of harms does not weigh in Plaintiffs' favor. If Plaintiffs are permitted to paint a street mural expressing their private message or point of view on the surface of a city street, then where does it stop? If Plaintiffs' argument is accepted – that street murals are public speech open to all who wish to speak through that medium – then city streets would be converted to private message boards. The public interest is not served by opening city streets to become private message boards. The primary function of public streets is for travel. Clear traffic control messages and limited visual distractions serve the public interest, not permitting private citizens to paint their messages and art on the road surface.

Plaintiffs have not satisfied any of the factors that need to be taken into consideration at the preliminary injunction stage. As such, their Motion should be denied.

### I.     Conclusion

For the forgoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

Respectfully submitted,

*Liberty L. Roberts*
Liberty L. Roberts, Atty. No. 23107-49
Attorney for Defendants
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April 2022, a true and exact copy of the foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the following persons by operations of the Court's Electronic filing system.

>William Bock, III
>wbock@kgrlaw.com
>KROGER, GARDIS & REGAS, LLP
>111 Monument Circle, Suite 900
>Indianapolis, IN 46204

             *Liberty L. Roberts*
             Liberty L. Roberts

CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
T:  (317)773-2190 / F:  (317)773-5320
Email:  LRoberts@cchalaw.com