# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

INDIANA UNIVERSITY CHAPTER
OF TURNING POINT USA, and
KYLE REYNOLDS,

          Plaintiffs,

vs.

CITY OF BLOOMINGTON,
INDIANA, ADAM WASON, in his
official capacity as Director of
Public Works for the City of
Bloomington, and KYLA COX
DECKARD, BETH H.
HOLLINGSWORTH and DANA
HENKE in their official capacities
as members of the Board of Public
Works of the City of the
Bloomington, Indiana,

          Defendants.

Cause No. 1:22-cv-00458-SEB-TAB

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

I.    Facts in Reply to the City's Response ................................................. 1

    A.    Bloomington Created a Designated Public Forum in City Right-of-Ways ................................................................................................ 1

    B.    Bloomington Approved the IU Black Collegians' Student-Initiated Street Mural in a City Right-of-Way ....................................... 4

    C.    Bloomington Rejected the IU TPUSA Chapter's Student-Initiated Street Mural for a City Right-of-Way ................................... 6

    D.    Bloomington's Proffered Reasons for Rejecting the IU TPUSA Chapter's Student-Initiated Mural Project Are Pretextual and False .. 8

    E.    Bloomington Has Continued to Provide Misleading and False Justifications for Its Actions ................................................. 11

II.   Legal Discussion ....................................................................... 13

    A.    Bloomington Created a Designated Forum in its Right-of-Ways ........ 13

    B.    The Black Collegians' Mural is Not Government Speech.................... 14

    C.    Bloomington Violated the Equal Privileges and Immunities Guarantee in the Indiana Constitution ................................................. 23

# TABLE OF AUTHORITIES

## Cases

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) ............................................................................................ 14

*Elrod v. Burns,*
   427 U.S. 347 (1976) ............................................................................................ 30

*Kidwell v. Eisenhauer,*
   679 F.3d 957 (7th Cir. 2012) .............................................................................. 29

*Matal v. Tam,*
   137 S.Ct. 1744 (2017) ............................................................................. 13, 22, 27

*Nat'l People's Action v. Vill. of Wilmette,*
   914 F.2d 1008 (7th Cir. 1990) ............................................................................ 30

*Paul Stieler Enterprises, Inc. v. City of Evansville,*
   2 N.E.2d  (Ind. 2014) .......................................................................................... 28

*Pleasant Grove City, Utah v. Summum,*
   555 U.S. 460 (2009) ................................................................................. 18, 19, 27

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
   515 U.S. 819 (1995) ............................................................................................ 13

*Shurtleff v. City of Boston,*
   2022 WL 1295700 ....................................................................................... passim

*Walker vs. Texas Div. Sons of Confederate Veterans, Inc.,*
   576 U.S. 200 (2015) ..................................................................................... 20, 21

*Whistle Stop Inn, Inc. v. City of Indianapolis,*
   51 N.E.3d 195 (2016) .......................................................................................... 28

## Statutes

Ind. Const. Art. I, § 23 ............................................................................................ 23

There are few principles more central to ordered liberty and healthy democracy than those enshrined in the First Amendment to the U.S. Constitution. This case implicates core First Amendment freedoms. Although the City of Bloomington contends "that it condemns all forms of bigotry, racism and hatred,"[1] in its conduct towards Kyle Reynolds and TPUSA the City lost sight of its basic First Amendment duty to treat even-handedly those seeking to use public places to express their viewpoints.

## I.    Facts in Reply to the City's Response

### A.    Bloomington Created a Designated Public Forum in City Right-of-Ways

There is no dispute that, although not required to do so, Bloomington opened its right-of-ways to diverse private expression by giving members of the public the opportunity to install non-permanent artwork in them.[2] For instance, all that the City has generally required for residents to have the opportunity to paint a street mural on a public right-of-way has been sign off by the City's Board of Public Works ("BPW") through a simple and perfunctory resolution.[3] A written description of the

---

[1] Defendants' Brief in Opposition ("City's Response") at 1, Dkt. 18, PageID # 512.

[2] *See*, *e.g.*, Defendants' Answer and Affirmative Defenses to Plaintiffs' Complaint for Declaratory and Injunctive Relief, Dkt. 17 ("City's Answer") to ¶ 23 ("Defendants admit that the Board of Public Works has the authority to approve applications for encroachment on public rights-of-ways."); Answer to ¶ 28 ("Defendants admit that . . . the City approved a Special Event Application by Middle Way House . . . to allow for [a] public art display to begin on October 1, 2021 and end on March 1, 2022" in City right-of-ways); Answers to ¶¶ 35-47 (approval of Black Collegians' street mural); *see also* Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Plaintiffs' Complaint") ¶ 27; City's Answer to ¶ 27 ("Defendants admit that the City has from time-to-time approved temporary expressive activities to occur within a public right of way.").

[3] *See*, *e.g.*, Board of Public Works Resolution 2017-53 **McDoel Neighborhood Street Painting Party**, Plaintiffs' Exhibits ("P.Ex.") 8C, Dkt. 22-3 (filed 5/11/22) (PageID #s 634 - 635) (2017 street mural) (emphasis added); Board of Public Works Resolution 2018-69

proposed design or content of the street mural has not been consistently required.[4]

In multiple instances, a special event application was not required.[5] Approval by

the Bloomington Arts Council has also not been typically required.[6] Thus, there

appear to be no uniform standards or rules generally applicable to street mural

projects in City right-of-ways.[7]

The City has also opened its right-of-ways to the private installation of non-

permanent art that has not involved street painting. For instance, on August 3,

2021, the City's Board of Public Works approved what was described in the event

application as "Middle Way House's annual wrapped in love public art display [to]

begin Oct. 1, 2021, and end March 1, 2022."[8] This display involved wrapping trees

and light posts in right-of-ways with "tree sweaters" and yarn.[9] The City is aware

that a purpose of all this private artwork that the City permits, and indeed

encourages, in its right-of-ways is communication of a message. For instance, the

resolution approving the Middle Way House art display recognizes that it is "to

raise awareness and funding for violence victim services[.]"[10] As with some prior

---

**Prospect Hill Neighborhood Street Painting Party**, P.Ex. 8E, Dkt. 22-5 (filed 5/11/22) (PageID #s 653 - 654) (2018 street mural) (emphasis added).

[4] P.Ex. 8C, Dkt. 22-3 (filed 5/11/22) (PageID #s 649 - 662) (2018 Prospect Hill mural).

[5] P.Ex. 8A, Dkt. 22-1 (filed 5/11/22) (PageID #s 617 - 624) (2017 Near Westside mural); P.Ex. 2C, Dkt. 7-9 (filed 3/10/22) (PageID # 368) (2021 street mural).

[6] In none of the four street mural painting approved by the BPW in 2017, 2018 and 2021 referenced below in footnotes 12, 13 and 14 was the Bloomington Arts Council referenced.

[7] Although the City refuses to admit that no concrete standards guide or confine the exercise of discretion in approving encroachments in public rights-of-way, *see* City's Answer at ¶ 30, PageID# 469, the City has failed to identify any such standards.

[8] Special Event Application by Applicant Madeline Plant, Director of Development Middle Way House, Inc., P.Ex. 2C, Dkt. 7-9 (filed 3/10/22) (PageID #s 347 – 353) at PageID# 348.

[9] *Id.*

[10] BPW Resolution 2021-37, P.Ex. 2B, Dkt. 7-9 (filed 3/10/22) (PageID #s 354 – 355) at PageID# 354.

street murals approved by the City, Middle Way House's public expression through

privately placed art work in City right-of-ways was initiated through a special event

application by a private group.[11]

On numerous occasions (described in the footnotes below) installations of

non-permanent artwork proposed and placed by City residents have involved street

murals, including two in 2017,[12] one in 2018,[13] and one in 2021.[14] All of these

---

[11] P.Ex. 2C, Dkt. 7-9 (filed 3/10/22) (PageID #s 347 – 353).

[12] BPW Staff Report and BPW Resolution 2017-34 Near Westside Neighborhood Block Party, P.Ex. 8A Dkt. 22-1 (filed 5/11/22) (PageID #s 617 - 624), *see* Board of Public Works Staff Report PageID # 620 ("**Near Westside Neighborhood Association … will be hosting a** Block Party and **Mural Painting project**") (emphasis added); BPW Staff Report, BPW Resolution 2017-53 McDoel Neighborhood Street Painting Party, Special Event Application, P.Ex. 8C Dkt. 22-3 (filed 5/11/22) (PageID #s 631 - 642), *see* Special Event Application PageID #s 636 - 637 (Applicants: Keith Romaine, Michael Valliant, Julia Debrucker Valliant, Amy Roche, "Description of Event: **We want to paint the intersection of Dodds and Fairview**") (emphasis added); Minutes Reflecting Approval of Resolution 2017-53: **Use of City Streets for McDoel Neighborhood Street Painting Party**, P.Ex. 8D, Dkt. 22-4 (filed 5/11/22) (PageID #s 647 - 648 (emphasis added).

[13] BPW Staff Report, BPW Resolution 2018-69 **Prospect Hill Neighborhood Street Painting Party**, Special Event Application, P.Ex. 8E Dkt. 22-5 (filed 5/11/22) (PageID #s 649 - 662), *see* Board of Public Works Resolution 2018-69 **Prospect Hill Neighborhood Street Painting Party** PageID # 653 ("The … Board of Public Works declares the intersection Howe and Fairview Streets will be closed to motor vehicle traffic from 10:00 a.m. until 7:00 p.m. on Saturday, August 4, 2018 . . . for the purpose of staging a neighborhood block party and **street mural painting**."), Special Event Application PageID # 656 (Applicant: Eoban Binder, Prospect Hill Neighborhood Association, "Description of Event: **Painting of public art by neighborhood association** (funded by … Bloomington community improvement grant program.").

[14] BPW Staff Report, P.Ex. 2C, Dkt. 7-9 (filed 3/10/22) (PageID # 368) ("The City of Bloomington Economic & Sustainable Development Department, Office of the Mayor, Community Family Resources Department, and the Public Works Department endorse the painting of a Black Lives Matter mural on Jordan Avenue adjacent to the IU Neil Marshall Black Cultural Center in partnership with the IU Provost's Office and the Black Collegians student group. This **community project** is requesting the Board of Public Works to permit this use of a public right-of-way and join in this public display of support for our Black and Brown residents who have been fighting for justice. This request is coming to the Board of Public Works after the project was completed due to an oversight by staff as City personnel transitioned out of the organization. Intentions were always to work with IU and this student group, and this before the Board in early June. Due to the oversight, we are requesting after the fact approval.") (emphasis added).

private requests to install street murals were ultimately approved by the City's Board of Public Works. Plaintiffs are not aware of a denial of a request to paint a street mural nor of scrutiny being given to the content of private artwork sought to be displayed in City right-of-ways before Plaintiffs sought approval to paint an "All Lives Matter"[15] mural.

### B.  Bloomington Approved the IU Black Collegians' Student-Initiated Street Mural in a City Right-of-Way

In Spring 2021 an Indiana University ("IU") student organization known as the Black Collegians organized an effort to win approval for a proposed mural which would spell out "BLACK LIVES MATTER"[16] on IU property on the IU Campus.[17] The City does not deny that the Black Collegians' mural project was not initiated by the City, but by the Black Collegians student group, and that *before* the Black Collegians' proposed to the City that their mural be located on a City street running through the IU campus the Black Collegians first proposed their mural be placed on IU campus property.[18] The IU Administration, however, was not willing to locate

---

[15] Also referred to herein as "ALM."

[16] Also referred to herein as "BLM."

[17] Plaintiffs' Complaint, Dkt. 1-1, ¶ 142, PageID# 42; City's Answer to ¶ 142, Dkt. 17, PageID# 505.

[18] Plaintiffs' Complaint ¶ 39 ("Tiera Howleit worked closely with Thomas Morrison, IU Capital Planning and Facilities Vice President, to identify a location for the mural and secure the University's support for locating the mural at one of the Black Collegians' favored sites."), City's Answer to ¶ 39 ("Defendant is without sufficient information to admit or deny the allegations in paragraph 39 of Plaintiffs' Complaint."); Plaintiffs' Complaint ¶ 55 (IU V.P. Morrison in an email to Kyle Reynolds: "the students who proposed this [Black Collegians'] mural did request of IU to place the mural a[t] several proposed locations on the IU Campus. Each of those proposed locations was not approved. IU does not permit mural type art on the Bloomington campus. The students did propose the location ultimately chosen and were directed to the City for approval. Please know that we did offer the students [*i.e.*, the Black Collegians] advice on facility related logistics (types of paint, colors, temperatures, surface preparation, sizing, etc.). We would provide that

the Black Collegians' proposed BLM mural on campus property.[19] Consequently, the

IU Administration suggested the Black Collegians seek approval for a mural to be

located on a City street running through campus and worked with the Black

Collegians to identify an acceptable street.[20]

The City also does not deny that the Black Collegians' mural was ultimately

paid for by the IU Funding Board which distributes funding obtained through IU

student fees.[21] In contrast, the two Black Lives Matter street murals organized by

the City of Bloomington were paid for out of City funds.[22]

The City concedes that the Black Collegians' street mural was described to

the public as a student led effort. On July 6, 2021, IU's Provost tweeted, "[t]he Black

Collegians finished the amazing Black Lives Matter mural on Jordan Ave."[23] Two

days later, IU's official twitter feed reported, "Black Lives Matter. Thank you to the

Black Collegians group for bringing this mural to life on our campus."[24] In contrast

---

expertise to you or any student group who inquired. We did not pass judgment on the art itself. Should you desire to propose a street mural, I would direct you to the City of Bloomington."), City's Answer to ¶ 55 ("Defendant is without sufficient information to admit or deny the allegations in paragraph 55 of Plaintiffs' Complaint.").

[19] *Id.*

[20] *Id.*

[21] Plaintiffs' Complaint, ¶ 37 ("Funding for the BLM Street Mural came primarily from the IU Funding Board and this funding was derived from student fees distributed to student organizations on the IU campus by the IU Funding Board."); City's Answer to ¶ 37 ("Defendant is without sufficient information to admit or deny the allegations in paragraph 37 of Plaintiffs' Complaint.").

[22] *See* Second Declaration of Mary Myers ("Myers Decl. 2"), ¶¶ 12-16, Dkt. 22-14, PageID #s 713 - 716 (discussing review of City records which demonstrate City funding of initial two Black Lives Matter murals and no apparent City funding for Black Collegians' mural).

[23] Plaintiffs' Complaint, ¶ 51; City's Answer to ¶ 51 ("Defendants admit the allegations contained in paragraph 51 of Plaintiffs' Complaint.").

[24] Plaintiffs' Complaint, ¶ 52; Defendants' Answer to ¶ 52 ("Defendants admit the allegations contained in paragraph 52 of Plaintiffs' Complaint.").

to the two prior BLM street murals paid for and organized by the City,[25] the

Bloomington Common Council did not issue a resolution calling for the installation

of the Black Collegians' mural.[26] Neither did the City issue a press release

announcing the Black Collegians' mural[27] as the City did for the two BLM murals

paid for and organized by the City.[28] Nor did the BPW issue a resolution relating to

the Black Collegians' mural as the BPW did for the City's two BLM murals.[29]

### C.   Bloomington Rejected the IU TPUSA Chapter's Student-Initiated Street Mural for a City Right-of-Way

During the summer of 2021 the Black Collegians' successful effort to install a

street mural on the IU campus caught the attention of IU student Kyle Reynolds

---

[25] Resolution 20-16 Supporting the Painting of **Two** Black Lives Matter Street Murals – One on Elm Street and One at a Downtown Location to Be Determined ("WHEREAS, governments may and regularly do engage in official government speech on important matters . . . ; and WHEREAS, the members of the Banneker Community Center Advisory Council have proposed **two** street murals that would involve the painting of the words 'Black Lives Matter' on the public right of way with one mural on Elm Street in Bloomington and another at a downtown Bloomington location to be determined, and the Board of Parks Commissioners endorsed the concept at their July 28, 2020 meeting, and the Bloomington Arts Commission endorsed it at their August 12, 2020 meeting . . . The City of Bloomington endorses the painting of **two** Black Lives Matter murals – one on Elm Street in front of the Banneker Center, or at such other nearby location as the City and the Banneker Community Center Advisory Council agree is appropriate, and one at a downtown location to be determined, and supports the City's use of existing funds to pay the artist(s) hired to design and paint the mural."), Dkt. 18-6 (filed 4/11/22) PageID #s 548-549 (emphasis added).

[26] *See* Myers Decl. 2, ¶ 17, Dkt. 22-14 (filed 5/11/22) PageID # 716 (discussing review of City records which indicate Common Council did not initiate a resolution calling for installation of the Black Collegians' mural).

[27] *Id.*, at ¶ 19 (discussing review of City records which indicate City did not issue a press release announcing the Black Collegians' mural).

[28] City of Bloomington News Release (Nov. 13, 2020), "Dedication Ceremony for Elm Street Black Lives Matter Mural Friday, November 13," Dkt. 18-16 (filed 4/11/22) PageID#s 579-582; City of Bloomington News Release (Dec. 1, 2020), "Second Black Lives Matter Street Mural Scheduled for Installation in 2021," Dkt. 18-17 (filed 4/11/22) Page ID#s 583-585; City of Bloomington News Release (Apr. 14, 2021), "City's Second Black Lives Matter Mural to be Installed on Downtown Square," Dkt. 18-18 (filed 4/11/22) PageID#s 586-589.

[29] Myers Decl. 2, ¶ 19, Dkt. 22-14 (filed 5/11/22) PageID# 716.

and several student organizations he represents, prompting them to seek to equally express their preferred message through a street mural.[30] This time, however, despite the City's consistent prior practice of authorizing non-permanent expressive art in public right-of-ways, when Kyle Reynolds sought approval to paint an ALM street mural he received the run around from the City.

Department of Public Works Director Adam Wason's instruction in response to Kyle's initial inquiry made it clear that the the Black Collegians group had followed an established pathway for individuals and groups to obtain approval to place expressive art in public right-of-ways. The existence of such a policy and practice is why Director Wason instructed Kyle, "to work with the IUB President's Office, *as did the other group*, in order to get the concept for any murals approved for placement on any streets on campus."[31]

The City concedes that Director Wason is a policy-making official and head of the City's Public Works Department, the City agency responsible for maintaining City right-of-ways.[32] Therefore, the City is bound by Director Wason's admission that there existed a process for groups "to get the concept for any murals approved for placement on any streets on campus." Moreover, the City's regular approvals of

---

[30] Plaintiffs' Complaint ¶¶ 53-62; City's Answer to ¶¶ 53-62.
[31] Plaintiffs' Complaint, ¶ 59; City's Answer to ¶ 59 ("Defendants admit that . . . on August 2, 2021, Mr. Wason sent an email to Kyle Reynolds that stated, 'You'll need to work with the IUB President's Office, as did the other group, in order to get the concept for any murals approved for placement on any streets on campus.").
[32] *See*, *e.g.*, City's Answer, pp. 3, 5-6 (admits Wason, a policymaking official is Head of the Dept. of Public Works which is responsible for management of all physical facilities of City).

street murals proposed by residents confirms the City's practice of making right-of-ways available to residents for the placement of street murals and public art.

After getting the ALM concept and a location (East Kirkwood in front of the Von Lee building) approved by the IU Administration Kyle returned to Director Wason on August 3, 2021, the very day the Director submitted a staff report to the Board of Public Works for after-the-fact approval of the Black Collegians' mural. A week passed, however, before Director Wason instructed Kyle to contact City Legal. It then took repeated inquiries to get a response from the City Attorney. On August 23, 2021 City Attorney Rouker emailed Kyle that, "the City does not take recommendations for art in its right-of-way from individuals, and, at this time, the City is not considering adding additional art within its right-of-way."[33]

### D.   Bloomington's Proffered Reasons for Rejecting the IU TPUSA Chapter's Student-Initiated Mural Project Are Pretextual and False

City Attorney Rouker's rejection of Kyle Reynolds' request came nearly four weeks after Kyle's' initial July 29, 2021, outreach to Director Wason. Had there, in fact, been a policy against taking recommendations from individuals for art in City right-of-ways it would have been a simple matter to advise Kyle of that policy on or about July 29, but the City did not do so. The fact that City officials first directed Kyle to IU and then gave him the run around for the better part of a month is circumstantial evidence Director Wason knew the City had a practice of approving

---

[33] Plaintiffs' Complaint ¶ 74; City's Answer to ¶ 74 ("Defendants admit that on August 23, 2021, City Attorney Rouker sent an email to Kyle Reynolds, which email is quoted in paragraph 74 of Plaintiffs' Complaint.").

public requests to place art in City right-of-ways. The incongruous treatment Kyle received as compared to the treatment received by the Black Collegians, Middle Way House or other groups who sought approval for placement of temporary art displays in City right-of-ways during 2017-2021 demonstrates that City officials singled out Kyle to deny him the art placement opportunities extended to others.

The emailed rejection from City Attorney Rouker was inaccurate. The City Attorney knew that Kyle was not acting solely as an "individual." Kyle had communicated very precisely in his initial email to Mr. Rouker that, "I represent . . . two student organizations at Indiana University."[34] It therefore appears Mr. Rouker was, at a minimum, being recklessly inaccurate.

Attorney Rouker and Director Wason were well aware that the Black Collegians student organization was recently given retroactive approval for the street mural the group had painted in a City right-of-way. Attorney Rouker also knew Kyle had recently been sent to the IU Administration by Director Wason to secure IU's approval for the proposed ALM mural, a route the Black Collegians group had traversed earlier. Kyle laid out this sequence of events in his August 10 email to the City Attorney.[35]

Thus, the City Attorney should have also known that the statement in his email that "the City does not take recommendations for art in its right-of-way from individuals" was false. The consistent practice of the City had, in fact, been to take

---

[34] Plaintiffs' Complaint ¶ 72; City's Answer to ¶ 72 ("Defendants admit that on August 10, 2021, Kyle Reynolds sent an email to City Attorney Mike Rouker which email is quoted in part in paragraph 72 of Plaintiffs' Complaint.").
[35] *Id.*

such recommendations from individuals and organizations including, but not limited to, the Black Collegians, Middle Way House and others. Indeed, the whole course of communications between Director Wason and Kyle Reynolds was premised on existence of a City practice and process for receiving proposals for individuals and groups to place street murals, as represented in Director Wason's August 2, 2021, email to Kyle. Absent such a process Director Wason's instruction for Kyle to seek IU Administration approval makes no sense.

Further, not only had the City recently solicited "additional art within its right-of-way," the City had only days before, on August 19, closed a request for qualification process to hire an individual or individuals to submit proposals to install "an innovative street mural celebrating the diversity and history of the Near West Side.[36]" Suggested themes for the additional street murals being sought by the City included, "LGBTQ+ Pride and visibility or the neighborhood's Black, Indigenous, and Other People of Color (BIPOC) histories."[37] Therefore, alongside the other inaccuracies in Mr. Rouker's short email, it is clear that the City did at that time accept (and even solicit) proposed artwork from individuals. Moreover, the City had historically been open to the temporary display of artwork within its right-of-ways. Thus, key portions of the City Attorney's August 23, 2021 email rejection to Mr. Reynolds were inaccurate.

---

[36] Near Westside Traffic Mural, City of Bloomington, Request for Qualifications, P.Ex. 10, Dkt. 22-11 (filed 5/11/2022) PageID # 673.
[37] *Id.*

**E.  Bloomington Has Continued to Provide Misleading and False Justifications for Its Actions**

Recently, the City doubled down on Mr. Rouker's initial inaccurate statements to Kyle. The following are four more examples of Bloomington's less than forthright approach.

1.  City Attorney Rouker recently affirmed that "[n]o . . . application form or application process exists" [38] for "authority to place a mural in the public right-of-way." [39] Yet, as demonstrated above, public records confirm this claim is false. The Board of Public Works has on numerous prior occasions approved applications by groups to place murals in City right-of ways.

2.  The City's Attorney recently claimed that "Kyle Reynolds did not submit an application for authority to place an All Lives Matter mural in a public right-of-way of the City." [40] To the contrary, however, the communications described above between Kyle Reynolds and Mr. Wason and Mr. Rouker demonstrate that these officials were well aware Kyle was seeking authorization to place an All Lives Matter mural in a City right-of-way. Kyle's communications with Mr. Wason and Mr. Rouker cannot reasonably be construed as anything other than an attempt to obtain City approval to place an ALM mural in a City right-of-way. Certainly, were there any doubt in Mr. Rouker's mind it would have been dispelled by Kyle's immediate response to Rouker's rejection. Kyle said, "I would like to point out that

---

[38] Defendant City of Bloomington's Answers to Plaintiffs' First Limited Interrogatories Related to the Preliminary Injunction Issues ("City's Interrogatory Responses"), P.Ex. 11, Dkt. 22-12 (filed 5/11/22) p. 2 (Answer No. 1), PageID# 677.
[39] *Id.*
[40] City's Interrogatory Responses, p. 3 (Answer No. 2), PageID# 678.

11

the City approved a BLM piece of art only a few months ago, and I and the organizations I represent will be pursuing legal action against the city **if this mural doesn't receive approval**. . . I'm sure I don't need to inform you that governmental entities cannot discriminate on the viewpoints they allow to be expressed."[41]

3.      The City has also adopted a litigation position that, "[s]treet murals are public art and are done in cooperation with the Economic and Sustainable Development Department (referred to as "ESD") and the Arts Commission."[42] However, as explained above, the City has approved at least four street murals that were not submitted to the Arts Commission, and there is no documentation in the public record that the mural project of the Black Collegians group was submitted to the Arts Commission.

4.      Finally, the City now argues that "Kyle [Reynolds] did not submit any proposal to the ESD or Arts Commission to pursue an All Lives Matter street mural project, so his proposed project was never submitted for consideration by the ESD and Arts Commission to be accepted or rejected."[43] The City's litigation position that there existed a requirement for ESD and Arts Commission approval for street art is false. As explained above, the City has approved street murals proposed by groups in the past with no public record of approval by the Arts Commission. Indeed, City

---

[41] City's Answer, ¶ 77 ("Defendants admit that on August 23, 2021, Kyle Reynolds sent an email to City Attorney Mike Rouker, which email is quoted in paragraph 77 of Plaintiffs' Complaint.") (emphasis added).
[42] City's Interrogatory Responses, pp. 3-4 (Answer No. 2), PageID#s 678-679.
[43] *Id.*

Attorney Rouker himself claimed in his rejection email that the "*Board of Public Works* approves the placement of art in the public right-of-way,"[44] mentioning neither the ESD nor the Arts Commission. There is also no record of pre-painting approval of the Black Collegians' mural by any body, and even the after-the-fact staff report does not reference approval by the Arts Commission.[45] Further, Kyle Reynolds communicated with City Officials about the TPUSA mural project for nearly a month and was never advised of a need for ESD and/or Arts Commission approval. Had there been a requirement that Mr. Reynolds submit his request for approval of the ALM Mural to the Arts Commission or the ESD it was incumbent upon Mr. Wason and Mr. Rouker to tell him. They never did so.

## II.   Legal Discussion

### A.   Bloomington Created a Designated Forum in its Right-of-Ways

"When government creates . . . a forum, in either a literal or 'metaphysical' sense . . . 'viewpoint discrimination' is forbidden." *Matal v. Tam*, 137 S.Ct. 1744, 1763 (2017). "Once it has opened a . . . forum . . . [t]he State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum[.]'" *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Also, once a forum is created the government may not exercise "unbridled discretion" over who may speak in that forum. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988). If Bloomington created a forum through permitting private installation of temporary art in its right-of-ways it could not

---

[44]  City's Answer, ¶ 74 (italics added).
[45]  BPW Staff Report, P.Ex. 2C, Dkt. 7-9 (filed 3/10/22) (PageID # 368).

deny Plaintiffs access to that forum based on the content of their mural. Moreover, as the City has not adopted reasonable standards regarding who may or may not use the forum denial of access was also for that reason *per se* unconstitutional.[46]

Bloomington contends that its "selection and installation of three Black Lives Matter street murals is a form of government expression that is not subject to First Amendment scrutiny."[47] However, even if all three BLM street murals were considered government speech, this would not change that the City has on other occasions opened City right-of-ways to installation of temporary art by private groups, including at least three prior instances involving street murals unrelated to BLM street murals.[48] Plaintiffs have therefore demonstrated a likelihood of success on the merits even if all three BLM murals were government speech.

## B. The Black Collegians' Mural is Not Government Speech

In any case, the Black Collegians' mural does not qualify as government speech. Rather, the Black Collegians' mural is another example of the designated forum created by the City through authorizing installation of temporary art displays in its right-of-ways. As explained above, the City neither selected, nor installed, nor paid for, nor announced to the public, the Black Collegians' mural. The City merely chose to endorse the Black Collegians' mural and approve encroachment on its right-of-way, something the City had done through approval of numerous other placements of art in rights-of-way by private groups.

---

[46] *See* discussion in Plaintiff's opening brief, Dkt. 6 (filed 3/10/22) Page ID #s 294 – 297.
[47] City's Response at 9 Dkt. 18 (filed 4/11/22) PageID # 520.
[48] *See* City approved resident street mural painting projects described *supra* at notes 3–13.

There is no dispute the City Council earlier proposed, and the City funded, two Black Lives Matter street murals during 2020 – 2021. Both mural projects were specifically planned by the City, approved by the City's Common Council through formal resolutions, promoted by the City through press releases, and entirely paid for by the City. The City contends that in approving and paying for these murals the City was engaged in government speech. While Plaintiffs do not concede this assertion, as it is not relevant to this case, Plaintiffs do not address it further.

What is relevant to this case is the contrast between the City's intense involvement with the initial two BLM street murals and the student-directed way the Black Collegians' mural was brought forward. The circumstances surrounding the initial two BLM street murals are vastly different than those leading to the mural funded by IU student government and ultimately painted by the Black Collegians. These differences demonstrate that even if the initial two murals are government speech the Black Collegians' mural cannot be.

The Black Collegians' mural was not a part of the original BLM mural project pursued by Bloomington pursuant to Council Resolution 20-16, entitled: *Supporting the Painting of Two Black Lives Matter Street Murals – One on Elm Street and One at a Downtown Location to Be Determined*, passed by the Bloomington Common Council on September 23, 2020 and signed and approved by the Mayor of Bloomington on September 29, 2020.[49]

---

[49] Resolution 20-16 Supporting the Painting of Two Black Lives Matter Street Murals – One on Elm Street and One at a Downtown Location to Be Determined, Dkt. 18-6 (filed 4/11/22) PageID #s 548-549.

The foregoing title to Council resolution 20-16 literally says it all. While there was discussion at July 10 and July 14, 2020, meetings of the Banneker Community Center Advisory Council[50] about the possibility of the City "own[ing]" three mural "projects in funding and purpose to show the BIPOC [Black, Indigenous, and people of color] community its commitment to equity and justice,"[51] the official actions of the City's Common Council and Board of Public Works repeatedly and explicitly reaffirmed the City's commitment was ultimately to fund, develop and maintain *two* BLM murals as expressed in Bloomington Common Council Resolution 20-16.

The City describes a July 28, 2020, meeting with the Parks Department Board of Commissioners as having "explained the goal was to have three Black Lives Matter street murals[.]"[52] The minutes from this meeting, however, are less definitive, with the ESD representative stating merely "[t]here is a possibility of having three murals in the community."[53] Moreover, there is no further reference in any public document after July 28, 2020, to the City seeking to install a third mural.

In fact, the July 2020 "Community Mural Proposal" proposed by the Banneker Community Center Advisory Council contains a "Recommendation for construction of *two* Black Lives Matter murals in Bloomington, Indiana."[54] The City has identified no evidence reflecting an official purpose of the City to pursue a third

---

[50] Pearson Affidavit, at ¶¶ 4 – 21, Dkt. 18-15 (filed 4/11/22), PageID #s 572-575.
[51] *Id.* at ¶ 10.
[52] City's Response at 5, Dkt. 18 (filed 4/11/22) PageID # 516.
[53] Board of Park Commissioner Minutes, July 28, 2020, Dkt. 18-5 (filed 4/11/22) PageID 546.
[54] Community Mural Proposal, Dkt. 18-4 (filed 4/11/22), PageID # 538 (emphasis added).

BLM mural, as an interdepartmental project, after the second BLM mural was painted in downtown Bloomington on or about April 17, 2021.[55] In this regard, the terminology in the Board of Public Works Staff Reports describing the two City murals and the Black Collegians' mural confirms the differences in the instigators of the projects. The September 29, 2020, Staff Report concerning the first BLM mural to be installed on Elm Street observed that "[w]e are also planning an additional mural somewhere downtown, pending public engagement."[56] This Staff Report referred to the Elm Street BLM mural as an "interdepartmental project."[57] The April 17, 2021, Staff Report concerning the second BLM mural which was to be installed on 6th Street likewise referred to the 6th Street BLM mural as an "interdepartmental project."[58] In contrast, the Staff Report concerning the Black Collegians' mural refers to it as a "community project."[59] The differing terminology in the Staff Reports is further confirmation of the distinction between the first two BLM murals recognized to be "interdepartmental projects" and the Black Collegians' mural referred to as a "community project."

The City relies on *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009). However, this case is nothing like *Summum*, where the Court found that,

---

[55] News Release: City's Second Black Lives Matter Mural to be Installed on Downtown Square, Dkt. 18-18 (filed 4/11/22), PageID #s 586-589.

[56] Board of Public Works Staff Report (for meeting date Sept. 29, 2020), Dkt. 7-7 (filed 3/10/22), PageID# 324.

[57] *Id*.

[58] Board of Public Works Staff Report (for meeting date Apr. 13, 2021), Dkt. 7-8 (filed 3/10/22), PageID# 334.

[59] Board of Public Works Staff Report (for meeting date Aug. 3, 2021), Dkt. 7-9 (filed 3/10/22), PageID# 368.

"[p]ermanent monuments displayed on public property typically represent government speech." *Id.* at 470. As the Court pointed out in *Summum*, "public parks can accommodate only a limited number of permanent monuments. . . monuments. . . endure. . . [t]hey monopolize the use of the land on which they stand and interfere permanently with other uses of public space." *Id.* at 478-79. It was the permanence of the monuments at issue in *Summum* that caused the Court to be reluctant to apply forum analysis. *Id.* at 480. However, the Court expressly noted that "temporary private displays" might be analyzed differently. *Id.*

In contrast to monuments, street paintings are temporary, non-permanent displays. For instance, the Black Collegians' mural became largely illegible within months after it was painted, undoubtedly owing to the effects of weather and traffic.[60] Thus, street paintings are not entitled to a similar presumption of permanence as public monuments, and when initiated and paid for by outside groups are subject to forum analysis and should not be considered government speech.

The City also relies upon *Walker vs. Texas Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015). As with *Summum*, the *Walker* case is not closely analogous to the facts in this case. In *Walker*, the Court found that automobile license plates constituted government speech and were not subject to forum analysis. Important to the Court's holding in *Walker* was that "the State exercises

---

[60] Second Declaration of Kyle Reynolds, ¶¶ 1-9 (attaching photographs depicting illegibility of the Black Collegians' mural in March and May 2022), P.Ex. 12, Dkt. 22-13 (filed 5/11/22) PageID#s 682 - 708.

final authority over each specialty license design." *Id*. at 216. In contrast, however, there is no evidence that the City retained final authority over the design of the Black Collegians' mural. Nor is there evidence any City official was present when the mural was painted and there exists no record the design was presented to the City for pre-approval. The *Walker* Court considered it relevant that, "Texas takes ownership of each specialty plate design" and the plates "are primarily used as a form of government ID, and bear that State's name." *Id*. These additional factors have no resonance in the instant case, making clear that *Walker* as well does not lead to a conclusion that the Black Collegians' mural should be considered government speech.

Moreover, *Walker* "likely marks the outer bounds of the government-speech doctrine." *Matal*, 137 S. Ct. at 1760. The lack of fit with *Summum* and *Walker*, make clear the government-speech doctrine cannot be stretched to insulate Bloomington from its duty to treat similarly situated speakers equivalently.

The Black Collegians' mural and the other murals the City has allowed private residents to paint on City streets make this case more closely analogous to the Court's recent decision in *Shurtleff v. City of Boston*, 2022 WL 1295700, -- S.Ct. -- (May 2, 2022), than to *Summum* or *Walker*. In *Shurtleff*, the City of Boston occasionally permitted members of the public to apply to fly a flag on a city flagpole also used to display the City of Boston flag. A unanimous Court held that "the city's lack of meaningful involvement in the selection of flags or the crafting of their messages leads us to classify the flag raisings as private, not government speech[.]"

*Id.* at *7. The *Shurtleff* Court found it significant that Boston had "no written policies or clear internal guidance—about what flags groups could fly and what those flags would communicate." *Id.* Likewise, Bloomington has issued no written policies or clear internal guidance regarding what street murals or other temporary artwork can be placed in right-of-ways or what such temporary artwork may communicate. Therefore, this Court should find the City created a forum for the dissemination of private speech through placement of temporary art in City right-of-ways. "[T]hough nothing prevents [Bloomington] from changing its policies going forward," the City violated the First Amendment when it refused to permit Plaintiffs access to the forum it created. *Id.*

There is no evidence that Bloomington prospectively enlisted the Black Collegians to convey Bloomington's message. Rather, the evidence is that Bloomington had previously determined to advance its message by encouraging and paying for the creation of *two* BLM street murals in other locations. The fact that the Black Collegians produced a message that was consistent with the City's did not make the Black Collegians' mural government speech. Although "the government can 'adop[t]' a medium of expression created by a private party and use it to express a government message," this requires that "the private party must alienate control over the medium of expression to the government. And government actors must put the medium to use to intentionally express a government message." *Shurtleff*, 2022 WL at *12 (Alito, J., concurring). Here, the Black Collegians never alienated control over their medium of expression. Rather, the Black Collegians painted their

20

message as they originally intended and without City control over their artwork. Further, the City has not put the medium to use to intentionally express a government message. In contrast to how the City handled its own murals, Bloomington did not issue a press release or hold a public dedication ceremony in connection with the Black Collegians' mural. Indeed, the Board of Public Works did not even adopt a formal resolution approving the Black Collegians' mural, instead merely approving a staff report that referenced it. Thus, the record reflects that the street mural conceived, labored over, and painted by the Black Collegians group and their supporters was not government speech.

*Shurtleff* indicates that the three-part test advanced in the City's response brief is not controlling. Nevertheless, applying the City's three-part test also leads to a decision in Plaintiffs' favor. The first factor is consideration of the history of the medium in which the message is sought to be expressed. As explained above, while in many cities "[p]ainting on city streets is traditionally for government messages only,"[61] in Bloomington, there is a history of permitting painting on City streets to convey private messages. The City ignores this history. Yet, the history exists, as explained above, and it cuts in favor of Plaintiffs on the first factor.

The public perception factor also favors Plaintiffs. A reasonable observer would consider the Black Collegians' mural to have communicated the student's own message and not a government message. As explained above, the public messages IU sent out on Twitter connected the mural solely to the Black

---

[61] City's Response at 11, Dkt. 18 (filed 4/11/22) PageID# 522.

Collegians.[62] Numerous news articles submitted with Plaintiffs' opening brief reflect the public focus on the students who conceived the Black Collegians' mural and brought it into being and what the students intended to communicate through it.[63]

The City has identified no press release from the City suggesting that the Black Collegians' mural was government speech. Rather, the City's brief points only to resolutions which specifically referred to the City intending to adopt only *two* murals. Response at 12-13. These resolutions, which do not reference the Black Collegians' mural, undermine the City's argument, making it clear that there is an absence of evidence from which a reasonable observer could conclude the Black Collegians' mural was government speech.

The final factor, "the extent to which the government has actively shaped or controlled the expression," *Shurtleff* , *4, also favors finding the Black Collegians' mural was private speech. There is no evidence that Bloomington shaped or controlled the Black Collegians' message in any way. Moreover, *none* of the Exhibits relied upon by the City in relation to this argument reference the Black Collegians' mural. *See* City's Response at 13 (citing Exhibits 101, 102, 115, 119-123).

Missing from the City's response is any cogent justification for denying Kyle Reynolds' application to paint a street mural in a City right-of-way. Others have been permitted to paint murals in a City right-of-way. So, why were Kyle Reynolds and TPUSA denied the opportunity to express their views in that way? As explained

---

[62] *See supra* at footnotes 23 and 24 and associated text quoting IU administration tweets.
[63] P.Exs. 3A, 3B, 3C, 3D, Dkts. 7-13, 7-14, 7-15 (filed 3/10/22) PageID #s 396 – 409.

above, the City has not provided a credible reason for the denial, leading to an inference the denial was based on a desire to censor the message. In his concurring opinion in *Shurtleff*, Justice Alito, author of the Court's opinion in *Summum*, cautioned that, "courts must be very careful when a government claims that speech by one or more private speakers is actually government speech. When that occurs, it can be difficult to tell whether the government is using the doctrine 'as a subterfuge for favoring certain private speakers over others based on viewpoint,' [*Summum*, 555 U.S.] at 473 . . . and the government-speech doctrine becomes 'susceptible to dangerous misuse.'" *Shurtleff*, 2022 WL at *8 (Alito, J., concurring) (quoting *Matal*, 137 S.Ct. at 1758. Justice Alito's caution is directly applicable here. Plaintiffs are entitled to an injunction.

### C.  Bloomington Violated the Equal Privileges and Immunities Guarantee in the Indiana Constitution

Likewise, Defendants lack a credible argument opposing application of Ind. Const. Art. I, § 23. While Defendants argue that an act of the General Assembly is not at issue, they ignore the Indiana cases relied on in Plaintiffs' opening brief and cited in the Complaint which hold this provision also applies to actions of municipalities.[64] Next, Defendants contend Plaintiffs are not similarly situated to the Black Collegians. Yet, as explained above, other groups have been permitted to paint street murals, and the Plaintiffs and Black Collegians are in equivalent positions. Both are student organizations at IU in Bloomington.

---

[64] *See Paul Stieler Enterprises, Inc. v. City of Evansville*, 2 N.E.2d 1269 (Ind. 2014); *Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 199 (2016).

The City contends it "was specifically seeking proposals for artists and volunteers to create and install three Black Lives Matter street murals"[65] but this convenient excuse, contained only in the argument section of the City's response, is not supported by any citation to evidence. The City elaborates further on its request for proposal fiction, claiming: "every artist's submission was required to be a 'Black Lives Matter' mural. To be considered for one of the three street murals, every submission had to include a proposed Black Lives Matter design."[66] These contentions likewise lack any basis in fact. [67] There was no such request for proposals, and the Black Collegians' mural was not submitted as part of some sort of request for proposal process with specified artist requirements. And, as explained in detail above, even though there was discussion at two Banneker Community Advisory Council meetings and at one Parks Board meeting (all held in July 2020) about three murals, there is simply no evidence that having three murals was ever adopted as a City program or goal. There is certainly no evidence that proposals for a third BLM mural were being sought by the City in the summer of 2021 at the time the Black Collegians obtained approval to paint their mural on a City street, much less that the Black Collegians advanced their mural in response to a City request

---

[65] City's Response, Dkt. 18 (filed 4/11/22) PageID # 526.

[66] *Id.*

[67] The City's numerous after-the-fact and unsubstantiated justifications for rejecting Plaintiffs' ALM mural are plainly pretextual, providing additional support for the conclusion that Bloomington's refusal to consider TPUSA's application to place a street mural in a public right-of-way violated Plaintiffs' First Amendment rights. *See, e.g., Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012) ("pretext in the form of 'a dishonest explanation, a lie rather than an oddity or an error'" can result in a finding of discriminatory motive).

for proposals. Bloomington has also violated the Equal Privileges and Immunities Guarantee in the Indiana Constitution.

### D.     Plaintiffs Are Entitled to a Preliminary Injunction

Last, the City contends Plaintiffs will not suffer irreparable harm if denied preliminary injunctive relief. However, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *Accord Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm."). Therefore, upon establishing a likelihood of success, the balance of harms automatically weighs in Plaintiffs' favor.

For each of the foregoing reasons, Plaintiffs have demonstrated a strong likelihood of success on the merits and are entitled to a preliminary injunction.

Respectfully submitted,
**KROGER, GARDIS & REGAS, LLP**

/s/ William Bock, III
William Bock, III, Atty. No. 14777-49

ATTORNEY FOR PLAINTIFFS

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2022, I filed the foregoing *Plaintiffs' Reply*

*Brief in Support of Motion for Preliminary Injunction* electronically with the Clerk

of the Court.  Notice of this filing will be sent to the following by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's

system.

> Liberty L. Roberts
> CHURCH CHURCH HITTLE + ANTRIM
> Two North Ninth Street
> Noblesville, IN 46060
> lroberts@cchalaw.com

> /s/ William Bock, III
> William Bock, III

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000