UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA UNIVERSITY CHAPTER OF TURNING POINT USA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:22-cv-00458-SEB-TAB |
| CITY OF BLOOMINGTON, INDIANA, et al., | ) ) ) | |
| Defendants. | ) | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction [Dkt. 5], filed pursuant to Federal Rule of Civil Procedure 65. Specifically, Plaintiffs Indiana University Chapter of Turning Point USA and Kyle Reynolds seek preliminary relief enjoining Defendants City of Bloomington, Indiana, Adam Weston, in his official capacity as Director of Public Works for the City of Bloomington, and Kyla Cox Deckard, Beth H. Hollingsworth, and Dana Henke, in their official capacities as members of the Board of Public Works of the City of Bloomington, Indiana (collectively, the "City"), from enforcing the City's "right-of-way art policy" against Plaintiffs, which Plaintiffs allege violates their rights secured by the First Amendment to the United States Constitution, by prohibiting them from painting their proposed "All Lives Matter" mural.

Having considered the parties briefing and the documentary evidence, for the reasons detailed below, we <u>GRANT</u> Plaintiffs' motion.

1

**Factual Background**

**The Black Lives Matter Mural Project**

On May 6, 2020, the City adopted a resolution "denounc[ing] and condemn[ing] hate based on racial, social, and cultural bias and hold[ing] up values of peace, respect, inclusivity, and equity."  Exh. 100 (Resolution 20-06).  In furtherance of this resolution, on July 10, 2020, a group of City employees and appointees to a City advisory council known as the Banneker Community Center Advisory Committee (BCCAC)[1] met to discuss the feasibility of developing Black Lives Matter ("BLM") street murals at the Banneker Community Center[2] and other locations within the City, an idea suggested by two BCCAC members, JaQuita Roberts and Nichelle Whitney.  Prior to the July 10th meeting, several City Departments, including the Office of the Mayor, Department of Public Works, Street Department, Community and Family Resources, Safe and Civil City, and Economic and Sustainable Development had expressed support for and endorsement of a BLM street mural project.

During the July 10th meeting, the attendees identified the following three potential locations in Bloomington for BLM street murals: Elm Street, in front of the Banneker Community Center gymnasium; Kirkwood Avenue, near the Monroe County Courthouse; and Jordan (now Eagleson) Avenue.  The group selected the Elm Street location for the first mural after discussing the level of traffic on the street as well as the type of design to

---

[1] BCCAC members are appointed by the City of Bloomington Board of Park Commissioners.
[2] The Banneker Community Center is a building owned by the City of Bloomington and used by the City's Parks and Recreation Department for City programs and services.

determine whether high traffic paint or exterior paint should be applied to produce the signage.  The attendees also discussed the manner in which the City should share information with the public about the mural project, deciding that a press release about the project should issue at a time that coincided with release of information regarding the City's formal adoption of policy actions in support of equity and justice for Black residents and the renaming of Jordan Avenue to Eagleson Avenue.[3]  The importance of the City's "own[ing]" the mural project "in funding and purpose to show the BIPOC community its commitment to equity and justice" was also addressed at the July 10th meeting.  Pearson Aff. ¶ 10.  At the close of the meeting, the City employees and members of the BCCAC were assigned specific tasks aimed at moving the mural project forward, including exploring funding sources, paint types, and local artists, communicating with Indiana University ("IU") administration and IU's Black Student Union, and engaging other community partners in the project.  *Id.* ¶ 17.

On July 28, 2020, the BLM street mural project was presented to the City's Parks Department and the Board of Parks Commissioners at their regular meeting.  The minutes from that meeting show that the Board discussed that the City "needs to take the onus of funding [the project] to show the Bloomington community its commitment to equality and justice."  Exh. 104 at 5.  During that meeting, Sean Starowitz, who at that time was

---

[3] The City renamed Jordan Avenue south of 17th Street, "Eagleson Avenue," in honor of four generations of the Eagleson family, including Halson Vashon Ealeson, who was born enslaved in 1851, and who arrived in Bloomington in the 1880s and became a prominent barber.  Mr. Eagleson's five children all attended Indiana University.  Jordan Avenue was previously named in honor of David Starr Jordan, whose "views … on eugenics and racial differences conflict … with the City's commitment to promote inclusion and equity in the community …."  Dkt. 7-14.

the City's Assistant Arts Director, stated that, in addition to the Elm Street mural and the

"downtown mural," there was "a possibility of having three murals in the community, as

there will be conversations with the County for possible partnerships, with [] Enough is

Enough[] and with Indiana University."  *Id.*  Mr. Starowitz informed the Parks Board that

the Bloomington Arts Commission had invited several artists of color to submit mural

proposals and that at that point the City had received six submissions from artists.  *Id.*

Mr. Starowitz indicated that "due to [the] limited number, this may be extended," with a

preference for Black artists on the project.  *Id.*  Following this discussion, the Parks

Board unanimously approved the BCCAC's recommendation to proceed with the BLM

street mural project.  *Id.* at 6.

Although the possibility of three BLM street murals had arisen during the Parks

Board meeting, the City passed Resolution 20-16 on September 23, 2020 officially

"endors[ing] the painting of two Black Lives Matter murals—one on Elm Street in front

of the Banneker Center, or at such other nearby location as the City and the Banneker

Community Center Advisory Counsel agree is appropriate, and one at a downtown

location to be determined, and support[ing] the City's use of existing funds to pay the

artist(s) hired to design and paint the mural."  Exh. 105.  Resolution 20-16 "call[ed] on

the Board of Public Works to permit th[e] use of a public right of way and join in th[e]

public display of support for [] Black and Brown residents who have been fighting for

justice and equality for far too long."  *Id.*

4

**The First Black Lives Matter Mural**

On September 29, 2020, Mr. Starowitz presented the Board of Public Works with Resolution 2020-50 requesting approval of a right-of-way encroachment for the painting of a BLM mural on the surface of Elm Street between 7th and 8th Streets.  Exh. 106 at 2. Mr. Starowitz indicated that the BLM street mural project was a "collaboration between the Board of Parks Commissioners, Banneker Community Center Advisory Council, Bloomington Arts Commission, the Office of the Mayor, Community and Family Resources Department and Bloomington Common Council."  *Id.*  In addition to the encroachment then requested, Mr. Starowitz stated that the City was "also planning an additional mural somewhere downtown, pending public engagement."  *Id.*  He further stated that the "interdepartmental project [was] requesting the Board of Public Works to permit [the] use of a public right of way and join in this public display of support for our Black and Brown residents, who have been fighting for justice and equality for far too long."  *Id.*  The Board of Public Works unanimously approved Resolution 2020-50 allowing for the encroachment for the first BLM street mural, which mural was painted on October 24, 2020.  *Id.* at 3.

The City issued a press release on November 13, 2020, inviting community members to a virtual dedication ceremony for "the City's newly completed Black Lives Matter street mural project …."  Exh. 116.  In that press release, Bloomington Mayor John Hamilton stated: "The City is proud that the words 'Black Lives Matter' live on our street ….  We appreciate the residents who led this public art project and the many who helped bring it to life, and we look forward to continuing to engage with residents to live

5

out the words in actions, to continue to address long-standing issues of racism and

discrimination in our community." *Id.*  A few weeks later, on December 1, 2020, the City

issued a press release announcing that "the City's second Black Lives Matter street mural

will be installed in downtown Bloomington on West Sixth Street between College and

Walnut (the north side of the square) in the spring." Exh. 117.  The December 1, 2020

press release indicated that funding for the first street mural had come from "unused

municipal dollars originally budgeted and earmarked" for another project that was

cancelled due to the COVID-19 pandemic and that the second street mural "will utilize

material (such as paint) already purchased for the first mural; additional funds needed

will come from the Department of Economic[] and Sustainable Development." *Id.*

**The Second Black Lives Matter Street Mural**

On April 13, 2021, Mr. Starowitz presented a second proposal to the Board of

Public Works authorizing the painting of the second BLM mural on 6th Street between

North College Avenue and North Walnut Streets.  Since this was part of the same project

previously approved by the Board of Public Works, consideration of Mr. Starowitz's Staff

Report regarding the second mural and the requested Resolution for the encroachment of

the right-of-way was addressed as part of the Board's consent agenda. Exh. 109 at 1.  As

with the first BLM mural, the second mural was identified as an "interdepartmental

project" whose purpose was to display support for "our Black and Brown residents who

have been fighting for justice and equality for far too long." Exh. 108.  The Board of

Public Works without further discussion approved Resolution 2021-10 authorizing the

encroachment for the second BLM street mural.  *Id.*

6

The City issued a press release on April 14, 2021, informing the public that "[t]he City's second Black Lives Matter street mural was approved … by the Board of Public Works for installation on the north side of the downtown square."  Exh. 118.  Mayor John Hamilton was quoted in the press release as follows: "The City is proud to welcome these murals to our public art landscape ….  Putting the words Black Lives Matter at the heart of our downtown matches up with values at the heart of this community: equity, inclusion, and justice.  The words on the street will serve as a constant reminder to combat the persistence of racism and discrimination in Bloomington and beyond."  *Id.*

**The Third Black Lives Matter Street Mural**

In June 2021, Mr. Starowitz transitioned from his position as the Assistant Arts Director for the City to a new employment opportunity outside City government, which created a temporary vacancy in that position until a new Assistant Director was hired three months later, in September 2021.  According to Adam Wason, Director of Public Works for the City of Bloomington, while Mr. Starowitz was transitioning from his position, "the City was working on the approval and installation of the third and final Black Lives Matter street mural."  Wason Aff. ¶ 8.  After Mr. Starowitz's departure, Mr. Wason assumed a "more active role in the selection and approval" of the third BLM street mural.  *Id.* ¶ 9.  Specifically, Mr. Wason, testifying by affidavit, said that he "worked with Indiana University and the Black Collegians for the installation of the third mural which was painted on Jordan Avenue, which is now known as Eagleson Avenue."  *Id.* ¶ 10.  The third BLM street mural was funded in part by Indiana University's funding board and painted on July 3–5, 2021; those funds came from mandatory student fees as

7

well as donations from individual community members and the Division of Student Affairs.  Exh. 3A.

The Staff Report for the third BLM mural was due to be presented to the Board of Public Works for approval in June 2021.  However, an oversight attributable to Mr. Starowitz's transition left the Staff Report for the third BLM mural unavailable for presentation to the Board of Public Works prior to the mural's scheduled installation. Following discovery of this omission, Mr. Wason finalized and presented the Staff Report to the Board of Public Works at the next regularly scheduled board meeting on August 3, 2021.  This date came approximately one month following the painting of the third BLM mural.  In that Staff Report, Mr. Wason stated that the mural had been endorsed by the City of Bloomington Economic & Sustainable Development Department, Office of the Mayor, Community Family Resources Department, and the Public Works Department and had been completed in partnership with Indiana University's Provost Office and the Black Collegians student group.  The Staff Report further described the third BLM mural as a "community project" and requested now after the fact that the Board of Public Works "permit this use of a public right of way and join in this public display of support for our Black and Brown residents who have been fighting for justice." Exh. 111.

The Staff Report explained that the request for approval was being made after the mural had already been completed "due to an oversight by staff as City personnel transitioned out of the organization," but that "[i]ntentions were always to work with IU and this student group, and have this before the Board in early June."  *Id.*  As with the

8

second BLM street mural, this request was included on the consent agenda of the Board of Public Works.  On August 3, 2021, the Board retroactively approved the third BLM street mural's encroachment on Jordan/Eagleson Avenue.

**Social Media and Press Coverage of Third Black Lives Matter Mural**

On July 5, 2021, the Black Collegians posted on their Facebook page the following message about the third BLM street mural: "Construction begins for our Black Lives Matter Street Mural on Jordan Avenue this Morning.  What an exciting time! #BlackCollegiansInc #blacklivesmatter."  Exh. 3E.  Following completion of the mural, Indiana University referenced the mural on its website and official Twitter feed, publicly thanking "the Black Collegians group for bringing this mural to life on our campus." Exh. 3F.  The University's Provost tweeted, "[t]he Black Collegians finished the amazing Black Lives Matter mural on Jordan Ave.  If you're on the @IUBloomington campus, check it out between @NMBCC_IU and @IU_Groups buildings!"  Exh. 3G.  Several news articles published at the time the street mural was painted detailed the efforts of the Black Collegians group to bring the BLM mural to Indiana University's campus and the students' involvement with the University in choosing the mural's location on Jordan/Eagleson Avenue.  Exhs. 3A; 3B; 3C; 3D.

**Plaintiffs' Request to Install All Lives Matter Street Mural**

Near the end of July 2021, and a few weeks after the third BLM street mural was installed on Jordan/Eagleson Avenue, Plaintiffs Kyle Reynolds and the Indiana University Chapter of Turning Point USA, an organization that describes itself as seeking to identify, educate, train, and organize students to promote principles of freedom, free

markets, and limited government, began sending emails to Indiana University and City officials requesting approval for a street mural stating, "All Lives Matter."  Plaintiffs stated that they believe that the "Black Lives Matter" statement is "contradictory to [their] core principles" and that they wished to express their own view that "all lives matter" by creating a mural setting out that message that would be similar in size and scope to the BLM mural painted on Jordan/Eagleson Avenue.  Exh. 1A.

On July 20, 2021, Mr. Reynolds reached out to Indiana University via email requesting permission to create an All Lives Matter mural on campus "[i]deally … on a large street, such as the one utilized for the BLM mural, however, any large space with high visibility on campus should be adequate."  Exh. 1A.  On July 26, 2021, Indiana University's office of Student Involvement and Leadership directed Mr. Reynolds to IU Vice President Thomas Morrison.  Mr. Reynolds then emailed his request to Vice President Morrison, who replied that the "BLM mural was created on a street owned by the City of Bloomington.  Thus, the City was the entity that ultimately approved the mural."  Exh. 1B.  Accordingly, Vice President Morrison instructed Mr. Reynolds to contact the City for further inquiry.  *Id.*

On July 29, 2021, Mr. Reynolds emailed Mr. Wason expressing his desire to create the All Lives Matter mural and requesting a permit to do so.  Mr. Wason replied on August 2, 2021, informing Mr. Reynolds that he "need[ed] to work with the IUB President's Office, as did the other group, in order to get the concept for any murals approved for placement on any streets on campus."  Exh. 1D.  After Mr. Reynolds conveyed this information to Vice President Morrison, Morrison replied that Mr.

Reynold's request was now "delegated to [him]," "as it was with the BLM group."  Exh.

1B.  Vice President Morrison requested that Mr. Reynolds send location ideas and a

proposed graphic for the All Lives Matter mural, which Mr. Reynolds did.  *Id.*

Upon review of the proposed mural design, featuring the phrase "All Lives

Matter" with blue and red lines to represent support for first responders, Vice President

Morrison emailed Mr. Reynolds saying that, "the graphic and sizing look good on my

end," and recommending that Mr. Reynolds "relay to the City that IU is ok with the East

Kirkwood location," a public right-of-way running through Indiana University's campus,

for the All Lives Matter mural.  Exh. 1B.  In that email, Vice President Morrison

reiterated that "[it] is the City's ultimate approval" that was required and that his input

mattered only because the City "consults with [the University] as an adjacent property

owner."  *Id.*

On August 3, 2021, Mr. Reynolds emailed Mr. Wason informing him that the

proposed All Lives Matter mural "was approved by the IUB President's Office,

specifically … Thomas Morrison."  Exh. 1D.  Mr. Wason responded on August 10, 2021,

instructing Mr. Reynolds to speak with "City Legal" about the mural and informing Mr.

Reynolds that "Mr. Morrison's office is also not in agreement with your take on IU

'giving permission.'"  *Id.*  That same day, Mr. Reynolds contacted City Attorney Michael

Rouker to report on his conversations with Mr. Wason and Vice President Morrison.  Mr.

Rouker responded to Mr. Reynolds on August 23, 2021, informing him that it is "the City

of Bloomington's Board of Public Works [that] approves the placement of art in the

public right of way.  The City does not take recommendations for art in its right of way

from individuals, and, at this time, the City is not considering adding additional art within its right of way." *Id.* This withholding of authorization is the decision challenged in this litigation for which a preliminary injunction is sought in an effort to secure the necessary approval(s).

**The City's Public Art Master Plan**

In January 2015, several years prior to the events at issue in this litigation, the Bloomington Arts Commission, an entity established by the Bloomington Common Council, developed a Public Art Master Plan for the City that "articulate[s] not only the principles and guidelines for those public art activities with which [the Commission] has direct connection, but also to put forth a blueprint for the ideal public art environment for the city of Bloomington, recognizing that the arts exist within a physical, artistic, sociological, governmental and economic construct that is constantly shifting." Exh. 126 at 1. The term "public art" is defined by the Master Plan as "any mode of temporary or permanent artistic expression or process that is funded through any source and is produced with the intention of making it available to the public." *Id.* at 3.

The Master Plan recognizes that "[a]rt created for the public sphere can give form to core values of the community, such as freedom of speech and expression, alongside respect for diverse viewers and users" and "can reflect the history of the community, including the evolution of taste, values, and formal expressions as well as challenge previously held views." *Id.* The Master Plan lists several "Priorities for Public Art," including "[p]rovid[ing] resources, training and mentorship for public art project development and management to organizations, collectives, neighborhoods, students,

individual artists and the general public," "[i]ncorporat[ing] works of public art and performance in high-traffic transportation corridors and pedestrian areas" by "[c]ontinu[ing] the placement of works of public art in roundabouts and intersections" and "[e]ncourag[ing] community-based works of public art and performance that support neighborhood cohesion and vitality" by "[o]ffer[ing] opportunities for citizens to work directly with providers to develop art projects for their neighborhoods." *Id.* at 6.

**Public Art Projects Approved by the City in Rights-of-Way**

Apart from the three Black Lives Matter murals, Plaintiffs have pointed to the following additional instances in which the Board of Public Works has approved encroachments on City rights-of-way for public art displays:

- 2021 Middle Way House Public Art Display

In August 2021, the Board of Public Works approved a Special Event Application from the Middle Way House, a nonprofit organization providing services for survivors of domestic abuse, sexual assault, stalking, and human trafficking, for its annual "wrapped in love public art display," beginning on October 1, 2021, and ending on March 1, 2022. Exh. 2B.  This public art display involved community participants wrapping trees and light posts located in various rights-of-way with knitted textiles and yarn "to raise awareness and funding for violence victim services." *Id.*

- 2018 Prospect Hill Neighborhood Street Painting Party

In July 2018, the Board of Public Works approved a Special Event Application from the Prospect Hill Neighborhood Association to host a "Street Mural Painting Party" that involved "paint[ing] and clos[ing] the intersection of Fairview and Howe Street to

13

install a public art project in the street." Exh. 8E at 4. The Board of Public Works resolution approving this application states that "the Neighborhood" would be responsible for posting "no parking signs," developing a Maintenance of Traffic Plan to be approved by the Planning and Transportation Department, obtaining and paying for any required barricades, financing and obtaining any and all required permits and licenses, and notifying the public, public transit, and public safety agencies of the street closing. *Id.* at 5.

Prior to the presentation of this request to the Board of Public Works, the Prospect Hill Neighborhood Association had submitted an application and been awarded a Neighborhood Improvement Grant for the street mural project, as public art subject to the design constraints of the City. The design that was ultimately selected and used for the project was called "Common Pollen" and consisted of a circular shape with points suggesting radiating petals of a sunflower. Exh. 124 ¶ 29 and Exh. B.

- <u>2017 McDoel Neighborhood Street Painting Party</u>

In July 2017, the Board of Public Works approved a Special Event Application from the McDoel Neighborhood Association subset "Dodds and Fairview Street Painting Group" to "paint and partially close the intersection of Fairview and Dodds Street" for a "Street Mural Painting Party." Exh. 8C at 3. The Board of Public Works resolution approving this request states that "the Neighborhood" would be responsible for posting "no parking signs," developing a Maintenance of Traffic Plan to be approved by the Planning and Transportation Department, obtaining and paying for any required barricades, financing and obtaining any and all required permits and licenses, and

notifying the public, public transit, and public safety agencies of the street closing.  *Id.* at
4.  The design that was painted on the intersection was approved by the City's Traffic and
Transportation and Planning and Transportation Engineers and consisted of colorful
spiraling sections that formed a turtle in the middle of the circle.  *Id.* at 11–12.  The
design did not include any words, letters, numbers, or other universally understood
symbols.

- 2017 Near Westside Neighborhood Association Block Party and Mural Painting
  Project

In May 2017, the Board of Public Works approved a request from the Westside
Neighborhood Association in collaboration with the Department of Economic and
Sustainable Development to hold "a neighborhood block party and traffic calming mural
painting," on 7th Street Between Adams and Waldron Streets.  The "traffic calming"
devices referenced are concrete circles that surround planters located in the middle of
intersections on 7th Street in Bloomington.  The City hosted the event and was
responsible for the posting of signs, developing a traffic plan, placing barricades it
funded, obtaining all permits and licenses, notifying the public, public transit, and public
safety of the event, and cleaning the street before and after the block party.  The
Department of Economic Sustainable Development worked with artist, Emily Wilson, to
create a geometric design that was painted on the traffic calming devices during the block
party.  The design did not include any words, letters, numbers, or other universally
understood symbols.

Plaintiffs cite these prior authorizations as evidence in support of their claim that the City's withholding of permission of their request was viewpoint-based, in violation of their constitutional rights.

**The Instant Litigation**

Plaintiffs originally filed their complaint and motion for preliminary injunction in Monroe Superior Court on February 23, 2022, alleging that Defendants' failure to permit them to paint their proposed All Lives Matter street mural constituted viewpoint discrimination in violation of their free speech rights as guaranteed by the First Amendment to the United States Constitution and Article 1, Section 9 of the Indiana Constitution, and also violated their right to equal privileges and immunities under the laws as guaranteed by Article 1, Section 23 of the Indiana Constitution.  Defendants removed the case to this Court on March 9, 2022, and Plaintiffs renewed their motion for preliminary injunction the next day, on March 10, 2022.  After additional discovery, two motions for extension of time filed by Plaintiffs, and multiple rounds of supplemental briefing requested by the parties, Plaintiffs' motion for preliminary injunctive relief became fully briefed on September 8, 2022 and is now before us for decision.

<u>Legal Analysis</u>

**I.     Preliminary Injunction Standard**

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; (3) irreparable harm absent the injunction.  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If the moving party fails to

demonstrate any one of these three threshold requirements, the injunctive relief must be denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). At this stage of the analysis, "a mere possibility of success is not enough." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Thus, Plaintiffs "must demonstrate that '[their] claim has some likelihood of success on the merits …, not merely a 'better than negligible' chance.'" *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (internal citations omitted).

If these threshold conditions are met, the Court must then assess the balance of the harm—the harm to Plaintiffs, if the injunction is not issued, against the harm to Defendants, if it is issued—and determine the effect of an injunction on the public interest. *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020). "[T]he more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays*, 974 F.3d at 818.

## II. First Amendment Viewpoint Discrimination Claim[4]

### A. Likelihood of Success on the Merits

Plaintiffs argue that they have established a reasonable likelihood of success on the merits of their claim that the City in withholding approval for their proposed mural engaged in viewpoint discrimination in violation of their First Amendment rights.

---

[4] Although Plaintiffs indicate that they are seeking preliminary injunctive relief on their free speech claims under the First Amendment and Article 1, Section 9 of the Indiana Constitution, the parties have discussed only the First Amendment in their briefing of this motion. The only mention of the Indiana Constitution is with regard to Plaintiffs' privileges and immunities claim. Accordingly, we limit our discussion of Plaintiffs' free speech claim to the First Amendment.

Plaintiffs claim that denial of their request to paint an "All Lives Matter" street mural on a City-owned street while permitting other private individuals and groups to display public art on the surface of City-owned streets and other rights-of-way within the City, including the "Black Lives Matter" street mural painted by the Black Collegians, another Indiana University student group, which was displayed on what is now Eagleson Avenue, was unconstitutional.  In response, the City invokes the government speech doctrine, arguing that the three Black Lives Matter murals painted on City-owned streets were all messages expressed by the City itself and as such they did not render the street surfaces designated or limited public fora subject to First Amendment scrutiny.

In determining whether Plaintiffs have established that they have a likelihood of success on the merits of their First Amendment free speech claim, we must first determine the nature of the speech at issue.  The government speech doctrine permits viewpoint discrimination when the "government speaks for itself."  *Shurtleff v. Boston*, 142 S. Ct. 1583, 1587 (2022).  "When the government wishes to state an opinion, to speak for the community, to formulate politics, or to implement programs, it naturally chooses what to say and what not to say."  *Id.* at 1589.  When a government actor speaks directly, it is not difficult to conclude that such speech is attributable to the government.  However, as the Supreme Court recently recognized in *Shurtleff*, "[t]he boundary between government speech and private expression can blur when … a government invites the people to participate in a program."  *Id.*  In such situations, it can be difficult to determine when "government-public engagement transmit[s] the government's own

message" and when it "instead create[s] a forum for the expression of private speakers' views." *Id.*

In determining whether challenged speech is government or private, "the Supreme Court has identified three primary factors: (1) whether the medium has historically been used to 'communicate[ ] messages from the States'; (2) whether the medium is 'often closely identified in the public mind with the State,' or can reasonably be interpreted as 'conveying some message on the [government's] behalf'; and (3) whether the government maintains direct, editorial control over the message's content." *Women for Am. First v. Adams*, No. 21-485-cv, 2022 WL 1714896, at \*2 (2d Cir. May 27, 2022) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210–13 (2015)); *accord Shurtleff*, 142 S. Ct. at 1589–90; *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470–72 (2009). The Supreme Court recently made clear in *Shurtleff* that, while consideration of these factors is helpful in guiding the court's analysis, determining whether the government "intends to speak for itself or to regulate private expression" requires a "holistic inquiry" that is "not mechanical" but is instead "driven by a case's context rather than the rote application of rigid factors." *Shurtleff*, 142 S. Ct. at 1589. Ultimately, "[t]he thrust of the inquiry, … is whether the Government has purposefully communicated a message of its own choosing." *Small Bus. in Transp. Coalition v. Bowser*, __ F. Supp. 3d __, 2022 WL 2315544, at \*3 (D.D.C. June 28, 2022), *appeal docketed*, No. 22-7102 (D.C. Cir. July 22, 2022) (citing *Shurtleff*, 142 S. Ct. at 1598–99 (Alito, J., concurring in the judgment)).

Applying these legal principles to the case at bar, we find on the admittedly limited record before us that the City has shown that the three BLM street murals were government, not private, speech.  Plaintiffs do not put forth any argument to the contrary as to the first two BLM murals, explaining that it is their view that whether those two murals are government speech is "not relevant" to this case.  We disagree, however, in light of the Supreme Court's directive that the Court conduct a "holistic inquiry" when applying the government speech doctrine.  Here, when viewed holistically and in context with the City's overall plan for its BLM street murals, the evidence supports a finding that all three BLM murals constituted government speech.

The evidence designated by Defendants discloses that a group of City employees and officially-selected appointees to the City's Banneker Advisory Council initiated the BLM street mural project, specifically choosing to express the "Black Lives Matter" message in furtherance of the City's May 2020 resolution condemning racism in order to demonstrate the City's "animosity to all forms of racism."  Exh. 106 at 3.  Although the City accepted submissions from private artists for the mural designs, the City dictated the message to be displayed, to wit, "Black Lives Matter," and also paid for the creation of the first two BLM murals with public funds.  Leading up to and following the installation of the first two BLM murals, the City issued press releases extolling its mural project with quotations from Mayor John Hamilton on behalf of the City, and explaining the significance of the murals and their importance to the City.  Although the BLM murals are distinct from the typical uses of street painting by the City—namely, for traffic control—given the murals' size, scope, and placement on widely-utilized throughfare

20

streets in the City, combined with the City's publicized resolution condemning racism and other contemporaneous anti-racist initiatives, including renaming City streets, a public observer of the BLM murals would reasonably conclude that they were messages by and from the City itself.

We recognize, as Plaintiffs highlight, that there are differences between the initial two BLM murals and the third that bear some relevance to the government speech analysis. Particularly, with regard to the public's perception of the third BLM mural, the fact that the City did not include reference to a third mural in its original resolution approving the first two BLM murals, issue a press release preceding the third mural's installation, or contribute public funds to pay for its installation, coupled with news articles and social media coverage attributing its installation to the efforts of the Black Collegians, which was an Indiana University student group, rather than the City, could lead the public to believe that the City had merely provided a forum for the Black Collegians' speech and was not itself speaking.

However, public perception is but one factor to be considered, and Defendants have adduced evidence, namely, that during the Banneker Advisory Council's initial discussions regarding the BLM street mural project, City officials did identify three locations as potential mural sites, specifically, Elm Street (site of the first BLM mural), a downtown location (site of the second BLM mural) and Jordan, now Eagleson Avenue (site of the third BLM mural). In addition, at the Board of Park Commissioners meeting at which the BLM mural project was first presented and discussed, the City's Banneker Advisory Council recommended to the Board that two BLM street murals be painted at

21

the Elm Street and downtown locations, respectively.  During the discussion of this

recommendation, Mr. Starowitz advised the Board that "there is a possibility of having

three murals in the community, as there will be conversations with the County for

possible partnerships, with [ ] Enough is Enough, and with Indiana University."  Exh. 104

at 5.  Mr. Starowitz further informed the Board that "[t]his [BLM street mural] project

will also be offering community participation, which will allow all walks of life to be

involved."  *Id.*  Consistent with the City's stated intentions, Mr. Wason testified that,

upon Mr. Starowitz's departure from the City, he (Wason) took on "a more active role in

the selection and approval" of a third BLM street mural and "worked with Indiana

University and the Black Collegians for the installation of the third mural which was

painted on Jordan Avenue, which is now known as Eagleson Avenue."  Wason Aff. ¶¶ 8–

9.

Thus, the third BLM street mural, although not specifically referenced in the City's

formal resolution: (1) was painted in the original location discussed by the City for a third

mural; (2) in partnership with Indiana University, as the City indicated was its intent; and

(3) expressed the exact same message as the first two murals, to wit, "Black Lives

Matter," which message the City specifically endorsed for its BLM mural project in order

to express its "animosity to all forms of racism."  Exh. 7.  Moreover, although the third

BLM street mural was not officially approved by the City until one month after it was

painted, which Plaintiffs cite as evidence that it was not government speech, Mr. Wason's

Staff Report submitted in support of the retroactive approval explained that the belated

request was "due to an oversight by staff as City personnel transitioned out of the

22

organization," and that the City's "[i]ntentions were always to work with IU and this student group, and have this before the Board in early June." Exh. 111. Mr. Wason's Staff Report is therefore consistent with his testimony that he had been working with Indiana University and the Black Collegians prior to the installation of the third BLM mural as well as the City's originally-stated intentions to partner with Indiana University for a third mural. The fact that the City officials knew of the mural prior to its installation and took no action to remove or otherwise alter its design within the approximately one-month period between its installation its retroactive approval further supports the conclusion that it was the City's speech.

Taken together and analyzed holistically, all these facts persuade us that it is more likely than not that the City was speaking on its own behalf and "purposefully communicat[ing] a message of its own choosing" with the installation of all three BLM street murals. *Small Bus. in Transp. Coalition*, 2022 WL 2315544, at *3 (citing *Shurtleff*, 142 S. Ct. at 1598–99 (Alito, J., concurring in the judgment)). Because Defendants have shown, at this juncture and on this preliminary record, that the BLM street murals constituted government speech, Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their claim that, by installing those murals on City streets, while not permitting Plaintiffs to paint a similar ALM mural, the City engaged in viewpoint discrimination in violation of Plaintiffs' First Amendment rights. As discussed above, when the government puts forth its own message, "it is entitled to say what it wishes," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and to "select the views it wants to express." *Summum*, 555 U.S. at 468. Having

determined that Defendants have made a sufficient showing that the three BLM matters murals constituted government speech, we proceed no further in our First Amendment analysis with regard to those murals because "[w]hen the government is speaking for itself, the [First Amendment] forum analysis simply does not apply." *Women for Am. First*, 2022 WL 1714896, at *4.

Plaintiffs contend, however, that even if all three BLM street murals are deemed government speech, they are still likely to succeed on the merits of their viewpoint discrimination claim because they have identified other instances apart from the BLM murals in which the City, in line with its policy of prioritizing public art, permitted private individuals and groups to encroach upon public rights-of-way to paint street murals and to display other forms of art, thereby creating a limited public forum for expressive activity on the surface of its streets and/or in its rights-of-way. Thus, Plaintiffs argue, the City cannot exclude Plaintiffs from that forum based on Plaintiffs' viewpoint. As support of this argument, Plaintiffs cite evidence of prior occasions when the City has granted requests from private neighborhood associations to encroach on public rights-of-way for community block parties at which participants painted street murals, yet here it has denied Plaintiffs' comparable request to paint their ALM mural for a pretextual reason, namely, that the City does not accept recommendations for public art in its rights-of-way from private individuals.

Although the City has represented to Plaintiffs that no application form or process exists for the City to grant authority for a private individual or group to place a mural on the street or other public rights-of-way, Plaintiffs have adduced evidence that the City

does in fact have such a process, pursuant to which it has approved on at least three prior

occasions applications from private neighborhood associations to paint murals directly on

City streets and/or on "traffic calming devices" placed within public intersections.[5]  The

details of the application process have not been clearly developed in the record before us,

but we understand the procedures to involve a private individual or group first submitting

an application to the City's Economic and Sustainable Development Department and/or

the Arts Commission with a special event proposal.  Such projects may in some cases be

initiated through or funded by City grants, but that is not always the case.[6]  If the

individual or group's special event application is approved, the request for an

encroachment on a right-of-way for the purpose of displaying public art is then presented

to the City's Public Works Department for final approval.

Defendants maintain that Plaintiffs have failed to establish any likelihood of

success of showing that, in approving the non-BLM street murals, the City created a

forum for expressive activity on the surface of its streets because none of the approved

murals contained words or otherwise conveyed any particularized message and were

painted not by private individuals or organizations but as part of City-sponsored

community-building projects in furtherance of the City's stated goals as set forth in its

---

[5] Although Defendants attempt to distinguish between murals painted on the surface of streets and murals painted on or around "traffic calming devices," which are essentially large concrete planters in the middle of public intersections, we do not find such a distinction dispositive for First Amendment purposes.

[6] The Prospect Hill Neighborhood Association Street Mural project, for example, had been approved for a Neighborhood Improvement Grant from the City prior to receiving final approval from the Board of Public Works for a right-of-way encroachment.

Public Arts Master Plan "of prioritizing public art" and "[e]ncourag[ing] community-based works of public art and performance that support neighborhood cohesion and vitality." Exh. 126 at 6. According to Defendants, the City worked closely with the neighborhood associations and their residents to develop the designs that were painted on the street and retained final approval authority over each of those designs. Defendants thus maintain that the City's efforts to involve its residents in these neighborhood revitalization projects "does not open the pavement of all City streets as a public forum for any painted message." Dkt. 32 at 7.

Insofar as Defendants contend that the City cannot have created a forum for expressive activity because the non-BLM murals do not "contain words, letters, or universally recognized symbols to convey an idea or message," (Dkt. 32 at 6), and thus "are not speech or acts of expression protected by the First Amendment," this argument is unavailing. The Seventh Circuit has long acknowledged that the free-speech clause of the First Amendment "has been expanded by judicial interpretation to embrace other silent expression, such as paintings." *Discount Inn, Inc. v. City of Chi.*, 803 F.3d 317, 326 (7th Cir. 2015) (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995) ("a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a particularized message, would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll")).

While it is, of course, true that "the government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness, Inc.*

*v. Lee*, 505 U.S. 672, 678 (1992), and that the government can place varying kinds and

levels of regulation on speech and expressive activity depending on the type of forum at

issue, including in some cases by imposing content-based restrictions,[7] it is axiomatic

that, once the government creates a forum for private speech on its property, regardless of

the type of forum it has created, it cannot discriminate based on viewpoint. *See Dye v.*

*City of Bloomington, Ind.*, 580 F. Supp. 3d 560, 570 (S.D. Ind. 2022) ("Viewpoint

discrimination is an 'egregious form of content discrimination,' and governments may not

regulate speech when 'the specific motivating ideology or the opinion or perspective of

the speaker is the rationale for the restriction.'") (quoting *Rosenberger*, 515 U.S. at 829).

Likewise, "[w]hen a government program's very concept contemplates presenting a

diversity of views from participating private speakers, the government may not then

'single out a particular idea for suppression because it [is] dangerous or disfavored.'"

*Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 37 (2d Cir. 2018) (quoting *Legal Servs.*

---

[7] In the context of non-government speech on public property, "[t]he amount of access to which the government must give the public for First Amendment activities, and the standards by which a court will evaluate limitations on those rights, depends on the nature of the forum at issue." *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)). However, even in limited public and non-public fora, where the government has the most leeway to impose limitations on speech, the limitations it imposes must be viewpoint neutral. *See, e.g.*, *id.* ("The government, like other private property holders, can reserve property for the use for which it was intended, 'as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'") (quoting *Perry*, 460 U.S. at 46); *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."); *Rosenberger*, 515 U.S. at 829–30 (stating that the government may permissibly restrict entire subject matters in limited public fora when such restriction preserves the purpose of the forum, but viewpoint discrimination is not permitted).

*Corp. v. Velazquez*, 531 U.S. 533, 541 (2001)); *see also Rosenberger*, 515 U.S. at 834 ("It does not follow … that viewpoint-restrictions are proper when the [government] does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers.").

We have before us no evidence that the City has promulgated any criteria or guidelines, content-based or otherwise, that it applies in regulating the display of public art in its rights-of-way.[8]  To the contrary, the City's Public Art Master Plan (the "Master Plan") defines "public art" very broadly as including "any mode of temporary or permanent artistic expression or process that is funded through any source and is produced with the intention of making it available to the public."  Exh. 126 at 3.  The Master Plan lists among the City's priorities to "[p]rovide resources … for public art project development" not just to "neighborhoods" but also to "organizations, … students, individual artists, and the general public" and to "[i]ncorporate works of public art … in high-traffic transportation corridors and pedestrian areas," by "continu[ing] the placement of works of public art in roundabouts and intersections."  *Id.* at 6.  The Master Plan explicitly recognizes that "[a]rt created for the public sphere can give form to core values of the community, such as freedom of speech and expression, alongside respect for

---

[8] In their briefing, Defendants point to "General Design Rules" considered by the City in connection with the McDoel Neighborhood Association's street mural, including that paintings could not contain "speech," including words, letters, numbers, or universally recognized symbols like a peace sign; depictions of traffic control devices; or copyright material. However, it is clear from the email chain in which this discussion is contained that these rules were the City of Portland's design requirements.  The parties have adduced no evidence that the City of Bloomington ever officially adopted similar criteria applicable to public art in its rights-of-way.

diverse viewers and users[,] … seek to balance issues of originality, artistic quality and intellectual provocation with a respect for the diverse activities that take place in the public domain[,] … [and] can reflect the history of the community, including the evolution of taste, values, and formal expressions as well as challenge previously held views." *Id.*

Despite the City's clearly expressed intent to encourage members of the general public to develop art to be displayed in City rights-of-way, including in "transportation corridors" and "roundabouts and intersections," without regard to any established objective criteria or content-based limitations, the City peremptorily denied Plaintiffs' access to the application process on grounds that "the City does not take recommendations for art in its right of way from individuals."  Exh. 1D.  Given the apparent inaccuracy of this reason for the City's denial and the fact that Plaintiffs' chosen message is plainly in tension with the City's publicly-espoused view, we hold that Plaintiffs have demonstrated at least some likelihood of success in establishing that the City's failure to permit them to submit a public art proposal in the same way other private groups have presented public art proposals for display in City rights-of-way was based on the viewpoint they sought to convey.  *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004) ("Suspicion that viewpoint discrimination is afoot is at its zenith where the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own.") (citing *Texas v. Johnson*, 491 U.S. 397, 411–17 (1989)).

To the extent Defendants contend that the City's actions, even if based on Plaintiffs' viewpoint, are not violative of the First Amendment because the non-BLM murals constitute government speech, this argument has not been adequately developed in response to Plaintiffs' request for preliminary injunctive relief. As discussed above, "[t]he boundary between government speech and private expression" is murkiest when "a government invites the people to participate in a program," requiring a holistic and nuanced analysis to determine whether the "government-public engagement transmit[s] the government's own message" or "instead create[s] a forum for the expression of private speakers' views." *Shurtleff*, 142 S. Ct. at 1589. Defendants' summary assertion that the non-BLM street mural projects, all of which were initiated by private individuals and organizations, were in fact "City projects," does not persuade us, at least at this juncture, that the government speech doctrine applies to other non-BLM murals.

For these reasons, we hold that Plaintiffs have demonstrated at least some likelihood of success of establishing that, by approving applications initiated by private individuals and/or organizations to display painted murals on City rights-of-way without established guidelines in place governing the expressive content of art which the City would approve, the City created a limited forum for expressive activity in its rights-of-way, and then failed to permit Plaintiffs to access that forum based on the viewpoint they sought to convey. Because Plaintiffs have demonstrated some likelihood of success on the merits of their First Amendment viewpoint discrimination claim, we turn to address the remaining preliminary injunction factors.

**B.     Irreparable Harm/Inadequate Remedy at Law**

It is well established that "[t]he loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*,

427 U.S. 347, 373 (1976) (citations omitted).  Thus, because Plaintiffs have shown that

they have a likelihood of successfully demonstrating that the City engaged in

impermissible viewpoint discrimination by failing to permit Plaintiffs to engage in the

process other private individuals and groups had followed to seek permission from the

Board of Public Works to encroach on a public right-of-way to display public art, they

have met their burden of showing the possibility of an irreparable injury (as a result of the

deprivation of the claimed free speech rights) for which there is no adequate remedy at

law.

**C.     Balance of Harms and Public Interest**

The balance of harms and public interest factor also weigh in favor of Plaintiffs

with regard to their First Amendment claim.  Generally, under Seventh Circuit precedent

"there can be no irreparable harm to a municipality" when it is prevented from violating a

plaintiff's First Amendment rights because "'it is always in the public interest to protect

First Amendment liberties.'"  *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th

Cir. 2004) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).

**D.     Bond**

Finally, "Rule 65(c) makes the effectiveness of a preliminary injunction contingent

on [a] bond having been posted."  *BankDirect Capital Fin., LLC v. Capital Premium*

*Fin., Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019).  However, the Seventh Circuit recognizes

that "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal

language of Rule 65(c)."  *Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d

692, 701 (7th Cir. 1977) (citations omitted).  Given that Defendants are not facing any

monetary injury as a result of the issuance of the preliminary injunction, we hold that,

due to the nature and effect of the preliminary injunction, no bond is required here.  *See*

*Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010)

(recognizing there is no reason to require a bond in cases in which "the court is satisfied

that there's no danger that the opposing party will incur any damages from the

injunction").  The parties have not argued otherwise.

## III.  Conclusion

For the reasons detailed above, Plaintiffs are entitled to preliminary injunctive

relief on their First Amendment claim,[9] to the extent that they must be permitted to

engage in the process afforded to other private individuals and groups to seek approval

for an encroachment on a City right-of-way to display public art.  Accordingly, we

GRANT Plaintiffs' Motion for Preliminary Injunction only to that extent.

The Court hereby orders Defendants, acting by and through their principal

officials, to take and/or comply with the following actions forthwith:

---

[9] Because we hold that Plaintiffs are entitled to preliminary injunctive relief on their First
Amendment claim, we need not address the parties' arguments as to Plaintiffs' privileges and
immunities claim.

(1)  Defendants are hereby <u>ORDERED</u> to promulgate and disseminate to the public, including to Plaintiffs, the procedural steps whereby private individuals and groups can seek approval for an encroachment on the City of Bloomington's rights-of-way for the purpose of displaying public art. Compliance with this requirement must occur within forty-five (45) days of the date of this Order.

(2) Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, are hereby <u>PRELIMINARILY ENJOINED</u>, until further order of this Court, from denying Plaintiffs access to or otherwise unduly delaying the application process by which the City of Bloomington passes on requests for encroachments on rights-of-way for the purpose of displaying public art.

Consistent with the Seventh Circuit's holding in *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, Nos. 19-2200, 19-2713 & 19-2782, 2019 WL 5280872, at *1 (7th Cir. Oct. 18, 2019), this injunction shall be set forth in a separate Order without reference to any other document.

IT IS SO ORDERED.

Date:   11/18/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

33

Distribution:

William Bock, III
KROGER GARDIS & REGAS
wbock@kgrlaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com