**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| **INDIANA UNIVERSITY CHAPTER OF TURNING POINT USA, KYLE REYNOLDS, and TIM WHEELER,** | |
| **Plaintiffs,** | |
| **vs.** | |
| **CITY OF BLOOMINGTON, INDIANA, DIRECTOR OF THE BLOOMINGTON DEPARTMENT OF PUBLIC WORKS ADAM WASON, in his individual capacity, BOARD OF PUBLIC WORKS MEMBERS, KYLA COX DECKARD, BETH H. HOLLINGSWORTH and DANA HENKE in their individual capacities, and CITY ATTORNEY MIKE ROUKER, in his individual capacity,** | **Cause No. 1:22-cv-00458-SEB-TAB** |
| **Defendants.** | |

<u>**RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................................iii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF MATERIAL FACTS IN DISPUTE ................................................. 1

ADDITIONAL MATERIAL FACTS .............................................................................. 5

    A.    Public Art in the City of Bloomington's Rights-of-Way .......................... 5

    B.    The City Approved Private Expression in Public Rights-of-Way, Including at Least Four Murals ...................................................... 6

    C.    Plaintiffs and Their Viewpoint That "All Lives Matter" ........................ 7

    D.    August 23, 2021 – The City Denied Plaintiffs' Proposal to Paint an "All Lives Matter" Mural in a Right-of-Way ............................ 8

    E.    December 20, 2022 – The City Adopts a New Policy ............................. 8

    F.    March 14, 2023 – The City Denied, Again, Plaintiffs' Proposal to Paint an "All Lives Matter" Mural in a Right-of-Way ............................................................................................... 9

ARGUMENT .................................................................................................................. 10

    A.    Defendants Violated the Court's Order .................................................. 10

    B.    Defendants Committed Viewpoint Discrimination ............................... 11

        1.    The City Created a Designated Public Forum for Private Artists to Install Public Art in Rights-of-Way ............................................................................................ 12

        2.    The City's Government Speech Argument is Irrelevant and Incorrect ............................................................. 12

        3.    Defendants' Engaged in Viewpoint Discrimination in 2021 When They Denied Plaintiffs' First Request for an ALM Mural ....................................................... 13

        4.    Defendants' Engaged in Viewpoint Discrimination in 2023 ...................................................................................... 17

i

5.      The New Policy is Not a Content-Neutral or
        Reasonable Time, Place, and Manner Restriction .................... 18

(a)     The New Policy is Not Content-Neutral ..................................... 18

(b)     The New Policy is Unreasonable ................................................ 21

C.      Defendants Violated Article 1, Section 9 of the Indiana
        Constitution ........................................................................... 22

        1.      The Indiana Speech and Interchange Clause
                Protects Comments on Government Action............................. 22

        2.      There Is No "Government Speech" Doctrine in the
                Indiana Constitution ..................................................... 24

        3.      Defendants Violated the Free Speech and
                Interchange Clause........................................................ 24

D.      Defendants Violated Article 1, Section 23 of the Indiana
        Constitution ........................................................................... 26

        1.      Plaintiffs Received Disparate Treatment Not
                Justified by Inherent Characteristics........................................ 27

        2.      Defendants Gave Preferential Treatment That Was
                Not Uniform ............................................................... 28

E.      Defendants Violated the Equal Protection Clause .............................. 29

CONCLUSION.................................................................................... 30

**TABLE OF AUTHORITIES**

Page(s)

Cases

*City of Austin, Texas v. Reagan Nat' Advert. of Austin*, LLC,
   596 U.S. 61 (2022) .................................................................................. 18, 20

*Collins v. Day*,
   644 N.E.2d 72 (Ind. 1994) ....................................................................... 26

*Dvorak v. City of Bloomington*,
   796 N.E.2d 236 (Ind. 2003) ..................................................................... 28

*Frederick Douglass Found., Inc. v. D.C.*,
   82 F.4th 1122 (D.C. Cir. 2023) ................................................................ 14

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*,
   100 F.3d 1287 (7th Cir. 1996) .................................................................. 19

*Mass. Bd. Of Retirement v. Murgia*,
   427 U.S. 307 (1976) ................................................................................. 29

*Morales v. Rust*,
   228 N.E.3d 1025 (Ind. 2024) ................................................................... 27

*Paul Stieler Enters., Inc. v. City of Evansville*,
   2 N.E.3d 1269 (Ind. 2014) .................................................................. 26, 28

*Price v. State*,
   622 N.E.2d 954 (Ind. 1993) ................................................... 22, 23, 24, 26

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ....................................... 14, 15, 18, 19, 20, 21

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022) ................................................................................. 13

*Shuttlesworth v. City of Birmingham*,
   394 U.S. 147 (1969) ..................................................................... 15, 17, 18

*State v. Katz*,
   179 N.E.3d 431 (Ind. 2022) ................................................................ 22–26

*Walker v. Sheahan*,
   526 F.3d 973 (7th Cir. 2008) ................................................................... 29

*Whistle Stop Inn, Inc. v. City of Indianapolis*,
   51 N.E.3d 195 (Ind. 2016) ....................................................................... 28

*Whittington v. State*,
   669 N.E.2d 1363 (Ind. 1996) ............................................................ 22–24, 26

*Zehner v. Trigg*,
   133 F.3d 459 (7th Cir. 1997) ................................................................... 29

Indiana Constitutional Provisions

Article 1, Section 9 of the Indiana Constitution ................................................ 22–24
Article 1, Section 23 of the Indiana Constitution .............................................. 26–28

## INTRODUCTION

Defendants admit that they do not approve the message "All Lives Matter," but contend they have not engaged in viewpoint discrimination when they denied Plaintiffs the right to paint an "All Lives Matter" mural in a public forum they created. The Court gave Defendants a chance to make this public forum available to Plaintiffs in its Preliminary Injunction Order. But rather than comply with that Order, Defendants adopted a new policy to exclude Plaintiffs' Mural. In March 2023, they enforced their new policy and did just that. Defendants say their policy is content-neutral and otherwise reasonable because it merely forbids murals that contain "words" or "universally recognized symbols." But evidence shows that this is a pretext for viewpoint, content, and subject-matter discrimination under the First Amendment. It also violates the Indiana Constitution and Equal Protection Clause.

## STATEMENT OF MATERIAL NOT IN DISPUTE

The parties do not dispute the material facts in this case, only the reasonable inferences and conclusions that should be drawn from them. Further, several facts in Defendants' "Statement of Material Facts Not in Dispute" "are not supported by admissible evidence" when all the evidence is considered. Local Rule 56-1(f)(1)(B).

1.     Defendants refer to the "Black Live Matter street mural project," and explain that this "project took months to develop and approve and nearly a full year to complete the installation," and assert that the third Black Lives Matter ("BLM") mural on Jordan Avenue was included in "the project." [Dkt. 77 at 4-9.] But the evidence shows that "the project" was the Banneker Community Center Advisory Committee's ("BCCAC") "recommend[ation] that two murals be created with

consideration to Elm Street and downtown Bloomington." [Dkt. 18-4 at 2.] A third

mural was discussed as a mere *possibility* [*e.g.*, Dkt. 18-15 ¶ 21 (discussing

"potential locations for the murals")], not part of "the project." [*See* Dkts. 18-3, 18-5

at 4-5, 18-6; 18-8; 18-10 at 1; 18-14, ¶¶ 10-19.]

> 2.   Defendants assert that "the project" "was presented to the Parks

Department and the Parks Board" in July 2020, where Sean Starowitz said "the

goal was to have three [BLM] street murals," that "there were on-going

conversations" with Enough is Enough and with Indiana University ("IU") about a

third mural. [Dkt. 77 at 5–6.] However, the evidence shows that the Parks

Department did not consider a third BLM mural in July 2020, only the BCCAC's

recommendation for two murals. [Dkts. 18-3, 18-5 at 4 ("C-13 Review/Approval of

Banneker Advisory Council Recommendation for Street Mural" and noting two (2)

murals).] Here's what Starowitz actually said about a third mural: "There is a

***possibility*** of having three murals in the community, as there ***will be***

conversations with the County for ***possible*** partnerships, with Enough is Enough,

and with [IU]." [Dkt. 18-5 at 5 (emphasis added).]

> 3.   Defendants assert that "[i]n June and July [2021] … the City

continued working on the third and final [BLM] street mural." [Dkt. 77 at 8.] The

evidence does not support the notion that the City "continued" working on the third

mural. The City did not "work[] on" the third BLM mural until representatives from

the Black Collegians reached out to Public Works Director Adam Wason ("Wason")

in early June 2021. [Answer ¶¶ 21, 43; Dkt. 79-1 at 3–4 (Exhibit 1 at 2–3); Dkt. 79-13 ("Wason Dep.") at 25:19–23; Dkt. 79-2 at 2 (Exhibit 2 at 1).]

4.    Defendants assert that the third BLM mural "was consistent with Starowitz's original stated plan as of July 28, 2020, of working with IU and other student groups … ." [Dkt. 77 at 9.] The evidence shows that there was no "stated plan" to install a third mural on July 28, 2020, as this mural was not one of the two murals considered by the Parks Department. [Dkt. 18-5 at 4-5 (emphasis added).]

5.    Defendants assert that City Attorney Mike Rouker ("Rouker") sent an email to Kyle Reynolds ("Reynolds") on August 23, 2021, "because he truly believed that what Mr. Reynolds was requesting – painting a personal or private groups' message on the city street – was not something the City allowed or approved, regardless of the viewpoint expressed in the message." [Dkt. 77 at 11-12.] This and similar statements in Rouker's affidavit are not statements of fact but legal argument and *post hoc* rationalization by the City's attorney about a legal conclusion on an ultimate fact – whether the City engaged in viewpoint discrimination [*id.* (citing Dkt. 77-6 ("Rouker Aff.").)]

6.    Defendants asserts that "[t]he definition for the term 'speech' [in the City of Bloomington's Policy and Procedures on Private Art Installations within the Public Wright of Way ("CARWP")] was consistent with what the City had applied to prior neighborhood street paintings." [Dkt. 77 at 13.] This is not a statement of fact but argument and *post hoc* rationalization by the City's attorney [*id.* (citing Rouker Aff.).] This is not admissible evidence. Further, the evidence actually shows that the

City's prior, unwritten criteria for approving murals did not include any policy or guidelines restricting the content or speech of art painted in rights-of-way. [Wason Dep. at 17:11–24; Dkt. 79-14 ("Hollingsworth Dep.") at 7:21–8:4; Dkt. 79-18 ("Deckard Dep.") at 7:5–9, 18:11–14.]

  7. Defendants appear to suggest in their Statement of Material Facts, and then more clearly assert in the body of their brief, that "other street paintings [in 2017, 2018, and 2021] were part of a neighborhood grant process, used City funds, or were done in conjunction with the City's initiative or project." [Dkt. 77 at 18; *see also id.* at 12–13.] This is not supported by admissible evidence. The designated evidence shows that there was a general Public Art Master Plan (the "Master Plan") that encouraged private citizens, not just neighborhoods, to create public art in rights-of-way. [Dkt. 32-2 at 6; (Answer) ¶ 79.] There was no written process for approving public art in rights-of-way. Deckard Dep. at 6:8–22; Dkt. 79-17 ("Warren Dep.") at 6:23–7:5); Wason Dep. at 16:16–17:3); Hollingsworth Dep. at 7:3–20); Dkt. 79-15 ("Henke Dep.") Dep. at 6:20–7:6; Dkt. 79-16 ("Karon Dep.") at 6:15–19).] The McDoel Neighborhood Association's ("McDoel Neighborhood") 2017 proposal was not part of the neighborhood grant process and was not paid for with City funds. [Answer ¶ 29 (omitting discussion of grant process or City funds); Dkt. 22-3 at 4–5 (Resolution 2017-53) (same); Dkt. 22-4 at 6 (approving Resolution 2017-53) (same); July 11, 2017 Board of Public Works Proceeding Video at 22:58–23:37, 24:45–25:20, 25:53–26:11, *available at* https://catstv.net/m.php?q=4320 (last

accessed July 22, 2024) (Defendant Deckard stating "the costs will be covered by the neighborhood").]

## ADDITIONAL MATERIAL FACTS

The following is a summary of additional material undisputed facts that were not identified in Defendants' brief. *See* Local Rule 56-1(f)(2).[1]

### A.   Public Art in the City of Bloomington's Rights-of-Way

In January 2015, the City of Bloomington ("City") adopted the Master Plan. [Dkt. 32-2 at 3.] The Master Plan "[p]rovide[s] resources, training and mentorship for public art project development and management to organizations, collectives, neighborhoods, students, individual artists and the general public." [Dkt. 32-2 at 6; Answer ¶ 79.] The Master Plan promoted a "higher level of community engagement" and encouraged the public to create art for the City's rights-of-way, including "transportation corridors" and "roundabouts and intersections." [Dkt. 32-2 at 5–6.] Public art includes murals painted on public rights-of-way. [Deckard Dep. at 6:5–7:4; Wason Dep. at 12:14–17, 13:1–16, 16:16–19; July 11, 2017 Video at 22:17–22:26 ("the change in orientation by the City encouraging neighborhoods to put in art"). Since 2015, the City's Board of Public Works ("Board"), accepted and approved requests by private entities to create public art in public rights-of-way, including painting murals, in public rights-of-way. [Answer ¶¶ 23-24, 27–29, 79; Dkt. 22-12 at 4–5 (Interrogatory No. 3); Wason Dep. 13:1-13; *e.g.*, Dkt. 22-3 at 2–5 (Resolution

---

[1] Plaintiffs have cross-moved for summary judgment [Dkt. 78], and incorporate by reference their Statement of Undisputed Material Facts. [Dkt. 79 at 7–20.]

2017-53); Dkt. 22-4 at 6 (approving Resolution 2017-53); Deckard Dep. at 7:10–18].

This process for accepting and approving expressive activity in public rights-of-way (hereinafter the "Encroachment Policy") was not written in formal guidelines. [Deckard Dep. at 6:8–22; Warren Dep. at 6:23–7:5; Wason Dep. at 16:16–17:3; Hollingsworth Dep. at 7:3–20; Henke Dep. Dep. at 6:20–7:6; Karon Dep. at 6:15–19).]  The unwritten Encroachment Policy did not include any policy or guidelines restricting the content or speech of art painted in rights-of-way. [Wason Dep. at 17:11–24; Hollingsworth Dep. at 7:21–8:4; Deckard Dep. at 7:5–9, 18:11–14.]

**B.    The City Approved Private Expression in Public Rights-of-Way, Including at Least Four Murals**

In 2017 and 2018, the Board approved three (3) requests by neighborhoods to install street murals. [Answer ¶ 29; Dkt. 22-1 at 5-6 (Resolution 2017-34); Dkt. 22-2 at 6 (approving Near Westside Resolution 2017-34); Dkt. 22-3 at 4–5 (Resolution 2017-53); Dkt. 22-4 at 6 (approving Resolution 2017-53); Dkt. 22-5 at 4–6 (Resolution 2018-69); Dkt. 22-6 at 4–5 (approving Resolution 2018-69).] Each mural was expressive content:

- a painting of blue and yellow colored petals that made the traffic circle in the middle of the street look like a yellow and blue flower [Dkt. 22-1 at 7–8];

- a painting called "Common Pollen" that gave the impression of "the radiating petals of an actual sunflower, and the sun itself" [Dkt. 32-1 at 5 (Declaration of Angela Van Rooy ("Rooy Decl.") ¶ 29); Dkt. 32-1 at 27–28; Dkt. 32-1 at 23]; and

- a turtle surrounded by colorful spiraling sections. [Dkt. 22-3 at 11–12; Answer ¶ 29; July 11, 2017, Video at 21:45–26:31).]

The Black Collegians is an IU Student Group. [*See* Answer ¶¶ 41, 43.] The Black Collegians painted their BLM mural on Jordan Street (now Eagleson Avenue) from July 3 to July 5, 2021. [Answer ¶¶ 50–55; Dkt. 7-12.] Social media postings attributed the BLM mural to the Black Collegians and students of IU. [Dkts. 7-12, 7-13, 7-16; Answer ¶¶ 54–55.] Each letter of the BLM mural was unique and "represent[ed] a different marginalized community." [Dkt. 7-12 at 2; *see* Answer ¶¶ 51-53 (photos); Dkt. 7-13 at 2 (describing letters).] A few weeks later, the Black Collegians obtained a permit to touch up the paint in the BLM mural installed by the Black Collegians. [Dkt. 79-3 (Exhibit 3), Dkt. 79-4 (Exhibit 4).] By May 2022, the paint for the BLM mural had deteriorated. [Reynolds Decl. ¶ 5.]

Since 2019, the City has approved at least seven (7) additional public art displays in public rights-of-way besides the displays discussed above. [Dkt. No. 22-12 at 4–5 (Interrogatory No. 3); Answer ¶¶ 27–29.]

**C.    Plaintiffs and Their Viewpoint That "All Lives Matter"**

IU Chapter of Turning Point USA ("TPUSA-IU") is a local student chapter of this group. [Dkt. 7-24 at 2 ("First Reynolds Decl.") ¶¶ 4–5, 7–8).]  From at least June 2021 through March 14, 2023, Reynolds was a student of IU and resided in Bloomington, Indiana. [Reynolds Decl. ¶ 4.] Reynolds was an authorized agent of TPUSA-IU. [*Id.* ¶ 6.]

"Black Lives Matter" is contrary to Plaintiffs' "core principles from the standpoint that it is connected to a political ideology that ultimately seeks to divide and alienate individuals based on characteristics such as skin color." [*Id.* ¶ 10.]

**D.    August 23, 2021 – The City Denied Plaintiffs' Proposal to Paint an "All Lives Matter" Mural in a Right-of-Way**

On July 29, 2021, Reynolds emailed the City requesting a permit to install a mural on IU's Campus that said "All Lives Matter" ("ALM Mural"). [Answer ¶¶ 61, 62, 69; Dkts. 7-5; 7-6.] The same day, Wason told City employees that he would handle communications with Reynolds. [Dkt. 79-5 (Exhibit 5).] On August 2, 2021, Wason emailed Reynolds that he "need[ed] to work with the IU President's Office, as did the other group." [Answer ¶ 62; Dkt. 7-4.] Reynolds did so. [Dkt. 7-2 at 4–5.]

On August 3, 2021, Reynolds informed Wason of IU's approval. [Answer ¶ 68.] Wason did not respond to Reynolds until August 10, 2021, directing Reynolds to speak to "City Legal." [Answer ¶¶ 73–74; Dkt. 7-4.] In between Reynold's August 2, 2021 request and Wason's August 10, 2021 response, Wason recommended on August 3, 2021, that the Board retroactively approve the BLM mural that the Black Collegians requested and painted. [Answer ¶¶ 70–72; Dkt. 7-9 at 29; Dkt. 7-10 at 2.]

After failing to respond to Reynolds's emails for almost two (2) weeks [Answer ¶¶ 75–76; Dkt. 7-5], Rouker denied the request for the ALM Mural on August 23, 2021, because "[t]he City does not take recommendations for art in its rights of way from individuals, and at this time, the City is not considering adding additional art within its right of way." [Answer ¶ 77; Dkt. 7-5.]

**E.    December 20, 2022 – The City Adopts a New Policy**

On December 20, 2022, the Board approved the CARWP. [Dkt. 79-6 (Exhibit 6); Dkt. 79-7 (Exhibit 7); Dkt. 79-8 (Exhibit 8); Answer ¶¶ 88–90; *see* December 20, 2022, Board of Public Works Proceeding Video at 7:05–32:31,

*available at* https://catstv.net/m.php?q=11986 (last accessed July 22, 2024).] The
CARWP was approved over public comment objecting to the Board's novel definition
of "speech" and objecting to the competency of the Board to determine what
constituted "universally recognized symbols." [December 20, 2022 Video at 12:48–
18:32.]

The CARWP says "Semi-Permanent Art Installations or Permanent Art
Installations may not contain Speech." (Hereinafter "anti-speech provision").
[Answer ¶ 103; Exhibit 8 at 3 (Section IV.B).] "Speech" means "[w]ords, letters,
numbers, universally recognized symbols, or logos of any kind." [Exhibit 8 at 2
(Section I.F); Answer ¶ 102.] The CARWP also contains public safety provisions,
including provisions mandating that the public art not mimic traffic control devices
or cause drivers to alter their course [Exhibit 8 at 2 (Section III.C)], and provisions
restricting where public art could be installed. [*Id.* at 3 (Section V).] Under the
CARWP, members of the City consider the content of applications for public art.
[Exhibit 7 at 2–3; Warren Dep. at 20:8–21:13; Deckard Dep. at 22:15–22.]

**F.    March 14, 2023 – The City Denied, Again, Plaintiffs' Proposal to Paint
an "All Lives Matter" Mural in a Right-of-Way**

On December 19, 2022, Plaintiffs, via a "Special Event Application" form,
submitted their second request for the City to permit them to paint the ALM Mural
on a public right-of-way. [Answer ¶ 87.] Some city employees presumed the
application would be granted because the City "already lost one court case to them."
[Dkt. 79-9 (Exhibit 9); *see also* Dkt. 79-10 (Exhibit 10).]

By the March 14, 2023 meeting of the Board, the Plaintiffs had satisfied all of Defendants' criteria except compliance with the anti-speech provision. [Answer ¶¶ 111, 113–114; Dkt. 79-11 (Exhibit 11).] After hearing public comment, the Board denied the ALM Mural solely because it contained "speech." [Exhibit 11, Dkt. 79-12 (Exhibit 12); Answer ¶¶ 98, 113–116, 118; March 14, 2023, Board of Public Works Proceeding Video at 24:55–48:25, *available at* https://catstv.net/m.php?q=12211 (last accessed July 22, 2024).]

The City disagrees with the message "All Lives Matter." [Answer ¶ 119.]

## ARGUMENT[2]

### A.    Defendants Violated the Court's Order

The Court's Preliminary Injunction Order ("Order") expressly forbade Defendants "from denying Plaintiffs access to or otherwise unduly delaying [Plaintiffs'] application process." [Dkt. 36.] Defendants did just that, imposing new substantive, content and viewpoint based criteria that did not exist before under the Encroachment Policy. Defendants adopted these criteria with the intent to block, and did block, Plaintiffs' opportunity to paint the mural altogether.

Defendants argue that they did not violate the Court's Order by enacting the anti-speech provision because "the criteria had been applied by the City since at

---

[2] Plaintiffs concede Summary Judgment should be granted in favor of Defendants Hollingsworth and Henke based on Rouker's Affidavit in which he admits misunderstanding the City's own past practices and policies and confirms consideration of Plaintiffs' mural did not reach Hollingsworth or Henke before they resigned from the Board.

least 2017." [Dkt. 77 at 24.] [3]  Not so. Multiple City employees confirmed the Encroachment Policy – which is "the application process" referenced in the Court's Order before the City adopted the CARWP – did not restrict the content of any public art created by private entities in rights-of-way. [Wason Dep. at 17:11–24; Warren Dep. at 7:21–8:4; Deckard Dep. at 7:5–9, 18:11–14.] But now, CARWP's anti-speech provision does restrict the content of public art. [Answer ¶¶ 102–103.] Contrary to the *post hoc* rationalization put forward by Rouker, these criteria were never recited to Plaintiffs in 2021 as the basis for denying the first ALM Mural. But it is now undisputed that these new, substantive criteria were the *only* basis for the City denying Plaintiffs their ALM Mural when they re-applied in 2023. [Answer ¶¶ 111, 113.] Moreover, it was certainly well understood that Plaintiffs' mural as originally proposed contained words and therefore that adoption of the anti-speech criteria would prevent approval of their mural. Thus, it is undisputed Defendants changed their process to exclude the ALM Mural, in violation of the Court's Order.

## B. Defendants Committed Viewpoint Discrimination

Defendants argue that for Plaintiffs' First Amendment claims "there is no new evidence to present to the Court" and "[t]he record … regarding the BLM murals has not changed since the preliminary injunction briefing." [Dkt. 77 at 2, 16.] But the record has changed. It is now clear that the public forum for public art in rights-of-way has existed since at least 2017 and that the Defendants excluded

---

[3] Plaintiffs do not take issue with "the time it took to get the Special Events Application to the Board of Public Words." [Dkt. 77 at 25.]

the Plaintiffs from this forum on August 23, 2021, and March 13, 2023, because of viewpoint discrimination under the guise of a so-called time, place, and manner restriction that is facially content-based.

### 1. The City Created a Designated Public Forum for Private Artists to Install Public Art in Rights-of-Way

Defendants created a public forum through their 2015 Master Plan [Dkt. 32-2], and through the City's repeated approvals of privately created art in rights-of-way without restrictions regarding expressive content. *See supra* at Additional Fact Section B. The unwritten process by which the City implemented the Master Plan – the Encroachment Policy – was successfully executed by the City multiple times from 2017 to 2021 to approve murals in rights-of-way. [Answer ¶¶ 28, 29, 79.]

Now, through its passage of the CARWP, the City admits that there is still a forum in Bloomington for public art, including murals, installed in public rights-of-way. [Answer ¶¶ 92-93, 95.]

### 2. The City's Government Speech Argument is Irrelevant and Incorrect

Defendants abandoned the argument they raised during the preliminary injunction proceedings that the murals of the various neighborhood associations are government speech. Rightly so. But they still argue that the Black Collegians BLM Mural in July 2021 is government speech. [Dkt. 77 at 16–17.]

First, Rouker's Affidavit effectively concedes that a public forum for public art in rights-of-way existed since at least 2017. Thus, Defendants should have permitted Plaintiffs to paint their ALM Mural as requested. Their proposal was virtually identical to the self-funded mural painted by the McDoel Neighborhood

that did not go through the neighborhood grant process. No anti-speech policy existed in 2017 when the McDoel project was approved or when the first ALM Mural request was denied.

Regardless, the full record shows the Black Collegians BLM Mural is not government speech when considered alongside the other murals the City approved since 2017, and when one considers that it speaks a message far beyond what the City endorses. *Shurtleff v. City of Boston*, 596 U.S. 243, 247 (2022). First, the City had cooperated with other groups before to install public art, which did not automatically transform those projects into government speech. Second, the public's press releases, social media posts, and the City's own Resolution retroactively approving the mural give credit to the Black Collegians and IU students, not the City staff or elected leaders. Third, the Black Collegian's message is unique and goes beyond any of the messages the City endorsed in its Resolutions. Each letter of the Black Collegian's mural incorporates many different symbols and images. [Dkt. 7-12 at 2; Dkt. 7-13 at 2.] The only message the City endorsed was "its animosity to all forms of racism." [Answer ¶ 50.] But there is no evidence in this case that the City adopted the message in "each letter [that] tells its own story." [Dkt. 7-12 at 2.]

Accordingly, the Court should apply the forum analysis to the City's decision to approve the Black Collegian's BLM Mural while exercising viewpoint discrimination to deny Plaintiffs' ALM Mural.

### 3. *Defendants' Engaged in Viewpoint Discrimination in 2021 When They Denied Plaintiffs' First Request for an ALM Mural*

Defendants argue that Defendants denied Plaintiffs' ALM Mural on

13

August 23, 2021, due to misunderstanding, not intentional discrimination. [Dkt. 77 at 17–19.] City Attorney Rouker said he denied Plaintiffs application on August 23, 2021, because it was not consistent – based on "his understanding" – with other private murals installed on public rights-of-way that the City had approved in the past. [*See generally id.*][4]

*First and foremost*, this new evidence does not exonerate Defendants because Plaintiffs do not need to show intentional discrimination to establish their First Amendment violation. Viewpoint discrimination violates the First Amendment, "regardless of the government's benign motive ... or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) (cleaned up). "Innocent motives do not eliminate the danger of censorship." *Id.* at 167; *accord Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1144–45 (D.C. Cir. 2023).

*Second*, Rouker's Affidavit all but admits he made a mistake in denying Plaintiffs' first ALM Mural request due to his admitted ignorance of the various other privately installed murals installed in public rights-of-way. Whether Rouker

---

[4] Every description of Rouker's motive in his Affidavit and in Defendants Brief is hedged with "his understanding" or some variant thereof. At no point in his affidavit does Rouker explain what City policy actually was with respect to approving public art in rights-of-way, or that Rouker's "understanding" was correct. [Dkt. 77 at 6 ("his understanding"); Dkt. 77 ¶ 16 ("I was thinking"); ¶ 18 ("I did not recall"); ¶ 19 ("I was thinking"); ¶ 21 ("I did not know"); ¶ 22 ("I believed my statements in [the August 23, 2021 email] were correct"); ¶ 26 ("I did not understand or believe"); ¶ 28 ("I was not familiar with [other private rights-of-way art installations]"; ¶ 29 ("I did not see [other private rights-of-way art installations] as comparable to … Reynolds [request]"); ¶ 30 ("it was my understanding"); ¶ 32 ("I truly believed"; "my understanding"); ¶ 33 ("I truly believed").]

intended it or not, *Reed*, 576 U.S. at 165, denying Plaintiffs' mural in 2021 had the effect of discriminating in favor of the various neighborhoods who installed paintings that celebrated getting to know one's neighbor and sense of place with pictures of flowers, turtles, and pollen [*see* Dkt. 32 (Surreply) at 4–5], and against the viewpoint of Plaintiffs who wanted to paint the phrase "All Lives Matter" that incorporated the symbolic thin blue and red lines.

Rouker, regardless of his intent, also exercised standardless discretion when he cut off the application process for Plaintiffs on August 23, 2021, [Answer ¶ 77; Dkt. 7-5.] *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969). Whether it was the result of Rouker's misunderstanding or not, the City's abrupt denial of Plaintiffs' application contrasts starkly with its diligent accommodation of several other public art projects and with the Black Collegians.

Further, Defendant's argument ignores the rest of the evidence in this case, including:

- Wason's role in directing Reynolds first to the IU Administration to identify a location for the mural just as had happened with the Black Collegians' mural request. [Answer ¶ 62; Dkt. 7-4];

- Wason's role in forwarding him to City Legal, which he did not do when approached by the Black Collegians [*compare* Answer ¶¶ 73–74; Dkt. 7-4 *with* Dkt. 79-1];

- Rouker's admission that he denied the ALM Mural because the mural was unlike anything he "understood" or "believed" the City had approved before [Dkt. 77-6 ¶¶ 32–33];

- The City's admission that it disagrees with the message "All Lives Matter." [Answer ¶ 119];

- Defendants concession that Rouker's response to Reynolds is

> "[a]t most, evidence of not asking more questions of
> Mr. Reynolds to explore his request" [Dkt. 77 at 18]; and

- Defendants continuing to deny the ALM Mural under the pre-
  text of a new, unconstitutional policy for semi-permanent art.
  [Answer ¶¶ 98, 113–116, 118.]

Rouker's Affidavit read alongside this evidence merely reflects the lack of
imagination and hesitation of a government official encountering a message he
disagrees with. Rouker's formalistic response sharply contrasts with the
enthusiastic response of city employees when approached by the Black Collegians to
install a BLM Mural [Dkt. 79-1 at 3 ("we'd certainly be supportive"); Dkt. 79-2
(responding "Absolutely! Please set up a time to meet with me next week … Happy
to help")], and it's clear that viewpoint discrimination explains the difference.

Defendants also explain their denial of Plaintiffs' mural by faulting Reynolds
for seeking approval through the "general email for the Public Works Department"
at a time when – unbeknownst to Renyolds – the Assistant Arts Director position
was vacant. [Dkt. 77 at 17.] This is all beside the point because there were no
written policies for Reynolds to follow. [Deckard Dep. at 6:8–22;  Warren Dep. at
6:23–7:5; Wason Dep. at 16:16–17:3; Hollingsworth Dep. at 7:3–20; Henke Dep. at
6:20–7:6; Karon Dep. at 6:15–19.]  Also, Wason stepped in just *four minutes* after
Reynolds sent his email and told City staff that he would handle communications.
[Wason Dep. at 43:5–12; Dkt. 79-5 at 2 (responding to City staff at 3:04 PM).] The
Black Collegians submitted their request to work with the City through a Special
Events Application, did not work with the Assistant Arts Director, and did not
"respond[] to a Request for Proposal from the City," [Dkt. 77 at 17], but that was

immaterial to their efforts to install their mural.  [*See* Dkt. 79-2.]

As the City now concedes, it opened a forum for the public to engage in expressive content in public rights-of-way, so it did not have the right to unilaterally close the forum to Plaintiffs.

### 4.    *Defendants' Engaged in Viewpoint Discrimination in 2023*

Regardless of Rouker's misunderstanding in 2021, viewpoint discrimination explains the denial of Plaintiffs' second ALM Mural request in 2023. When forced by the Court to make its "application process" available to Plaintiffs, the City created the anti-speech provision that appears nowhere in the 2015 Master Plan, in the Board minutes and staff reports approving other murals, or in City employees' correspondence with Plaintiffs in 2021. [*See, e.g.,* Deckard Dep. at 18:11–14 (there was not "any prohibition on speech" prior to the CARWP).] The only reasonable inference is that the City did not think it could continue to exclude Plaintiffs' ALM Mural from the forum it had created unless it invented a pretext for its viewpoint discrimination. So that's what it did.

Further, the staff report and depositions show that the City used the CARWP to continue engaging in standardless discretion. *Shuttlesworth*, 394 U.S. at 151. Here's what the witnesses said:

- Rouker: "there will be close cases on universally recognized symbols"; "[we cannot answer specific questions] without further discussion with the legal team"  [Exhibit 7 at 1–2.]

- Deckard: "special event applications" – one of the ways to obtain a permit for installing *any* art under the CARWP – has "a lot of factors" and "it would be hard for [her] to guarantee something would be approved." [Deckard Dep. at 20:3–11.]

- Warren: "there are no rules" in the CARWP, "only guidelines that we follow;" [Warren Dep. 18:15–18.] "[we need to ask] what is appropriate to our city? … does this reflect our community?" [*Id.* at 18:21–19:2.]

In other words, the CARWP invites viewpoint discrimination because it is not "narrow, objective, and definite," *Shuttlesworth*, 394 U.S. at 151. On its face, it violates the First Amendment.

### 5. *The New Policy is Not a Content-Neutral or Reasonable Time, Place, and Manner Restriction*

Defendants argue that Plaintiffs' second ALM Mural application "was denied because it did not comply with the City's Policy" which "prohibited words from being in semi-permanent or permanent art installations." [Dkt. 77 at 19.] This argument fails because a speech policy that permits expressive content in a public forum but prohibits the use of "words" or "universally recognized symbols" is facially content-based, and not a reasonable time, place, and manner restriction.

### (a) *The New Policy is Not Content-Neutral*

Whether a restriction is "'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Reed,* 576 U.S. at 169 (citation omitted); *see also City of Austin, Texas v. Reagan Nat' Advert. of Austin*, LLC, 596 U.S. 61, 74 (2022) ("[A] regulation of speech cannot escape classification as facially

18

content based simply by swapping an obvious subject-matter distinction for a "function or purpose" proxy that achieves the same result.").

*First*, the CARWP repackages a premise the Court already found "unavailing" – namely, that art that does not contain words or universally recognized symbols is "not speech or acts of expression." [Dkt. 35 at 26.] While Defendants no longer make this unfounded assertion in so many words, their attempt to craft a policy that distinguishes between art that does and does not use words and symbols and call it content-neutral is just as unavailing.  All art is expressive content, period. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569 (1995). To discriminate between works of art based on its communicative content is, *per se*, content-based discrimination.

*Second*, the CARWP is content-based because City employees say they consider the content of the proposed public art. [*e.g.*, Exhibit 7 at 2–3; Warren Dep. at 20:8–21:13; Deckard Dep. at 22:15–22.]

*Third*, the CARWP is a subtle pretext for limiting discourse based on the subject-matter of the public art – that is, limiting political and cultural discourse on city streets while permitting other subject matter. *Reed,* 576 U.S. at 169; *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1297 (7th Cir. 1996) (content neutrality "prevents the government from even limiting discussion in public fora to specific subjects") (citations omitted)). The CARWP's anti-speech provision permits the murals it has approved in the past, which included paintings of flowers, pollen and turtles – paintings that Defendants concede conveyed a

message regarding the "subject matter" of neighborliness and sense of place. [Dkt. 32 (Surreply) at 4-5.] But the undisputed facts necessarily imply that the City does not permit murals on the "subject matter" of robust cultural and political discourse because this subject-matter necessarily requires the use of words or universally recognized symbols. Politics and cultural discourse is, by definition, meaningless without words and symbols recognized within the political and cultural community.

In sum, the CARWP is no different than the sign code the Supreme Court rejected in *Reed*, which distinguished between directional signs, ideological signs, and political signs. 576 U.S. at 171–172. In the words of the Supreme Court, "the [CARWP] singles out specific subject matter for differential treatment," namely expressive content on neighborliness and sense of place but not on political or cultural issues, "even if it does not target viewpoints within that subject matter" on its face. *Reed*, 576 U.S. at 169. Or in other words more recently used by the Supreme Court, the CARWP "swap[s] an obvious subject-matter distinction [*i.e.*, no political discourse] for a 'function and purpose' proxy that achieves the same result [*i.e.*, no words or universally recognized symbols]." *Reagan*, 596 U.S. at 74.

Defendants argue that it has never approved a mural in a public right-of-way "that contained words, other than the City's government speech in the BLM murals," and "[t]he neighborhood street paintings identified by Plaintiffs did not contain any words." [Dkt. 77 at 19.] However, this ignores that the City's policy facially discriminates based on content and subject-matter as explained above. Defendants' argument also necessarily implies that the government has the power

to create a public forum but limit political discourse within that forum only to speech that it approves – an unsettling, if not Orwellian, notion that should not be the law, and is barred by *Reed* in any case.

As a content-based restriction on speech, the CARWP must satisfy strict scrutiny and be narrowly tailored to advance compelling ends. *Reed*, 567 U.S. at 163. Defendants Motion for Summary Judgment does not attempt to articulate a compelling government interest that justifies the CARWP's anti-speech provision or explain how the anti-speech provision is narrowly tailored. Assuming that public safety might be such an interest, the City cannot satisfy that standard here. The undisputed facts show that the ALM Mural satisfied every requirement of the CARWP except the anti-speech provision. [Answer ¶¶ 111, 113–116, 118; Exhibits 11 & 12.] That means Plaintiffs satisfied all the safety provisions, including those meant to address the "heightened probability of conflicts with traffic control devices and driver distraction." [Exhibit 8 at 2–3 (Section III.C, V).] Thus, the anti-speech provision is not about public safety or any other potentially compelling interest that could support it.

### (b)    *The New Policy is Unreasonable*

The CARWP provisions are also unreasonable. As Warren testified, "there are no rules." [Warren Dep. 18:15-18.] City employees could not define a "universally recognized symbol" in a definite manner. [Deckard Dep. at 22:22–23:10; *see also* Warren Dep. 30:18–31:19; Karon Dep. 14:17–24.] Additionally, the anti-speech provision does not materially impact public safety considering the several other provisions that expressly address public safety. [Exhibit 8 at 3–4 (Sections

III.C and V.).] The CARWP's application of the anti-speech provision to semi-permanent and permanent art, but not temporary art, is also unreasonable. As the designated evidence shows, semi-permanent art can deteriorate rather quickly. [*See* Exhibits 3 & 4 (seeing permission to touch-up the paintings).] And if the City is trying to promote safety by eliminating painted words on the street, it fails to achieve that objective by allowing local artists to write whatever they want on the street as long as it's only "temporary." If words are hazards, then temporary words are just as hazardous as semi-permanent words.

All told, the CARWP is content-based and unreasonable. Defendants used it as a cloak for their viewpoint discrimination. The Court should say so.

## C. Defendants Violated Article 1, Section 9 of the Indiana Constitution

### 1. The Indiana Speech and Interchange Clause Protects Comments on Government Action

Article 1, Section 9 of the Indiana Constitution says:

> No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever: but for the abuse of that right, every person shall be responsible.

Indiana's free speech protections are broader than the speech clause of the First Amendment. *Price v. State*, 622 N.E.2d 954, 958 (Ind. 1993) (holding Article 1, Section 9 protected speech that the First Amended did not). It. "extends to 'any subject whatever'" and every conceivable mode of expression." *Whittington v. State*, 669 N.E.2d 1363, 1368 (Ind. 1996) (citations omitted); *State v. Katz*, 179 N.E.3d 431, 444-445 (Ind. 2022). "The efficacy of political speech often depends upon its ability to jar and galvanize." *Price*, 622 N.E.2d at 963 (citations omitted).

Unlike the First Amendment, Indiana's "right to speak clause … protects against restriction of expressive activity, not discrimination because of content or viewpoint." *Whittington*, 669 N.E.2d at 1368 (emphasis original). It "focuses on the restrictive impact of state action on an individual's expressive activity. At a minimum, the clause is implicated when the state imposes a direct and significant burden on a person's opportunity to speak his or her mind, in whatever manner the speaker deems most appropriate." *Whittington*, 669 N.E.2d at 1368; *accord Katz*, 179 N.E.2d at 446-447 (quoting *Whittington*, 669 N.E.2d at 1368).

"The right to speak is qualified . . . by § 9's responsibility clause, which provides that 'for the abuse of that right, every person shall be responsible[;]' . . . [t]he responsibility clause expressly recognizes the state's prerogative to punish expressive activity that constitutes an 'abuse' of the right to speak." *Whittington*, 669 N.E.2d at 1368; *accord Katz*, 179 N.E.3d at 447. "[I]f a claimant demonstrates that the right to speak clause is implicated, he or she retains the burden of proving that the State could not reasonably conclude that the restricted expression was an 'abuse.'" *Whittington*, 669 N.E.2d at 1369. The Supreme Court has held that expressive activity that undermines the rational exercise of a State's police power is an abuse of the right to speak. *Katz*, 179 N.E.3d at 447-448.

That said, lest this exception regarding exercise of state police power swallow all of Article 1, Section 9, the Indiana Supreme Court held that when the state exercises its police power, it "may not punish expression when doing so would impose a material burden upon a core constitutional value." *Id.* at 448 (quoting

*Price*, 622 N.E.2d at 959-60). "Political expression is a core value." *Id.*  "Expressive

activity is political, for the purposes of the responsibility clause, if its point is to

comment on government action."  *Id.* (quoting *Whittington*, 669 N.E.2d at 1369).

### 2. There Is No "Government Speech" Doctrine in the Indiana Constitution

The Indiana Supreme Court has not recognized any limitation on Article 1,

Section 9 protection based upon any legal doctrine akin to the First Amendment's

government speech exception to forum analysis. *First*, there is no forum analysis

under the Indiana Constitution. The analysis focuses on *any* restraint imposed by a

government actor, and the abuse of the right to free interchange by the person

engaging in protected expression. By contrast, the government speech exception is

relevant only when a Court must decide whether the government has designated a

forum in which protected speech may occur.

*Second*, the Indiana Supreme Court has recognized that all expressive

activity that "comment[s] on government action" is of "core constitutional value."

*Katz*, 179 N.E.3d at 448. Government cannot eliminate this core value by choosing

to speak on a topic, thereby precluding any rival message. In fact, if the government

does speak, any response to that government message is automatically transformed

into political speech on government action.

### 3. Defendants Violated the Free Speech and Interchange Clause

Defendants do not contest that the ALM Mural is protected expressive

activity and expression under the Article 1, Section 9, and they concede that they

"restricted" Plaintiff's protected expression "because the City has prevented

24

Plaintiffs from communicating their message of 'All Lives Matter' in the manner the Plaintiffs prefer." [Dkt. 77 at 20.] This was a "direct and significant burden," *Katz*, 179 N.E.2d at 447, because it stymied the protected expression entirely.

Plaintiffs have not abused the right to engage in free expression through their proposal to install the ALM Mural because the ALM Mural is "political speech," that is exempt from the "abuse" prong. *Katz*, 179 N.E.3d at 448. Defendants contest this point, arguing that Plaintiffs "were not seeking to comment on government action … [but] simply wanted to express their personal view and 'show support for first responders.'" [Dkt. 77 at 21.] This argument is not supported by the evidence. The City concedes that the idea for the ALM Mural arose as a response to the City's approval of BLM murals, whose political nature is well-documented in the record. [*e.g.*, Dkts. 7-8, 7-12, 7-13, 7-19, 18-1, 18-4, 18-6, 18-8.] Reynolds testified in his Declaration that the "'Black Lives Matter' statement … is connected to a political ideology that ultimately seeks to divide and alienate individuals based on characteristics such as skin color … Therefore, TPUSA-IU and I sought to express our own view that All Lives Matter." [Dkt. 7-24 at 2 (Reynolds Decl. ¶¶ 10–11).] If the Court finds that the Black Collegian's BLM Mural was government speech under the First Amendment (it was not), that finding would, of course, further confirm that the ALM Mural is political speech.

Because Plaintiffs sought political speech, they cannot have abused their right to speak. *Katz*, 179 N.E.3d at 448. But Plaintiffs have not "abused" their right to speak in any case because they have not painted their mural yet. Defendants'

argument that "Plaintiffs' request to 'speak' by way of painting on city property *would* have been a criminal act if it was done without the City's consent" [Dkt. 77 at 21 (emphasis added)], only applies if the Court were analyzing a mural that Plaintiffs *already* painted without City consent. When the Indiana Supreme Court analyzed the "abuse" prong, it applied it only to plaintiffs who were *already* arrested or charged for speech that amounted to disorderly conduct, as in *Price*, 662 N.E.2d at 967, and *Whittington*, 669 N.E.2d at 1371, or non-consensual distribution of an intimate image, as in *Katz*, 179 N.E.2d at 439. Plaintiffs here have not and will not paint the mural without government consent or Court order. So, there has been no abuse of the right to speak in this case.

## D.     Defendants Violated Article 1, Section 23 of the Indiana Constitution

Article 1, Section 23 of the Indiana Constitution provides:

> The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.

"Section 23 should be given independent interpretation and application" from the Fourteenth Amendment. *Collins v. Day*, 644 N.E.2d 72, 75 (Ind. 1994). The Indiana Supreme Court has held that when the government treats entities differently, the different treatment "must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing characteristics." *Collins*, 644 N.E.2d at 78-79; *Paul Stieler Enters., Inc. v. City of Evansville*, 2 N.E.3d 1269, 1275 (Ind. 2014).

### 1.    *Plaintiffs Received Disparate Treatment Not Justified by Inherent Characteristics*

Here, the City allowed the Black Collegians, and others associated with them (the "BLM Street Mural Group") to paint a street mural on a public right-of-way on the IU campus. The City refused the same right to Plaintiffs and others associated with them (the "ALM Street Mural Group"). No distinctive, inherent characteristics rationally distinguishes the BLM Street Mural Group from the ALM Street Mural Group to justify the disparate treatment.

Defendants say the inherent characteristic of the BLM Street Mural Group is the City's "select[ion]" of the Group based on the group's support of "the City's Resolution and public showing of support for Black and Brown residents." [Dkt. 77 at 23.] This is not an inherent characteristic. A group's political and cultural beliefs about racism, bias, inclusivity, and equity, and the support they show to government officials who share those beliefs, are not inherent. They reflect personal choices. *Morales v. Rust*, 228 N.E.3d 1025, 1053 (Ind. 2024) (holding no "inherent characteristic" at issue where political candidate was denied ballot access because of *personal choice* on where he voted in prior three elections). Beliefs can and do change over time. They are not inherent characteristics.

The BLM Mural Street Group aside, Defendants do not address the relevance of the other groups to paint murals on City streets before 2021 (*i.e.*, the "Neighborhood Mural Group"). These groups painted expressive content that communicated messages celebrating the importance of getting to know one's neighbor or a "sense of place." [*See* Dkt. 32 (Surreply) at 4-5.] The ALM Street

Mural Group does not possess any inherent characteristics that distinguish it from the Neighborhood Mural Groups that rationally justifies the disparate treatment. A student group celebrating "All Lives Matter" with a mural is not rationally distinct from a neighborhood group celebrating their neighborhood.

### 2.      Defendants Gave Preferential Treatment That Was Not Uniform

A separate requirement of Section 23 is that, "the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Dvorak v. City of Bloomington*, 796 N.E.2d 236, 238 (Ind. 2003).

The City argues that the BLM and ALM Groups are "not on the same terms" or similarly situated because the don't equally support the City's Resolution or "Black and Brown residents." [Dkt. 77 at 23.] But as the Indiana Supreme Court held in *Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 203 (Ind. 2016), "[t]his argument 'misses the point' because [the Indiana Supreme Court] "focus[es] not on the *purposes* presumably motivating the enactment, but on the disparate *treatment* it accords." 51 N.E.3d 195, 203 (Ind. 2016) (emphasis in original) (quoting *Paul Stieler*, 2 N.E.3d at 1275). While the *purpose* of the City in rejecting the ALM Mural was to pick a mural that affirmed the City's viewpoint, the *treatment* was to discriminate between two student groups who were otherwise similarly situated. The same is true when comparing the Neighborhood Mural Group to the ALM Mural Group. The preferential treatment – the right to create semi-permanent expressive content on rights-of-way – is available only to those who self-censor expression by removing words and universally recognized symbols and express the message of neighborliness and sense of place. This is unconstitutional.

28

**E.** **Defendants Violated the Equal Protection Clause**

"[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. Of Retirement v. Murgia*, 427 U.S. 307, 312 & n.4 (1976). First Amendment rights are fundamental rights. *Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir. 1997) ("A classification receives strict scrutiny if it … burdens a fundamental right, such as free speech."). The violation occurs when "an express policy caus[es] the loss when enforced" or "a person with final policymaking authority cause[s] the loss." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008).[5]

Here, the CARWP created two (2) classes: (1) private entities (like the Neighborhood Groups) who communicate expressive content without words and universally-recognized symbols, and (2) private entities (like Plaintiffs) who don't. This classification interferes with Plaintiffs' exercise of their fundamental First Amendment rights. As shown above, this classification fails strict scrutiny because it cannot satisfy the narrowly tailored requirements under the inquiry for content-neutral time, place, and manner restrictions. *See supra* at Section B.5.

Defendants argue that "Plaintiffs were not treated differently than [neighborhood] groups" whose projects were not "approved via an email request without working with the relevant City departments" and were not allowed to paint

---

[5] Plaintiffs do not necessarily need to succeed on their First Amendment claims to succeed on their Equal Protection Claims, as Defendants argue [Dkt. 77 at 26], only prove that they do not enjoy the same rights as others who are similarly situated.

words in their murals. [Dkt. 77 at 28.] But this ignores the evidence that no restrictions against words in murals existed before the CARWP. [Wason Dep. at 17:11–24; Warren Dep. at 7:21–8:4; Deckard Dep. at 7:5–9, 18:11–14.]  Further, Defendants admit that Plaintiffs ALM Mural was denied in 2023 solely for non-compliance with the anti-speech provision, [Answer ¶¶ 111, 113–116, 118; Exhibits 11 & 12], not because it came "via an email request without working with the relevant City departments."

Defendants also argue that Adam Wason "had no personal involvement in the decisions related to Mr. Reynolds' Special Events Application."  This ignores that Wason participated in the drafting process of the CARWP (Wason Dep. 70:8-24), attended the meeting where the CARWP was approved [Dkt. 79-7 (meeting minutes), and received Plaintiffs' December 2022 Special Events Application by email [Dkt. 79-9 at 1.] At the very least, his involvement is a disputed fact.

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion for Summary Judgment as to all Defendants (except Hollingsworth and Henke) and grant Plaintiffs' Cross-Motion for Summary Judgment. [Dkt. No. 78.]

Date:  August 19, 2024          Respectfully submitted,

**KROGER, GARDIS & REGAS, LLP**

/s/ William Bock III
William Bock III, Atty. No. 14777-49
Keith A. Butler, Atty. No. 27766-29
Justin R. Olson, Atty. No. 31450-49

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2024, I filed the foregoing *Response in Opposition to Defendant's Motion for Summary Judgment* electronically with the Clerk of the Court. Notice of this filing will be sent to the following by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

        Liberty L. Roberts
        CHURCH CHURCH HITTLE + ANTRIM
        Two North Ninth Street
        Noblesville, IN 46060
        lroberts@cchalaw.com

                                /s/ Justin R. Olson
                                Justin R. Olson

KROGER, GARDIS & REGAS
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000

31