UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA UNIVERSITY CHAPTER OF TURNING POINT USA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:22-cv-00458-SEB-TAB |
| CITY OF BLOOMINGTON, INDIANA, et al., | ) ) ) | |
| Defendants. | ) ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Indiana University Chapter of Turning Point USA, Kyle Reynolds, and Tim Wheeler have brought this action under both state law and federal statutes—42 U.S.C. §§ 1981 and 1983—against Defendants City of Bloomington, Indiana (the "City"); Adam Wason, Director of Public Works for the City of Bloomington, in his individual capacity; Board of Public Works Member Kyla Cox Deckard, in her individual capacity;[1] and Mike Rouker, attorney for the City of Bloomington, in his individual capacity, alleging that Defendants' actions, as applied to Plaintiffs, violated Plaintiffs' free speech and equal protection rights, as guaranteed, respectively, by the First and Fourteenth Amendments to the United States Constitution, as well as the free speech and

---

[1] Plaintiff has also sued Board of Public Works Members Dana Henke and Beth H. Hollingsworth in their individual capacities, but now concedes that they are entitled to summary judgment in their favor on all claims. Accordingly, we GRANT Defendants' Motion for Summary Judgment and correspondingly DENY Plaintiffs' Motion for Summary Judgment as to Defendants Henke and Hollingsworth.

privileges and immunities clauses of the Indiana Constitution.  Plaintiffs have also brought a claim against Defendants for their alleged violation of the Court's November 18, 2022 Order Granting Plaintiffs' Motion for Preliminary Injunction.

Now before the Court are Defendants' and Plaintiffs' respective motions for summary judgment [Dkts. 76 and 78] seeking the Court's consideration and decisions.

## **Factual Background**[2]

**The Parties**

Plaintiff Indiana University Chapter of Turning Point USA is a student organization that describes itself as "seek[ing] to identify, educate, train, and organize students to promote principles of freedom, free markets, and limited government."  Dkt. 7-24 at 2.  Plaintiff Kyle Reynolds is an authorized agent of Turning Point USA and its former campus coordinator.  Plaintiff Tim Wheeler is the current President of the Indiana University Chapter of Turning Point USA.

Defendant Adam Wason is the Public Works Director for the City of Bloomington and has served in that capacity since 2016.  Defendant Kyla Cox Deckard has served on the Board of Public Works from January 2016 through the present.  Defendant Mike Rouker served as the City Attorney at all time periods relevant to this litigation.

---

[2] Our factual recitation, as appropriate, draws heavily on our November 18, 2022 Order Granting Plaintiffs' Motion for Preliminary Injunction.

**The Black Lives Matter Mural Project**

On May 6, 2020, the City adopted a resolution "denounc[ing] and condemn[ing] hate based on racial, social, and cultural bias and hold[ing] up values of peace, respect, inclusivity, and equity."  Dkt. 18-1 (Resolution 20-06).  In furtherance of this resolution, on July 10, 2020, a group of City employees and appointees to a City advisory council known as the Banneker Community Center Advisory Committee (BCCAC)[3] met to discuss the feasibility of developing Black Lives Matter ("BLM") street murals at the Banneker Community Center[4] and other locations within the City, an idea suggested by two BCCAC members, JaQuita Roberts and Nichelle Whitney.  Dkt. 18-5 (Pearson Aff.) ¶¶ 4–5, 7.  Prior to the July 10th meeting, several City Departments, including the Office of the Mayor, Department of Public Works, Street Department, Community and Family Resources, Safe and Civil City, and Economic and Sustainable Development had expressed support for and endorsement of a BLM street mural project.  *Id.* ¶ 8.

During the July 10th meeting, the attendees identified the following three potential locations in Bloomington for BLM street murals: Elm Street, in front of the Banneker Community Center gymnasium; Kirkwood Avenue, near the Monroe County Courthouse; and Jordan (now Eagleson) Avenue.  *Id.* ¶ 12.  The group selected the Elm Street location for the first mural after discussing the level of traffic on the street as well as the type of design to determine whether high traffic paint or exterior paint should be applied to

---

[3] BCCAC members are appointed by the City of Bloomington Board of Park Commissioners.
[4] The Banneker Community Center is a building owned by the City of Bloomington and used by the City's Parks and Recreation Department for City programs and services.  Pearson Aff. ¶ 6.

produce the signage. *Id.* ¶ 16. The attendees also discussed the manner in which the City should share information with the public about the mural project, deciding that a press release about the project should issue at a time that coincided with release of information regarding the City's formal adoption of policy actions in support of equity and justice for Black residents and the renaming of Jordan Avenue to Eagleson Avenue.[5] *Id.* ¶ 14. The importance of the City's "own[ing]" the mural project "in funding and purpose to show the BIPOC community its commitment to equity and justice" was also addressed at the July 10th meeting. *Id.* ¶ 10. At the close of the meeting, the City employees and members of the BCCAC were assigned specific tasks aimed at moving the mural project forward, including exploring funding sources, paint types, and local artists, communicating with Indiana University ("IU") administration and IU's Black Student Union, and engaging other community partners in the project. *Id.* ¶ 17.

On July 28, 2020, the BLM street mural project was presented to the City's Parks Department and the Board of Parks Commissioners at their regular meeting. The minutes from that meeting show that the Board discussed that the City "needs to take the onus of funding [the project] to show the BIPOC community its commitment to equality and justice." Dkt. 18-5 at 4. During that meeting, Sean Starowitz, who at that time was the City's Assistant Arts Director, stated that, in addition to the Elm Street mural and the

---

[5] The City renamed Jordan Avenue south of 17th Street, "Eagleson Avenue," in honor of four generations of the Eagleson family, including Halson Vashon Ealeson, who was born enslaved in 1851, and who arrived in Bloomington in the 1880s and became a prominent barber. Mr. Eagleson's five children all attended Indiana University. Jordan Avenue was previously named in honor of David Starr Jordan, whose "views … on eugenics and racial differences conflict … with the City's commitment to promote inclusion and equity in the community …." Dkt. 7-14.

"downtown mural," there was "a possibility of having three murals in the community, as there will be conversations with the County for possible partnerships, with [] Enough is Enough[], and with Indiana University." *Id.* at 5. Mr. Starowitz informed the Parks Board that the Bloomington Arts Commission had invited several artists of color to submit mural proposals and that at that point the City had received six submissions from artists. *Id.* Mr. Starowitz indicated that "due to [the] limited number, this may be extended," with a preference for Black artists on the project. *Id.* The Parks Board recognized that the "funding mechanism is a bit of a challenge" and one member of the Board expressed that she believed there were "many hoops to jump through" and that "the process in general is a big hurdle." *Id.* Following this discussion, the Parks Board unanimously approved the BCCAC's recommendation to proceed with the BLM street mural project. *Id.* at 6.

Although the possibility of three BLM street murals had arisen during the Parks Board meeting, the City adopted Resolution 20-16 on September 23, 2020 officially "endors[ing] the painting of two Black Lives Matter murals—one on Elm Street in front of the Banneker Center, or at such other nearby location as the City and the Banneker Community Center Advisory Counsel agree is appropriate, and one at a downtown location to be determined, and support[ing] the City's use of existing funds to pay the artist(s) hired to design and paint the mural." Dkt. 18-6. Resolution 20-16 "call[ed] on the Board of Public Works to permit th[e] use of a public right of way and join in th[e] public display of support for [] Black and Brown residents who have been fighting for justice and equality for far too long." *Id.*

**The First Black Lives Matter Mural**

On September 29, 2020, Mr. Starowitz presented the Board of Public Works with Resolution 2020-50 requesting approval of a right-of-way encroachment for the painting of a BLM mural on the surface of Elm Street between 7th and 8th Streets.  Dkt. 18-7 at 2. Mr. Starowitz indicated that the BLM street mural project was a "collaboration between the Board of Parks Commissioners, Banneker Community Center Advisory Council, Bloomington Arts Commission, the Office of the Mayor, Community and Family Resources Department and Bloomington Common Council."  *Id.*  He further stated that the "interdepartmental project [was] requesting the Board of Public Works to permit [the] use of the public right of way and join in this public display of support for our Black and Brown residents, who have been fighting for justice and equality."  *Id.*  The Board of Public Works unanimously approved Resolution 2020-50 allowing for the encroachment of the first BLM street mural, which mural was painted on October 24, 2020.  *Id.* at 3.

The City issued a press release on November 13, 2020, inviting community members to a virtual dedication ceremony for "the City's newly completed Black Lives Matter street mural project …."  Dkt. 18-16 at 2.  In that press release, Bloomington Mayor John Hamilton stated: "The City is proud that the words 'Black Lives Matter' live on our street ….  We appreciate the residents who led this public art project and the many who helped bring it to life, and we look forward to continuing to engage with residents to live out the words in actions, to continue to address long-standing issues of racism and discrimination in our community."  *Id.* at 3.  A few weeks later, on December 1, 2020, the City issued a press release announcing that "the City's second Black Lives Matter street

mural will be installed in downtown Bloomington on West Sixth Street between College and Walnut (the north side of the square) in the spring." Dkt. 18-17 at 2. The December 1, 2020 press release indicated that funding for the first street mural had come from "unused municipal dollars originally budgeted and earmarked" for another project that was cancelled due to the COVID-19 pandemic and that the second street mural "will utilize material (such as paint) already purchased for the first mural; additional funds needed will come from the Department of Economic[] and Sustainable Development." *Id.*

**The Second Black Lives Matter Street Mural**

On April 13, 2021, Mr. Starowitz presented a second proposal to the Board of Public Works authorizing the painting of the second BLM mural on 6th Street between North College Avenue and North Walnut Streets. Dkt. 18-9. Since this was part of the same project previously approved by the Board of Public Works, consideration of Mr. Starowitz's Staff Report regarding the second mural and the requested Resolution for the encroachment of the right-of-way was addressed as part of the Board's consent agenda. Dkt. 18-10 at 1. As with the first BLM mural, the second mural was identified as an "interdepartmental project" whose purpose was to display support for "our Black and Brown residents who have been fighting for justice and equality for far too long." Dkt. 18-9. The Board of Public Works without further discussion approved Resolution 2021-10 authorizing the encroachment for the second BLM street mural. Dkt. 18-10 at 1.

The City issued a press release on April 14, 2021, informing the public that "[t]he City's second Black Lives Matter street mural was approved … by the Board of Public

Works for installation on the north side of the downtown square." Dkt. 18-18 at 2.

Mayor John Hamilton was quoted in the press release as follows: "The City is proud to

welcome these murals to our public art landscape …. Putting the words Black Lives

Matter at the heart of our downtown matches up with values at the heart of this

community: equity, inclusion, and justice. The words on the street will serve as a

constant reminder to combat the persistence of racism and discrimination in Bloomington

and beyond." *Id.*

**The Third Black Lives Matter Street Mural**

In June 2021, Mr. Starowitz transitioned from his position as the Assistant Arts

Director for the City to a new employment opportunity outside City government, which

created a temporary vacancy in that position until a new Assistant Director was hired

three months later, in September 2021. Dkt. 18-14 (Wason Aff.) ¶¶ 6–7. According to

Adam Wason, Director of Public Works for the City of Bloomington, while Mr.

Starowitz was transitioning from his position, "the City was working on the approval and

installation of the third and final Black Lives Matter street mural." *Id.* ¶ 8. After Mr.

Starowitz's departure, Mr. Wason assumed a "more active role in the selection and

approval" of the third BLM street mural. *Id.* ¶ 9. Specifically, Mr. Wason, testifying by

affidavit, said that he "worked with Indiana University and the Black Collegians for the

installation of the third mural which was painted on Jordan Avenue, which is now known

as Eagleson Avenue." *Id.* ¶ 10.

It is not clear what communications, if any, regarding the installation of a third

BLM mural in Bloomington occurred prior to June 4, 2021 between the City and Indiana

University and/or the Black Collegians. However, on June 4, Mr. Wason emailed Adam Thies, an employee of Indiana University, stating that the City had been approached by the Black Collegians "regarding their desire to install a BLM mural on 7th Street during Juneteenth celebrations" and indicating that the City would "certainly be supportive" of such a project. Dkt. 79-1 at 3. Mr. Thies, in turn, reached out to Indiana University's Vice President for Capital Planning and Facilities, Thomas Morrison, who informed Mr. Thies that he had earlier that day spoken with Tiera Howlett and Joa'Quinn Griffin, two members of the Black Collegians, regarding their proposed mural. Mr. Morrison advised them that their project would need further approval from Indiana University administrators as well as from the City and that the University would also require "a review of the design and installation methods/process to approve of the materials (type of paint) to be used on street project." Dkt. 79-1 at 2. Mr. Thies forwarded Mr. Morrison's response to Mr. Wason.

On June 11, 2021, Gloria Howell, an Indiana University employee and Director of the Neal-Marshall Black Culture Center, emailed City employee Shatoyia Moss, who had worked with the organizers of the first BLM mural, to inquire whether Ms. Moss would be willing to speak with the Black Collegians members who "are facilitating the creation of a BLM mural on campus … on Jordan Avenue." Dkt. 79-2 at 3. Ms. Moss responded, "[a]bsolutely" and agreed to meet to discuss the project. *Id.*

The third BLM street mural was painted on Jordan/Eagleson Avenue by volunteers from the Black Collegians on July 3–5, 2021. The mural was funded in part by Indiana University's funding board with funds from mandatory student fees as well as

donations from individual community members and the Division of Student Affairs. Dkt. 7-12 at 2. The third BLM mural design included letters that spelled "Black Lives Matter" and was also "inclusive of other marginalized communities." *Id.* For example, the "L" in "Black" depicted an adult holding the hand of a child; the "A" included a rainbow-colored infinity symbol; the "K" was in the form of the letter K in American Sign Language; the "L" in "Lives" incorporated the pride flag; and the "M" in "Matter" incorporated the Jewish Star of David, the Muslim crescent moon, the Christian cross, and the yin and yang symbol. Dkt. 7-13 at 2.

The Staff Report for the third BLM mural was due to be presented to the Board of Public Works for approval in June 2021. However, an oversight attributable to Mr. Starowitz's transition left the Staff Report for the third BLM mural unavailable for presentation to the Board of Public Works prior to the mural's scheduled installation. Dkt. 18-14 ¶¶ 13–14. Following discovery of this omission, Mr. Wason finalized and presented the Staff Report to the Board of Public Works at the next regularly scheduled board meeting on August 3, 2021, approximately one month following the painting of the third BLM mural. Dkt. 18-12. In that Staff Report, Mr. Wason stated that the mural had been endorsed by the City of Bloomington Economic & Sustainable Development Department, Office of the Mayor, Community Family Resources Department, and the Public Works Department and had been completed in partnership with Indiana University's Provost Office and the Black Collegians student group. The Staff Report further described the third BLM mural as a "community project" and requested after the fact that the Board of Public Works "permit this use of a public right of way and join in

this public display of support for our Black and Brown residents who have been fighting for justice."  Dkt. 18-12.

The Staff Report explained that the request for approval was being made after the mural had already been completed "due to an oversight by staff as City personnel transitioned out of the organization," but that "[i]ntentions were always to work with IU and this student group, and have this before the Board in early June."  *Id.*  As with the second BLM street mural, this request was included on the consent agenda of the Board of Public Works.  On August 3, 2021, the Board retroactively approved the third BLM street mural's encroachment on Jordan/Eagleson Avenue.  Dkt. 18-13 at 1–2.

On August 5, 2021, the Black Collegians applied for and obtained a permit for "touch ups" to the third BLM mural.  Dkt. 79-3.  According to Plaintiffs, by May 2022, the paint used in the BLM mural had deteriorated.  Reynolds Decl. ¶ 5.

**Social Media and Press Coverage of Third Black Lives Matter Mural**

On July 5, 2021, the Black Collegians posted on their Facebook page the following message about the third BLM street mural: "Construction begins for our Black Lives Matter Street Mural on Jordan Avenue this Morning.  What an exciting time! #BlackCollegiansInc #blacklivesmatter."  Dkt. 7-16.  Following completion of the mural, Indiana University referenced the mural on its website and official Twitter feed, publicly thanking "the Black Collegians group for bringing this mural to life on our campus."  Dkt. 7-17.  The University's Provost tweeted, "[t]he Black Collegians finished the amazing Black Lives Matter mural on Jordan Ave.  If you're on the @IUBloomington campus, check it out between @NMBCC_IU and @IU_Groups buildings!"  Dkt. 7-18.

Several news articles published at the time the street mural was painted detailed the efforts of the Black Collegians group to bring the BLM mural to Indiana University's campus and the students' involvement with the University in choosing the mural's location on Jordan/Eagleson Avenue.  Dkts. 7-12, 7-13, 7-14.

**Plaintiffs' Request to Install All Lives Matter Street Mural**

Near the end of July 2021, a few weeks after the third BLM street mural was installed on Jordan/Eagleson Avenue, Plaintiff Kyle Reynolds, who was then a student attending Indiana University and residing in Bloomington, began sending emails to Indiana University and City officials on behalf of Plaintiff Indiana University Chapter of Turning Point USA and non-party *The Crimson Post*, another Indiana University student-led organization with which Mr. Reynolds was affiliated, requesting approval for an "All Lives Matter" street mural.  Dkts. 7-5, 7-6.  In these communications, Plaintiffs stated that they believe that the "Black Lives Matter" statement is "highly divisive and not representative of all the groups on campus" and that they wished to express their own view that "all lives matter" by creating a mural setting out that message that would be similar in size and scope to the BLM mural painted on Jordan/Eagleson Avenue. Dkt. 7-1.

On July 20, 2021, Mr. Reynolds reached out to Indiana University via email requesting permission to create an All Lives Matter mural on campus "[i]deally … on a large street, such as the one utilized for the BLM mural, however, any large space with high visibility on campus should be adequate."  Dkt. 7-2.  On July 27, 2021, Indiana University's Office of Student Involvement and Leadership directed Mr. Reynolds to IU

12

Vice President Thomas Morrison.  *Id.*  Mr. Reynolds then emailed his request to Vice President Morrison, who replied that the "BLM mural was created on a street owned by the City of Bloomington.  Thus, the City was the entity that ultimately approved the mural."  *Id.*  Accordingly, Vice President Morrison instructed Mr. Reynolds to contact the City for further inquiry.  *Id.*

On July 29, 2021, Mr. Reynolds sent an email to the Public Works Department's general email account (public.works@bloomington.in.gov) requesting approval to paint the All Lives Matter mural on the surface of a Bloomington street.  The City's Assistant Arts Director position was vacant at that time due to Mr. Starowitz's transition out of the Public Works Department; thus, although Mr. Wason did not typically handle requests for mural paintings, he agreed to respond to Mr. Reynolds's request and informed his City colleagues that he would handle any communications with Mr. Reynolds going forward. Wason Dep. at 42–44; Dkt. 79-5.  According to Mr. Wason, before responding via email, he called Mr. Reynolds and informed him that he (Mr. Reynolds) would need to contact the Economic and Sustainable Development Department to work through the City's procedures governing public art projects.  Wason Dep. at 46–47.  There is no indication in the record that Mr. Reynolds reached out to the Economic and Sustainable Development Department at that time regarding his mural request.

On August 2, 2021, Mr. Wason emailed Mr. Reynolds stating that he "need[ed] to work with the IUB President's Office, as did the other group, in order to get the concept for any murals approved for placement on any streets on campus."  Dkt. 7-4.  After Mr. Reynolds conveyed this information to Vice President Morrison, Morrison replied that

13

Mr. Reynold's request was now "delegated to [him]," "as it was with the BLM group." Dkt. 7-2.  Vice President Morrison requested that Mr. Reynolds submit location ideas and a proposed graphic for the All Lives Matter mural, which Mr. Reynolds did.  *Id.*

Upon review of the proposed mural design, which featured the phrase "All Lives Matter" with a thin blue line running through "All Lives" and a thin red line running through "Matter" to represent support for first responders, Vice President Morrison emailed Mr. Reynolds saying that, "the graphic and sizing look good on my end," and recommending that Mr. Reynolds "relay to the City that IU is ok with the East Kirkwood location," a public right-of-way running through Indiana University's campus, for the All Lives Matter mural.  *Id.*  In that email, Vice President Morrison reiterated that "[it] is the City's ultimate approval" that was required and that his input mattered only because the City "consults with [the University] as an adjacent property owner."  *Id.*

On August 3, 2021—the same day Mr. Wason sought retroactive approval from the Board of Public Works for the third BLM mural—Mr. Reynolds informed Mr. Wason via email that the proposed All Lives Matter mural "was approved by the IUB President's Office, specifically … Thomas Morrison."  Dkt. 7-4.  On August 10, 2021, Mr. Wason responded to Mr. Reynolds instructing Mr. Reynolds to speak with "City Legal" about the mural and also informing Mr. Reynolds that "Mr. Morrison's office is also not in agreement with your take on IU 'giving permission.'"  *Id.*

That same day, Mr. Reynolds, as instructed, contacted City Attorney Michael Rouker by email to report on his conversations with Mr. Wason and Vice President Morrison.  After Mr. Reynolds failed to receive a response from Mr. Rouker, he sent

three follow-up emails on August 17, 18, and 19.  Dkt. 7-5.  Mr. Rouker responded to these communications on August 23, 2021, informing Mr. Reynolds that it is "the City of Bloomington's Board of Public Works [that] approves the placement of art in the public right of way.  The City does not take recommendations for art in its right of way from individuals, and, at this time, the City is not considering adding additional art within its right of way."  Dkt. 7-5.  Mr. Rouker has testified that he was unaware at the time he responded to Mr. Reynolds of any previous request by a private citizen or group to paint a message on a City street that was not part of a City initiative or City-sponsored project.  Rouker Aff. ¶¶ 18, 21–23.

**The City's Public Art Master Plan**

In January 2015, several years prior to the events at issue in this litigation, the Bloomington Arts Commission, an entity established by the Bloomington Common Council, developed a Public Art Master Plan for the City that "articulate[s] not only the principles and guidelines for those public art activities with which [the Commission] has direct connection, but also to put forth a blueprint for the ideal public art environment for the city of Bloomington, recognizing that the arts exist within a physical, artistic, sociological, governmental and economic construct that is constantly shifting."  Dkt. 32-2 at 1.  The term "public art" is defined by the Master Plan as "any mode of temporary or permanent artistic expression or process that is funded through any source and is produced with the intention of making it available to the public."  *Id.* at 3.

The "Objectives & Aspirations" for the City in establishing the Master Plan include creating "bold, innovative works of public art," having an "impact on city image

and pride," and promoting a "higher level of community engagement." *Id.* at 5. The Master Plan recognizes that "[a]rt created for the public sphere can give form to core values of the community, such as freedom of speech and expression, alongside respect for diverse viewers and users"; can "seek to balance issues of originality, artistic quality and intellectual provocation with a respect for the diverse activities that take place in the public domain"; "can reflect the history of the community, including the evolution of taste, values, and formal expressions as well as challenge previously held views"; and "can reflect the community's unique engagement with the world." *Id.* at 3.

The Master Plan lists several "Priorities for Public Art," including "[p]rovid[ing] resources, training and mentorship for public art project development and management to organizations, collectives, neighborhoods, students, individual artists and the general public," "[i]ncorporat[ing] works of public art and performance in high-traffic transportation corridors and pedestrian areas" by "[c]ontinu[ing] the placement of works of public art in roundabouts and intersections" and "[e]ncourag[ing] community-based works of public art and performance that support neighborhood cohesion and vitality" by "[o]ffer[ing] opportunities for citizens to work directly with providers to develop art projects for their neighborhoods." *Id.* at 6.

**Public Art Projects Approved by the City in Rights-of-Way**

Apart from the three Black Lives Matter murals, Plaintiffs have cited the following

additional instances in which the Board of Public Works approved encroachments on

City rights-of-way for public art displays:[6]

- 2021 Middle Way House Public Art Display

In August 2021, the Board of Public Works approved a Special Event Application

from the Middle Way House, a nonprofit organization providing services for survivors of

domestic abuse, sexual assault, stalking, and human trafficking, for its annual "wrapped

in love public art display," beginning on October 1, 2021, and ending on March 1, 2022.

Ans. to Sec. Am. Compl. ¶ 28.  This public art display involved community participants

wrapping trees with tree sweaters and light posts with yarn.  *Id.*

- 2018 Prospect Hill Neighborhood Street Painting Party

On July 10, 2018, the Board of Public Works approved a Special Event

Application from the Prospect Hill Neighborhood Association to host a "Street Mural

Painting Party" that involved "paint[ing] and clos[ing] the intersection of Fairview and

Howe Street to install a public art project in the street."  Dkt. 22-6 at 4–5.  In seeking

approval, the Prospect Hill Neighborhood Association noted that "[a]t least one

intersection mural has been painted in Bloomington before (at Fairview & Dodds St. in

McDoel Gardens)," which is detailed below.  Dkt. 32-1 at 8.  The Board of Public Works

---

[6] Plaintiffs reference the existence of at least six other public art displays in public rights-of-way that have been approved by the Board of Public Works since January 1, 2019, but provide no further details.

17

resolution approving this application states that "the Neighborhood" would be responsible for posting "no parking signs," developing a Maintenance of Traffic Plan to be approved by the Planning and Transportation Department, obtaining and paying for any required barricades, financing and obtaining any and all required permits and licenses, and notifying the public, public transit, and public safety agencies of the street closing.  Dkt. 22-5 at 5–6.

Prior to the presentation of this request to the Board of Public Works, the Prospect Hill Neighborhood Association had submitted an application and been awarded a Neighborhood Improvement Grant for the street mural project as public art subject to the design constraints of the City.  The design that was ultimately selected and used for the project was called "Common Pollen" and consisted of a circular shape with points suggesting radiating petals of a sunflower.  Dkt. 32-1 ¶ 29; Exh. B to Dkt. 32-1.  The design did not include any words or letters.

- <u>2017 McDoel Neighborhood Street Painting Party</u>

On July 11, 2017, the Board of Public Works approved a Special Event Application from the McDoel Neighborhood Association subset "Dodds and Fairview Street Painting Group" to "paint and partially close the intersection of Fairview and Dodds Street" for a "Street Mural Painting Party."  Dkt. 22-3 at 4–5; Dkt. 22-4 at 6.  The Board of Public Works resolution approving this request states that "the Neighborhood" would be responsible for posting "no parking signs," developing a Maintenance of Traffic Plan to be approved by the Planning and Transportation Department, obtaining and paying for any required barricades, financing and obtaining any and all required permits

18

and licenses, and notifying the public, public transit, and public safety agencies of the street closing. Dkt. 22-3 at 4. The design that was painted on the intersection was approved by the City's Traffic and Transportation and Planning and Transportation Engineers and consisted of colorful spiraling sections that formed a turtle in the middle of the circle. *Id.* at 11–12. The design did not include any words or letters.

- 2017 Near Westside Neighborhood Association Block Party and Mural Painting Project

On May 2, 2017, the Board of Public Works approved a request from the Westside Neighborhood Association in collaboration with the Department of Economic and Sustainable Development to hold "a neighborhood block party and traffic calming mural painting," on 7th Street Between Adams and Waldron Streets. Dkt. 22-1 at 5–6; Dkt. 22-2 at 6. The "traffic calming" devices referenced were concrete circles that surrounded planters located in the middle of intersections on 7th Street in Bloomington. Dkt. 22-1 at 8. The City hosted the event and was responsible for the posting of signs, developing a traffic plan, placing barricades it funded, obtaining all permits and licenses, notifying the public, public transit, and public safety of the event, and cleaning the street before and after the block party. *Id.* at 5. The Department of Economic Sustainable Development worked with artist Emily Wilson to create a geometric design that was painted on the traffic calming devices during the block party. Specifically, the design included blue and yellow-colored petals painted around the traffic circle to form a flower. *Id.* at 7–8. The design did not include any words or letters.

19

Plaintiffs cite these prior authorizations as evidence to support their claim that the City's withholding of permission of their request was viewpoint-based, in violation of their constitutional rights.

**The Court's Preliminary Injunction Order and Subsequent Events**

On November 18, 2022, the Court issued a preliminary injunction in this case, ordering Defendants within forty-five days "to promulgate and disseminate to the public, including to Plaintiffs, the procedural steps whereby private individuals and groups can seek approval for an encroachment on the City of Bloomington's rights-of-way for the purpose of displaying art." Dkt. 36 at 1. The Court further ordered that Defendants were preliminarily enjoined "until further order of this Court, from denying Plaintiffs access to or otherwise unduly delaying the application process by which the City of Bloomington passes on requests for encroachments on rights-of-way for the purpose of displaying public art." *Id.* at 1–2.

Following the issuance of the preliminary injunction, on December 6, 2022, the Board of Public Works passed Resolution 2022-90, which placed a moratorium on the consideration of Special Event Applications for public art installations until the City could "promulgate and disseminate" the applicable procedures as the Court's order required. Accordingly, the moratorium ran from December 6 through December 20, 2022, during which time no application from any member of the public, including Plaintiffs, was considered by the City.

On December 20, 2022, the Board of Public Works approved the "City of Bloomington Policy and Procedures on Public Art Installations Within the Public Right of Way" ("the Policy"), which authorizes two avenues for requests submitted by individuals and external groups to install public art in a public right of way in Bloomington: (1) the Neighborhood Improvement Grant Program; and (2) a Special Event Application.  Dkt. 79-3.  Under both procedures, the Policy distinguishes between "Temporary Art," which is expected to remain in place within the public right of way for seven or fewer days, and "Semi-Permanent Art or Permanent Art," which is art expected to remain in the public right of way for more than seven days.  *Id.*  The Policy contains public safety provisions applicable to all private art installations, including provisions mandating that public art not mimic traffic control devices or cause drivers to alter their course as well as provisions restricting where public art can be installed and prohibiting public art from "depict[ing] activities, materials, images, or products that are not legally available to all ages."  *Id.*  The Policy sets forth additional criteria for Semi-Permanent and Permanent Art, including that "Semi-Permanent and Permanent Art Installations may not contain Speech," which is defined under the Policy as "[w]ords, letters, numbers, universally recognized symbols, or logos of any kind."  *Id.*  According to City Attorney Rouker, these criteria, while not previously adopted as official policy by the City, are the same criteria it had applied informally to public art installation requests since 2017. Rouker Aff. ¶ 42.

On December 19, 2022, Kyle Reynolds, acting on behalf of Turning Point USA at Indiana University, submitted a Special Event Application (the "Application") seeking

permission to paint an All Lives Matter mural on a public street in Bloomington.

Specifically, the Application requested authorization to:

> [P]aint an approximately 12' x 120' "All Lives Matter" street mural on East Kirkwood in front of the Von Lee Building and Indiana University Parking Lot. The mural, which will be contained to the westbound side of the road and will not cross the center line, will contain the phrase "All Lives Matter" bisected by red and blue lines to show support for first responders.

Dkt. 77-8. Because Plaintiffs' requested mural was expected to remain in the public right-of-way for more than seven days, it fell within the Policy's definition of "Semi-Permanent or Permanent Art."

The City's moratorium was lifted the day after Plaintiffs had submitted their Application, and, between January 3, 2023 and March 14, 2023, Kyle Reynolds and staff from the City worked to address various issues that the City identified as needing clarification, including traffic control plans, scaled drawings, and planned paint materials. The City also advised Mr. Reynolds that the application was inconsistent with the Policy because the requested mural contained words. Mr. Reynolds was given the option to submit an alternative design without words prior to submission of the application to the Board of Public Works, but he chose not to do so. Accordingly, the Application was submitted to the Board of Public Works including the use of words in the proposed mural. The Application was accompanied by a Staff Report recommending that the Board deny the mural request because the proposed mural constituted a Semi-Permanent or Permanent Art installation containing words, which contravened the Policy.

The Board of Public Works considered the Application at its March 14, 2023 regular meeting. After receiving public comment, the Board denied the Application on

the grounds that it was "inconsistent with Section IV(B) of the Policy" because the proposed mural included words.  Dkt. 77-10.

**Plaintiffs' Second Amended Complaint**

On February 19, 2024, Plaintiffs amended their complaint to allege that Defendants' actions in denying both Plaintiffs' initial request in 2021 and their subsequent application in 2023 seeking permission to paint an All Lives Matter street mural violated their free speech rights as guaranteed by the First Amendment and the Indiana Constitution; their Fourteenth Amendment equal protection and/or due process rights; and the Privileges and Immunities Clause of the Indiana Constitution.  Plaintiffs also allege that Defendants have breached the Court's November 18, 2022 Preliminary Injunction by promulgating the Policy for the purpose of banning Plaintiffs from painting their proposed mural.

Now before the Court are the parties' cross-motions for summary judgment. Defendants seek summary judgment in their favor on all of Plaintiffs' claims.  Plaintiffs, however, have included in their brief in support of their motion for summary judgment only their First Amendment viewpoint discrimination claims and their claim that Defendants violated the Court's preliminary injunction order.  Accordingly, their motion is treated as being for partial summary judgment on the claims addressed in their opening brief.  Both motions are now fully briefed and ripe for ruling.

## Legal Analysis

### I.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md. 1998).  Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.     Conceded Claims

Plaintiffs concede that Defendants Hollinsworth and Henke are entitled to summary judgment in their favor on all claims alleged against them in this lawsuit and that Defendant Cox Deckard is entitled to summary judgment on Count I of the Second Amended Complaint.  Accordingly, Defendants' motion for summary judgment is granted as to these Defendants and claims, and Plaintiff's motion for summary judgment correspondingly is denied.

## III.    First Amendment Viewpoint Discrimination

We return to address these issues nearly three years after granting Plaintiffs preliminary injunctive relief.  While much has transpired during that time period to change the shape and scope of this litigation, the underlying question remains the same: whether Defendants acted within their rights in restricting Plaintiffs from painting their desired ALM street mural, or, if in withholding authorization of their display, Defendants acted unconstitutionally by discriminating against them based on Plaintiffs' viewpoint.

Plaintiffs argue that, by repeatedly approving privately created art in public rights of way without imposing any restrictions regarding expressive content, the City created a designated public forum for private artists to install public art in rights-of-way, including paintings on City streets, and, that once they did so, Defendants were not permitted to discriminate based on viewpoint in permitting access to that forum by others in the future.  Plaintiffs contend that when Defendants allowed the Black Collegians to paint the third BLM mural and permitted other neighborhood groups to paint street murals, but denied Plaintiffs access to the same application process that had been

25

followed in approving these private groups' requests to paint comparable murals, they did what they were not entitled to do. Plaintiffs further argue that, once this litigation commenced and the Court directed Defendants to make the City's application process available to Plaintiffs, Defendants again violated Plaintiffs' First Amendment rights by adopting the Policy and enforcing the Policy's anti-speech provision against Plaintiffs all with the purpose of discriminating against Plaintiffs' viewpoint.

Defendants counter that the City never created a public forum for private citizens to freely express themselves by painting messages on public rights of way. Defendants maintain that the City was speaking for itself when it approved all three BLM murals and was thus permitted to choose the message it wanted painted on its streets, and further, that there is no evidence outside the BLM murals that any other private individual or group was ever permitted to paint a semi-permanent design containing letters or words on the City's streets as Plaintiffs sought to do. With regard to the City's subsequent adoption of the Policy and its denial of Plaintiffs' application to paint the ALM mural, Defendants contend that there was no viewpoint discrimination because Plaintiffs' application was denied, not because of the message they sought to convey, but because their proposed ALM mural violated the Policy's restriction on the use of words or letters in semi-permanent and permanent art displayed in the public rights of way, a constitutional content- and viewpoint-neutral time, place, or manner restriction.

While it is, of course, true that "the government need not permit all forms of speech on property that it owns and controls," *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992), and that the government can place varying kinds and

levels of regulation on speech and expressive activity depending on the type of forum at issue, including in some cases by imposing content-based restrictions,[7] it is axiomatic that, once the government creates a forum for private speech on its property, regardless of the type of forum it has created, it cannot discriminate thereafter, based on viewpoint. *See Dye v. City of Bloomington, Ind.*, 580 F. Supp. 3d 560, 570 (S.D. Ind. 2022) ("Viewpoint discrimination is an 'egregious form of content discrimination,' and governments may not regulate speech when 'the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'") (quoting *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995)).

Accordingly, we first address whether the City created a forum for private individuals to display art in public rights of way, specifically, in paintings on public streets. If so, we examine whether evidence of viewpoint discrimination exists here and,

---

[7] In the context of non-government speech on public property, "[t]he amount of access to which the government must give the public for First Amendment activities, and the standards by which a court will evaluate limitations on those rights, depends on the nature of the forum at issue." *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)). However, even in limited public and non-public fora, where the government has the most leeway to impose limitations on speech, the limitations it imposes must be viewpoint neutral. *See, e.g., id.* ("The government, like other private property holders, can reserve property for the use for which it was intended, 'as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'") (quoting *Perry*, 460 U.S. at 46); *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."); *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995) (stating that the government may permissibly restrict entire subject matters in limited public fora when such restriction preserves the purpose of the forum, but viewpoint discrimination is not permitted).

if so, which of the defendants may be held legally liable for it.  Our analysis begins with a discussion of the government speech doctrine.

### A.  Government Speech Doctrine

To the extent that Plaintiffs contend that Defendants created a forum for the public to paint messages on City streets based on the City's approval of the BLM street murals—specifically the third mural painted by the Black Collegians, another Indiana University student group—we reject this argument for the same reasons set forth in our preliminary injunction order, namely, that the BLM murals constituted government speech, which is not subject to First Amendment analysis.  Because the evidence adduced at summary judgment is virtually identical to that presented to us at the preliminary injunction stage of the proceedings, we incorporate here our analysis with limited alterations.

The government speech doctrine permits viewpoint discrimination when the "government speaks for itself."  *Shurtleff v. Boston*, 596 U.S. 243, 247–48 (2022). "When the government wishes to state an opinion, to speak for the community, to formulate politics, or to implement programs, it naturally chooses what to say and what not to say."  *Id.* at 251.  When a government actor speaks directly, it is not difficult to conclude that such speech is attributable to the government.  However, as the Supreme Court recognized in *Shurtleff*, "[t]he boundary between government speech and private expression can blur when … a government invites the people to participate in a program." *Id.* at 252.  In such situations, it can be difficult to determine when "government-public engagement transmit[s] the government's own message" and when it "instead create[s] a forum for the expression of private speakers' views."  *Id.*

28

In determining whether challenged speech is government or private speech, the Court considers, "(1) whether governments have traditionally spoken to the public in the manner at issue; (2) whether observers of the speech at issue would reasonably interpret it to be that of the government; and (3) whether the government maintained editorial control over the speech." *Higher Soc'y of Ind. v. Tippecanoe Cnty.*, 858 F.3d 1113, 1117 (7th Cir. 2017); *see also Shurtleff*, 596 U.S. at 252; *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210–13 (2015); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470–72 (2009). The Supreme Court recently made clear in *Shurtleff* that, while consideration of these factors is helpful in guiding the court's analysis, determining whether the government "intends to speak for itself or to regulate private expression" requires a "holistic inquiry" that is "not mechanical," but is instead "driven by a case's context rather than the rote application of rigid factors." *Shurtleff*, 596 U.S. at 252. Ultimately, "[t]he thrust of the inquiry, … is whether the Government has purposefully communicated a message of its own choosing." *Small Bus. in Transp. Coalition v. Bowser*, 610 F. Supp. 3d 149, 154–55 (D.D.C. June 28, 2022) (citing *Shurtleff*, 596 U.S. at 267–68 (Alito, J., concurring in the judgment), *aff'd*, 2023 WL 2770986 (D.C. Cir. Apr. 4, 2023), *reh'g denied*, 2023 WL 3235577 (D.C. Cir. May 1, 2023)).

Applying these principles to the case at bar, we find that the City has established that all three BLM street murals were government, not private, speech and thus do not implicate First Amendment restrictions. Focusing solely on the third BLM mural, Plaintiffs maintain otherwise. Viewing the third BLM mural in a vacuum, as Plaintiffs

do, we too might reach an opposite conclusion.  However, as discussed above, the Supreme Court has directed the Court to conduct a "holistic inquiry" when applying the government speech doctrine.  Doing so here, we find that when viewed "holistic[ally]," as the Supreme Court has instructed and in context with the City's overall plan for its BLM street murals, each of the three BLM murals constituted government speech.

We summarize again the designated evidence that forms our decision:  a group of City employees and officially-selected appointees to the City's Banneker Advisory Council initiated the BLM street mural project, specifically choosing to express the "Black Lives Matter" message in furtherance of the City's May 2020 resolution condemning racism in order to demonstrate the City's "animosity to all forms of racism." Exh. 106 at 3.  Although the City accepted submissions from private artists for the mural designs, the City dictated the message to be displayed, to wit, "Black Lives Matter," and also financed the creation of the first two BLM murals with public funds.  Leading up to and following the installation of the first two BLM murals, the City issued press releases extolling its mural project, including quotations from Mayor John Hamilton on behalf of the City, and explaining the significance of the murals and their importance to the City. Although the BLM murals are distinct from the typical uses of street painting by the City—namely, for traffic control—given the murals' size, scope, and placement on widely-utilized throughfare streets in the City, combined with the City's publicized resolution condemning racism and other contemporaneous anti-racist initiatives, including renaming City streets, a public observer of the BLM murals would reasonably conclude that they were messages promulgated by and issued from the City itself.

30

We recognize, as Plaintiffs highlight, that there are procedural differences between the authorizations of the initial two BLM murals and the third that bear some relevance to the government speech analysis.  Particularly, with regard to the public's perception of the third BLM mural, the fact that the City did not specifically reference a third mural in its original resolution approving the first two BLM murals did not issue a press release preceding the third mural's installation, or contribute public funds to pay for its installation, coupled with news articles and social media coverage attributing its installation to the efforts of the Black Collegians, which was an Indiana University student group, rather than the City, could cause the public to believe that the City had merely provided a forum for the Black Collegians' speech and was not itself speaking.

However, public perception is but one factor to be considered in this analysis and "[t]he fact that private parties take part in the design and propagation of a message does not extinguish the governmental nature of the message or transform the government's role into that of a mere forum-provider."  *Walker v. Texas Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 217 (2015); *accord Summum*, 555 U.S. at 468 ("[A] government entity may exercise [its] freedom to express its views" even "when it receives assistance from private sources for the purpose of delivering a government-controlled message."). Defendants have adduced evidence that shows that during the Banneker Advisory Council's initial discussions regarding the BLM street mural project, City officials did identify three locations as potential mural sites, specifically, Elm Street (site of the first BLM mural), a downtown location (site of the second BLM mural) and Jordan, now Eagleson Avenue (site of the third BLM mural).  In addition, during the Board of Park

Commissioners meeting at which the BLM mural project was first presented and discussed, the City's Banneker Advisory Council recommended to the Board that two BLM street murals be painted at the Elm Street and downtown locations, respectively. During discussions of this recommendation, Mr. Starowitz advised the Board that "there is a possibility of having three murals in the community, as there will be conversations with the County for possible partnerships, with [ ] Enough is Enough, and with Indiana University." Exh. 104 at 5. Mr. Starowitz further informed the Board that "[t]his [BLM street mural] project will also be offering community participation, which will allow all walks of life to be involved." *Id.* Upon Mr. Starowitz's departure from his employment with the City, the Black Collegians reached out to Mr. Wason expressing interest in painting a BLM mural on a city street adjacent to Indiana University, and, consistent with the City's previously stated intentions, Mr. Wason "worked with Indiana University and the Black Collegians for the installation of the third mural which was painted on Jordan Avenue, which is now known as Eagleson Avenue." Wason Aff. ¶¶ 8–9.

Thus, the third BLM street mural, although not specifically referenced in the City's formal resolution: (1) was painted in the original location discussed by the City for a third mural shortly after the completion of the City's second BLM mural; (2) in partnership with Indiana University, as the City indicated was its intent; and (3) expressed the exact same wording as the first two murals, to wit, "Black Lives Matter," which message the City specifically and publicly endorsed for its BLM mural project in order to express its "animosity to all forms of racism." Exh. 7. Moreover, although the third BLM street mural was officially approved retroactively by the City one month after it was painted,

which Plaintiffs cite as evidence that it was not government speech, Mr. Wason's Staff

Report, submitted in support of the retroactive approval, explained that the belated

request was "due to an oversight by staff as City personnel transitioned out of the

organization," and that the City's "[i]ntentions were always to work with IU and this

student group, and have this before the Board in early June." Exh. 111. Mr. Wason's

Staff Report is therefore consistent with his testimony that he had been working with

Indiana University and the Black Collegians prior to the installation of the third BLM

mural as well as the City's originally-stated intentions to partner with Indiana University

for a third mural. The fact that the City officials knew of the mural prior to its

installation and took no action to remove or otherwise alter its design within the

approximately one-month period between its installation its retroactive approval further

supports the conclusion that it was the City's speech.

Taken together and analyzed holistically, these facts persuade us that the City was

speaking on its own behalf and "purposefully communicat[ing] a message of its own

choosing" regarding the installation of all three BLM street murals. *Small Bus. in

Transp. Coalition*, 610 F. Supp. 3d at 155 (citing *Shurtleff*, 596 U.S. at 267–68 (Alito, J.,

concurring in the judgment)). Because we find that the BLM street murals constituted

government speech, any argument that Defendants engaged in viewpoint discrimination

in violation of Plaintiffs' First Amendment rights by approving the installation of the

BLM murals on City streets. while not permitting Plaintiffs to paint a similar ALM

mural, necessarily fails. As discussed above, when the government puts forth its own

message, "it is entitled to say what it wishes," *Rosenberger v. Rector and Visitors of*

*Univ. of Va.*, 515 U.S. 819, 833 (1995), and to "select the views it wants to express." *Summum*, 555 U.S. at 468.

Having determined that Defendants have established that the three BLM matters murals constituted government speech, we proceed no further in our First Amendment analysis with regard to those murals because "[w]hen the government is speaking for itself, the [First Amendment] forum analysis simply does not apply." *Women for Am. First v. Adams*, No. 21-484-cv, 2022 WL 1714896, at *4 (2d. Cir. May 27, 2022).

### B.  Non-BLM Street Murals

Having determined that the three BLM murals constituted government speech, if those murals were the only evidence that the City had ever permitted painting on the surface of its streets, our First Amendment analysis would be over.  Here, however, the evidence shows that, apart from the BLM street murals, on other occasions prior to Plaintiffs seeking to paint their ALM mural, the City had permitted other private groups to encroach upon public rights-of-way to paint on the surface of its streets.  Specifically, Plaintiffs have adduced evidence that in 2017 and 2018 the City approved at least three applications submitted by private neighborhood groups seeking permission to encroach on public rights-of-way for community block parties at which participants painted murals directly on City streets and/or on "traffic calming devices," which were essentially large concrete planters located within public intersections.  None of these authorized designs, however, included words or letters.

As explained to us, the City's procedures prior to December 2022, a private individual or group desiring to encroach on a public right-of-way, including by painting

34

on a City street, was required to submit an application to the City's Economic and Sustainable Development Department and/or the Arts Commission with a special event proposal. Such projects could in some cases be initiated through or funded by City grants, but not always.[8] If the individual or group's special event application was approved, the request for an encroachment on a right-of-way for the purpose of displaying public art was then presented to the City's Public Works Department for final approval. Although the City has adduced evidence showing that it had final approval regarding the designs that were painted and that none of those designs contained words or letters, the record before us reveals that, prior to December 2022, the City had promulgated no specific criteria or guidelines, content-based or otherwise, according to which it explicitly regulated the display of public art in its rights-of-way.

While city streets may be a quintessential public forum for "purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (citation modified), they are not typically a public forum for such activities as painting murals on the surfaces of the streets. *See Summum*, 555 U.S. at 478–79 (explaining that a park can constitute a public forum for some activities, such as "the delivery of speeches and the holding of marches and demonstrations," while not a forum for other activities, such as installing a permanent monument). Here, however, based on the City's prior permission granted to

---

[8] The Prospect Hill Neighborhood Association Street Mural project, for example, had been approved for a Neighborhood Improvement Grant from the City prior to receiving final approval from the Board of Public Works for a right-of-way encroachment.

private groups to paint non-government-speech murals on the surface of its streets with no specific restrictions on expressive content, we find that the City created a designated public forum for painting on the surface of its streets.

In designated public forums, "[a]ny content-based exclusion of speech … is subject to strict scrutiny, meaning that the government must show the exclusion 'is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Surita v. Hyde*, 665 F.3d 860, 870 (7th Cir. 2011) (quoting *Perry Educ. Ass'n*, 460 U.S. at 45). The government may enforce reasonable time, place, and manner restrictions in designated public forums provided such restrictions are "content neutral, they are narrowly tailored to serve a significant public interest, and ample alternative channels of communication exist." *Id.* Given the creation of this designated public forum which implicated various legal standards, we turn to examine Plaintiffs' viewpoint discrimination claims.

### C. 2021 Thwarting of Access to the Special Event Application Process

Plaintiffs' first viewpoint discrimination claim is based on the manner in which Defendants Wason and Rouker addressed Plaintiff Reynolds's initial email inquiry regarding the process for securing approval to paint the ALM street mural. Plaintiffs' theory of liability is based on what might be characterized as the runaround Plaintiff Reynolds was given by Mr. Wason which ultimately culminated in his being referred to City Attorney Rouker, who told him that the City did not have a procedure for accepting recommendations on art in its rights-of-way from private individuals, despite the fact that

36

the City had on prior occasions approved encroachments on its rights-of-way for private

neighborhood groups to paint street murals.

Genuine issues of material fact exist regarding the motives of Mr. Wason and Mr.

Rouker that preclude summary judgment for either side on Plaintiffs' viewpoint

discrimination claim based on their respective roles in allegedly thwarting Plaintiffs'

access to the City's encroachment procedures.  Significant questions also exist, in any

event, regarding causation, yet no such argument was adequately fleshed out by either of

the parties.[9]  It is beyond the Court's role to concoct theories of relief and especially to

weigh credibility on summary judgment.  Accordingly, both sides' motions for summary

judgment as to the viewpoint discrimination claim against Defendants Wason and Rouker

are denied.

With regard to Plaintiffs' viewpoint discrimination claim against the City based on

their having been denied access to the Special Event Application process, again neither

party has sufficiently briefed the issue of the City's potential culpability to allow the

Court to undertake a full analysis and reach a reasoned decision on the merits.  Plaintiffs

have sued both the City as well as Defendants Wason and Rouker in their individual

capacities, and while different legal standards apply to hold a municipality liable versus

an individual City employee liable, Plaintiffs have referred to "Defendants" collectively

without delineating or applying their legal theories as to each Defendant.  The viability of

---

[9] Although Defendants' statement of defenses lists the defense of qualified immunity, Defendants
did not address that issue in their briefing in support of their motion for summary judgment.
Accordingly, we do not consider the issue.

Plaintiffs' viewpoint discrimination claim against the City is governed by the requirements set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny, which requires proof of a city policy that caused the alleged constitutional deprivation, but Plaintiffs have engaged in no analysis under *Monell* to explain their theory for tagging the City with liability based on the actions taken by the individual defendants. Plaintiffs rely on various buzzwords, including that the City had a "standardless" policy allowing "unbridled discretion," but Plaintiffs have stopped short of adequately developing these arguments to explain how such action caused a specific harm to Plaintiffs, to wit, by their having been denied access to the City's application procedures. We cannot determine from the barebone facts before us and Plaintiffs' underdeveloped arguments how First Amendment culpability attaches to the City based on the alleged bureaucratic shuffle Mr. Reynolds was forced to undergo.

Nor do Defendants' general rejoinders sharpen the discussion of the legal issues that may or may not apply here. Defendants, like Plaintiffs, never invoke *Monell* in their briefing, limiting their argument to a single line that asserts that Defendant Rouker's advice is not "evidence of a city policy or custom of denying requests for street paintings based on the viewpoint expressed in the proposed painting." No further argument or explanation was proferred.

Because both parties have failed to address any *Monell* liability theories, we deny both requests for summary judgment on Plaintiffs' viewpoint discrimination claim against the City.

### D. The 2022 Promulgation of Policy and the 2023 Denial of Application

Plaintiffs assert that Defendants engaged in viewpoint discrimination when they promulgated the Policy prohibiting the use of words and letters in semi-permanent and permanent art in the City's rights-of-way and denied Plaintiffs' application to paint the ALM mural due to Plaintiffs' proposed street mural constituting semi-permanent or permanent art that contained words or letters in violation of the Policy.

Any content-based exclusion of speech in traditional and designated public forums is subject to strict scrutiny by the courts, meaning that the government must show that the exclusion "is necessary to serve a compelling interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n*, 460 U.S. at 45. The government may enforce reasonable time, place, and manner restrictions in such forums, provided that they are content neutral, are narrowly tailored to serve a significant government interest, and that ample alternative channels of communication exist. *Id.*

Defendants defend the Policy's prohibition on the use of letters and words[10] in permanent art displayed in the City's rights-of-way as a permissible time, place, or manner restriction and argue that the Board's denial of Plaintiffs' application on the grounds that their proposed ALM mural contained words and letters was not violative of Plaintiffs' First Amendment rights. Plaintiffs counter that the Policy's restriction on the use of words and letters in permanent art is not content-neutral and thus must satisfy strict

---

[10] As detailed above, the provision also bars the use of numbers and universally recognized symbols, but neither of these appeared in Plaintiffs' proposed mural. Because Plaintiffs have brought an as-applied rather than a facial challenge, these portions of the provision are not relevant to our analysis and we do not address them further.

scrutiny, which it cannot do. Even if the provision is deemed facially content-neutral, Plaintiffs continue, the Board's denial of their application based on the Policy's words and letters restriction was a pretext for viewpoint discrimination such that strict scrutiny still applies. Plaintiffs further argue that, even if intermediate scrutiny applies, the Policy's restriction on words and letters in permanent art is not narrowly tailored.

In determining whether a particular regulation is content-based and subject to strict scrutiny, the Court first considers whether the regulation is, on its face, content-based. If it is, strict scrutiny applies "regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015). If upon examination it is determined that the law is facially content-neutral, the Court next considers whether the government adopted the regulation for an improper purpose or justification, *i.e.*, the suppression of free expression. *Id.* at 166. If an improper purpose or justification underlies an otherwise facially content-neutral law, the law may be considered content-based and subject to strict scrutiny. *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022).

In applying these legal principles to the regulation before us, we look first to determine whether the Policy's prohibition on letters and words in permanent art for display in the City's public rights-of-way is facially content-neutral. "A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 69 (citation modified). The Supreme

Court has "reject[ed] the view that *any* examination of speech or expression inherently triggers" strict scrutiny, *id.* at 73; thus, a regulation may still be content neutral even if it requires reading the speech at issue to determine if it is covered by the regulation so long as it requires an examination of speech only to draw neutral lines "agnostic as to content." *Id.* at 69. While "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result," it is not the case that "any classification that considers function or purpose is *always* content based." *Id.* at 74.

Here, under the Policy, the Board must look to the length of time the artwork will be displayed relative to its content to determine whether the restriction on the use of words and letters applies, but the topic of the artwork or the content of the message is not otherwise considered. Accordingly, under the Policy, regardless of whether the subject matter of a proposed mural is "neighborliness and sense of place" or "political or cultural issues," as Plaintiffs frame the distinction between the murals painted by the neighborhood groups and the ALM mural they seek to paint, if the mural is temporary (removable after seven days), it may include letters or words; if it is semi-permanent or permanent, it may not, regardless of subject matter or topic.

Plaintiffs argue that the Policy's restriction on the use of words and letters merely swaps an obvious subject-matter distinction—no political discourse—for a "function and purpose" proxy—no words or letters—that achieves the same result, which the Supreme Court has made clear does not save a regulation from being deemed facially content based. *City of Austin*, 596 U.S. at 74. We do not agree with Plaintiffs' contention,

41

because it is based on the premise that "robust cultural and political discourse" *necessarily requires* the use of words and letters and thus, by restricting words and letters, the Policy is in practice singling out cultural and political discourse for regulation.[11] While words and letters arguably might be the easiest way to transmit *any* message, whether it be on the subject of politics or neighborliness or anything else, such messages, including political and cultural commentary, obviously can still be expressed without the use of words and letters. Thus, we are not persuaded that the Policy's restriction on words and letters serves as a proxy for discriminating against certain topics or subject matter. We conclude that, as applied to Plaintiffs, the Policy's prohibition on the use of words and letters in permanent art displayed in its public rights-of-way is facially content-neutral as it does not "single out any topic or subject matter for differential treatment," either on its face or by proxy. *See City of Austin*, 596 U.S. at 71.

We next examine whether evidence exists to show that the Board adopted the Policy's restriction on words and letters pursuant to a content-based purpose or justification. If so, strict scrutiny of the restriction applies. In making this determination, the Court considers whether the restriction "cannot be justified without reference to the content of the regulated speech" or whether it "was adopted by the government because of disagreement with the message the speech conveys." *TikTok Inc. v. Garland*, 604 U.S. __ , 145 S.Ct. 57, 67 (2025) (citation modified). But a regulation does not have an

---

[11] Plaintiffs also take issue with the "universally recognized symbols" restriction in the Policy, but again, this is an as-applied challenge and it is undisputed that Plaintiffs' application was not denied based on their proposed mural containing a universally recognized symbol. Accordingly, we do not address the constitutionality of that restriction.

underlying improper purpose or justification merely because "it may disproportionately affect speech on certain topics" or "it has an incidental effect on some speakers or messages but not others." *McCullen v. Coakley*, 573 U.S. 464, 480 (2014).

Plaintiffs argue that the evidence shows that Defendants' adoption of the Policy's words and letters restriction and subsequent denial of Plaintiffs' special event application pursuant to that provision were merely "a cloak for their viewpoint discrimination," Dkt. 81 at 22.  Relying on some supportive factual references, Plaintiffs maintain that their view, which they sought to express, to wit, "All Lives Matter," was indisputably opposed to the City's view as evidenced by the BLM murals.  Plaintiffs note that, prior to the Court's order requiring the City to make its application process available to Plaintiffs, the restriction on the use of words and letters in art displayed in its public rights-of-way appeared nowhere in the City's 2015 Master Plan, in the Board minutes and staff reports approving other murals,[12] nor were Plaintiffs informed of any such restriction in 2021 when they first inquired about painting their mural.  Plaintiffs assert that the only reasonable inference from these facts is that "the City did not think it could continue to exclude Plaintiffs' ALM Mural from the forum it had created unless it invented a pretext for its viewpoint discrimination.  So that's what it did."  Dkt. 81 at 17.

---

[12] The only reference to any restriction on words and letters prior to the Policy's adoption in December 2022 appears in an email chain from 2017 among City employees discussing the McDoel Neighborhood Association's street mural in which one City employee quotes a similar restriction imposed by the City of Portland (Oregon).  However, on the record before us, the evidence establishes that the City never officially adopted similar criteria or made any explicit determinations based on such criteria when approving art displayed in its rights-of-way prior to December 2022.

In response, Defendants reference the City's statement made at the time of the Policy's adoption stating that the Policy as a whole was "designed to reduce the risks to public safety and burden on public resources that private Art Installations within the right of way may impose while simultaneously recognizing the importance of private as well as public art to Bloomington's culture, community, and economy." Dkt. 77-7. In defense of the words and letters restriction, specifically, Defendants explain that the content-neutral justification for restricting words and letters in public streets is that words and letters are usually reserved for transportation-guidance for drivers and pedestrians and other similar government messages, such that limiting additional words and letters on public streets serves the purpose of reducing risks to public safety by limiting such non-transportation and non-governmental messages to drivers and pedestrians, which could easily distract or confuse them. Defendants repeat that the City has never permitted a non-government-speech mural containing words or letters to be painted on its streets, even prior to enactment of the Policy, which fact they cite as further support for their argument that Plaintiffs' claim that the City promulgated the restriction out of a viewpoint discriminatory motive lacks evidentiary support.

On the record before us, we find that the Policy's words and letters restriction can be justified without reference to content. While it is undisputed that the City's BLM viewpoint did not align with Plaintiffs' "All Lives Matter" message, the challenged restriction was enforced, albeit informally, prior to the adoption of the Policy as evidenced by the fact that no previous private street mural design was ever approved by the City that contained words or letters. Thus our conclusion that the restriction was not

44

promulgated for the purpose of squelching Plaintiffs' speech but instead was consistent with and pursuant to what had previously been permitted.  That the Policy governs artwork placed in the City's rights of way, including the surfaces of the streets as opposed to locations that would present fewer concerns related to traffic and risk of distraction further supports our conclusion that legitimate safety concerns motivated the restriction, rather than disagreement with or opposition to Plaintiffs' viewpoint.  Based on the evidence before us, we hold that Defendants have adequately demonstrated that any possible, potential viewpoint-based motives by the Board did not affect its decision and, further, would not have.  *See TikTok*, 145 S.Ct. at 72 (upholding speech regulation despite evidence of mixed motives where "the record … adequately support[ed] the conclusion that Congress would have passed the challenged provisions based on the [content-neutral] justification alone").

As applied to Plaintiffs' Special Event Application, the Policy's restrictions on words and letters in semi-permanent and permanent art are sufficiently tailored to serve the City's substantial public safety interest in limiting non-traffic and non-government messages on its streets.  To survive intermediate scrutiny, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S.  622, 662 (1992).  Rather, "[t]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989).  If the regulation is found to

45

meet these standards, "courts should defer to the government's reasonable determination." *Id.* at 783.

As previously noted, Defendants argue that limiting additional words and letters in semi-permanent and permanent art installed in the City's rights-of-way serves the purpose of limiting the number of non-transportation and non-government related messages for drivers and pedestrians to read and process thereby reducing the risk to public safety created by potentially distracting or confusing messages. In response, Plaintiffs claim that despite the City's stated rationale, the words and letters restriction is unreasonable and is not narrowly tailored because, pursuant to the Policy, temporary art, including, for example, street murals applied with chalk,[13] may contain words and letters and such messages are likely to be no less confusing for drivers and pedestrians. The narrowly tailored inquiry is focused on whether the restrictions are too broad, not whether it is too limited. Here, the City's interest in reducing the risk to public safety would be less effectively achieved if no such limitation on words and letters displayed in the public rights-of-way were imposed and it is not substantially broader than necessary to promote that interest.

The words and letters restriction also leaves open ample alternative channels of communication for Plaintiffs to share their "All Lives Matter" message given that the restriction applies only to semi-permanent and permanent art installations in the City's

---

[13] It is likely true, for whatever it's worth, that temporary substances, like chalk, are not typically used to convey transportation and government related messages.

rights-of-way.  Accordingly, Plaintiffs are free to share their message in a myriad of

bother ways, including by seeking approval to write the message on a City street in a

less-permanent medium such as chalk.

For the above detailed reasons, we conclude that the adoption of the words and

letters restriction along with Defendants' denial of Plaintiffs' application to paint their

ALM street mural based on that provision did not violate Plaintiffs' First Amendment

rights.  Accordingly, Defendants are entitled to summary judgment on these claims;

Plaintiffs' motion for summary judgment is correspondingly denied.

## IV.    Violation of Court Order

We can dispose quickly of Plaintiffs contention that Defendants' promulgation of

the Policy violated the Court's November 18, 2022 preliminary injunction, which ordered

Defendants to "promulgate and disseminate to the public, including to Plaintiffs, the

procedural steps whereby private individuals and groups can seek approval for an

encroachment on the City of Bloomington's rights-of-way for the purpose of displaying

public art" and enjoined them "from denying Plaintiffs access to or otherwise unduly

delaying the application process by which the City of Bloomington passes on requests for

encroachments on rights-of-way for the purpose of displaying public art."  Dkt. 36.

To the extent that Plaintiffs believe that certain actions taken by Defendants

violate the Court's preliminary injunction, however, the proper method to enforce

compliance would have been a motion for contempt and/or sanctions, not an amendment

to their complaint as a standalone claim.  A violation of a court order does not ordinarily constitute an independent claim for relief.

Even if Plaintiffs had moved for contempt, "[t]o hold a party in contempt, the district court must be able to point to a specific decree from the court which sets forth in specific detail an unequivocal command which the party in contempt violated." *Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir. 1989) (citation modified).  Plaintiffs have failed to make such a showing here.  Our order directed Defendants to promulgate and disseminate to the public, including Plaintiffs, the procedures for private individuals and groups to apply for permission to display public art on rights-of-way and not to delay or deny Plaintiffs' access to those procedures.  In response to that order, the City did promulgate and disseminate the Policy, which includes both the procedural steps for applying for a special event permit to display public art in the City's rights-of-way, as ordered by the Court, as well as the additional substantive requirements, including the "no speech" limitation on permanent art.  There is no evidence that the City delayed or denied Plaintiffs access to those procedures.  To the contrary, Plaintiffs were permitted to submit an application using the very procedures promulgated by the City, which application was duly considered by the Board of Public Works, though ultimately denied.

The facts before us in no way support a finding that Defendants acted in contravention of the Court's preliminary injunction.  While the Court's order directed the City to promulgate and disseminate the procedural steps required for individuals and groups to seek approval for displaying art in the City's public rights-of-way, it did not prohibit the City from also promulgating and disseminating information regarding

48

substantive criteria applicable to such requests.  Whether the promulgation of the policy and the ultimate denial of Plaintiffs' application was violative of Plaintiffs' rights in some other fashion has been already raised by Plaintiffs in their federal and state constitutional claims.  They are entitled to no additional relief based on an alleged violation of a court order.  Accordingly, Defendants are entitled to summary judgment on this claim and Plaintiffs' cross-motion is correspondingly denied.

### V.    Fourteenth Amendment Equal Protection

The Equal Protection Clause of the Fourteenth Amendment guarantees that "no State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "This is essentially a direction that all persons similarly situated should be treated alike."  *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019) (citation modified).

"[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."  *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976).  "A classification receives strict scrutiny if it … burdens a fundamental right, such as free speech."  *Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir. 1997) (citations omitted).

Here, Plaintiffs allege that the no words and letters requirement in the Policy creates two classes: (1) private entities, such as the neighborhood associations, who communicate expressive content without words and letters; and (2) private entities, such as Plaintiffs, who communicate expressive content with words and letters.  Plaintiffs

contend that this classification interferes with Plaintiffs' exercise of their fundamental First Amendment rights because, as they argued with reference to their First Amendment challenge to the Policy, it "cannot satisfy the narrowly-tailored requirements under the inquiry for content-neutral time, place, and manner restrictions." Dkt. 81 at 29. Having determined for the reasons detailed previously that the Policy's words and letters restriction *does* satisfy those narrowly-tailored requirements, Plaintiffs are unable to establish they were treated differently than any other similarly situated group. Defendants are therefore entitled to summary judgment on Plaintiffs' Fourteenth Amendment equal protection claim for the same reasons detailed above.

## VI.    Article 1, Section 9 of the Indiana Constitution

Article 1, Section 9 of the Indiana Constitution provides: "No law shall be passed, restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever." Ind. Const. art. 1, § 9. This clause is not absolute, providing that "but for the abuse of that right, every person shall be responsible." *Id.* "Under this freedom-and-responsibility standard, the legislature's 'sole authority over expression is to sanction individuals who commit abuse." *State v. Katz*, 179 N.E.3d 431, 442 (2022) (quoting *Price v. State*, 622 N.E.2d 954, 958 (Ind. 1993)). To successfully challenge state action as violative of this clause, "a claimant must first demonstrate that the state action has, in the concrete circumstances of the case, restricted his or her opportunity to engage in expressive activity." *Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996). If it has, the Court must determine "whether the restricted activity constituted an 'abuse' of the right to speak." *Id.*

"For Article 1, Section 9 claims, if a statute affects political speech, which is an established core constitutional value, we engage in 'material burden' analysis." *State v. Economic Freedom Fund*, 959 N.E.2d 794, 805 (Ind. 2011) (quoting *Price*, 622 N.E.2d at 960, 963). The Indiana Supreme Court has held that expressive activity is political for purposes of Article 1, Section 9 "if its point is to comment on government action, whether applauding an old policy or proposing a new one, or opposing a candidate for office or criticizing the conduct of an official acting under color of law. The judicial quest is for some express or clearly implied reference to governmental action." *Whittington*, 669 N.E.2d at 1370.

Here, we assume, for purposes of resolving the pending motions, that Plaintiffs' message, to wit, "All Lives Matter," which message Plaintiffs sought to express as a counterpoint to the City's BLM murals, constitutes political speech, at least under the circumstances presented here. Accordingly, we address whether the words and letters restriction imposed a material burden on Plaintiffs' desired political speech. Making this determination "may involve two components: 'magnitude of the impairment' analysis and 'particularized harm' analysis." *Economic Freedom Fund*, 959 N.E.2d at 806. Under the first inquiry, we "look [to] whether there has been a substantial obstacle on the right to engage in political speech," namely, "whether the right to engage in political speech, as affected, no longer serves the purpose for which it was designed." *Id.* If a substantial obstacle does not exist, there is no material burden on political speech and the inquiry ends. *Id.*

51

Defendants' adoption of the words and letters restriction and their denial of Plaintiffs' request to paint the ALM street mural do not constitute a substantial obstacle on Plaintiffs' right to engage in political speech.  Contrary to Plaintiffs' contention, such action did not "stymie[] the protected expression entirely."  Dkt. 81 at 21.  Defendants prevented Plaintiffs from painting that specific message on City property.  The City did not prevent Plaintiffs from speaking or otherwise expressing that message in *any* other manner.  Under the Policy, Plaintiffs may still apply for permission to place their message on a City street in chalk or some other less permanent medium than paint and are free to "engage in political discourse in countless other ways." *Economic Freedom Fund*, 959 N.E.2d at 807.  Plaintiffs' right to engage in political speech therefore continues to serve its purpose notwithstanding the Policy's words and letters requirement; accordingly, there is no substantial obstacle.  Where, as here, "a substantial obstacle does not exist, there is no material burden on the right to engage in political speech." *Id.* at 806.

For these reasons, Defendants are entitled to summary judgment on Plaintiffs' claim brought pursuant to Article 1, Section 9 of the Indiana Constitution.

## VII.    Article 1, Section 23 of the Indiana Constitution

Article 1, Section 23 of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens."  Ind. Const. art. 1, § 23.  The Indiana Supreme Court has adopted a two-part standard for determining an ordinance's validity under this provision:

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second the preferential treatment must be uniformly applicable and equally available to all persons similarly situated.

*Collins v. Day*, 644 N.E.2d 72 (Ind. 1994). "Compliance with both elements is required to satisfy the constitutional requirement." *Paul Stieler Enterprises, Inc. v. City of Evansville*, 2 N.E.3d 1269, 1273 (Ind. 2014). The requirements of Article 1, Section 23 "govern not only state statutes, but also the enactments of county, municipal, and other governmental entities and their equivalents." *Dvorak v. City of Bloomington*, 796 N.E.2d 236, 238 (Ind. 2003) (citations omitted). When determining whether the government's actions complied with or violated Article 1, Section 23, the Court "must exercise substantial deference to legislative discretion." *Collins*, 644 N.E.2d at 80.

Plaintiffs argue that by allowing the Black Collegians and others associated with them (the "BLM Street Mural Group") to paint a street mural on a public right-of-way on the Indiana University campus but refusing the same right to Plaintiffs and others associated with them (the "ALM Street Mural Group"), Defendants gave preferential treatment that was not uniform, and Plaintiffs were treated disparately. Plaintiffs maintain that no distinctive, inherent characteristics rationally distinguish the BLM Street Mural Group from the ALM Street Mural Group to justify Defendants' actions.

Here, the two classes that Plaintiffs identify are the BLM Street Mural Group and the ALM Street Mural Group. Applying the required, deferential standard of review, we find that Plaintiffs lacked an inherent characteristic to qualify for painting a written message on the City street because they were not seeking to paint a BLM mural as part of

the City's project, which is the only time the City has opened the surface of its streets for the painting of written messages by private individuals and groups.  Plaintiffs have not shown that any other group seeking to paint their own written message on a City street that was not part of the City's BLM mural project was granted such permission, including the Neighborhood Mural Group.  Thus, Plaintiffs have not shown they were seeking privileges on the same terms.  Because there is no evidence that Plaintiffs were treated unequally, Defendants are entitled to summary judgment on Plaintiffs' equal protection challenge under Article 1, Section 23.

## VIII.  Conclusion

For the reasons detailed above, Defendants' Motion for Summary Judgment [Dkt. 76] is DENIED IN (ONE) PART, to wit, as to Plaintiffs' viewpoint discrimination claims related to Plaintiffs' 2021 request to paint their BLM Mural against the City and Defendants Rouker and Wason, and GRANTED as to all other claims.  Plaintiffs' Motion for Summary Judgment [Dkt. 78] is DENIED.

IT IS SO ORDERED.

Date:    _7/21/2025_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

William Bock, III
KROGER GARDIS & REGAS
wbock@kgrlaw.com

Keith Andrew Butler
Kroger Gardis & Regas, LLP
kbutler@kgrlaw.com

Justin Olson
Kroger Gardis & Regas, LLP
jolson@kgrlaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com