# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| **INDIANA UNIVERSITY CHAPTER OF TURNING POINT USA, et al.,** <br><br>        **Plaintiffs,** <br><br>   **vs.** <br><br> **CITY OF BLOOMINGTON, INDIANA, et al.,** <br><br>        **Defendants.** | **Cause No. 1:22-cv-00458-SEB-TAB** |

## PLAINTIFFS' TRIAL BRIEF

Pursuant to the Amended Case Management Plan, Plaintiffs Indiana University Chapter of Turning Point USA, Kyle Reynolds, and Tim Wheeler (collectively "Plaintiffs"), by counsel, respectfully tender their Trial Brief in the form of proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.     Parties

1.     Plaintiff Indiana University Chapter of Turning Point USA is a student organization that describes itself as "seek[ing] to identify, educate, train, and organize students to promote principles of freedom, free markets, and limited government." [Dkt. 7-24 at 2.]

2.     Plaintiff Kyle Reynolds is an authorized agent of Turning Point USA and its former campus coordinator.

3.     Plaintiff Tim Wheeler was the President of the Indiana University Chapter of Turning Point USA at all time periods relevant to this litigation.

4.     Defendant Adam Wason is the Public Works Director for the City of Bloomington and has served in that capacity since 2016.

5.     Defendant Kyla Cox Deckard has served on the Board of Public Works from January 2016 through the present, and has served as president of the Board of Public Works at all time periods relevant to this litigation.

6.     Defendant Mike Rouker served as the City Attorney at all time periods relevant to this litigation.

7.     The chief administrative body of the City is the Board of Public Works ("Board"), which has control of the day-to-day operations of the City's Department of Public Works.  [Dkt. 65 ¶ 17.]  The Department of Public Works is responsible for street maintenance. [*Id.* ¶19.]

## II.     The City's BLM Murals

8.     On May 6, 2020, the City adopted a resolution "denounc[ing] and condemn[ing] hate based on racial, social, and cultural bias and hold[ing] up values of peace, respect, inclusivity, and equity." [Dkt. 18-1.]

9.     In furtherance of this resolution, on July 10, 2020, a group of City employees and appointees to a City advisory council known as the Banneker Community Center Advisory Committee (BCCAC)[1] met to discuss the feasibility of

---

[1] BCCAC members are appointed by the City of Bloomington Board of Park Commissioners.

developing street murals depicting the words "Black Lives Matter" (hereafter "BLM murals" or "BLM street murals") at the Banneker Community Center and other locations within the City, an idea suggested by two BCCAC members, JaQuita Roberts and Nichelle Whitney. [Dkt. 18-15 ¶¶ 4–5, 7.]

10. The Banneker Community Center is a building owned by the City of Bloomington and used by the City's Parks and Recreation Department for City programs and services. [Dkt. 18-15 ¶ 6.]

11. Prior to the July 10th meeting, several City Departments, including the Office of the Mayor, Department of Public Works, Street Department, Community and Family Resources, Safe and Civil City, and Economic and Sustainable Development had expressed support for and endorsement of a BLM street mural project. Dkt. [18-15 ¶ 8.]

12. During the July 10th meeting, the attendees identified the following three potential locations in Bloomington for BLM street murals: Elm Street, in front of the Banneker Community Center gymnasium; Kirkwood Avenue, near the Monroe County Courthouse; and Jordan (now Eagleson) Avenue. [Dkt. 18-15 ¶ 12.]

13. The group selected the Elm Street location for the first mural after discussing the level of traffic on the street as well as the type of design to determine whether high traffic paint or exterior paint should be applied to produce the signage. [Dkt. 18-15 ¶ 16.]

14. The attendees also discussed the manner in which the City should share information with the public about the mural project, deciding that a press release

about the project should issue at a time that coincided with release of information regarding the City's formal adoption of policy actions in support of equity and justice for Black residents and the renaming of Jordan Avenue to Eagleson Avenue.[2] [Dkt. 18-15 ¶ 14.]

15.    The importance of the City's "own[ing]" the mural project "in funding and purpose to show the BIPOC community its commitment to equity and justice" was also addressed at the July 10th meeting. [Dkt. 18-15 ¶ 10.]

16.    At the close of the meeting, the City employees and members of the BCCAC were assigned specific tasks aimed at moving the mural project forward, including exploring funding sources, paint types, and local artists, communicating with Indiana University ("IU") administration and IU's Black Student Union, and engaging other community partners in the project. [Dkt. 18-15 ¶ 17.]

17.    On July 28, 2020, the BLM street mural project was presented to the City's Parks Department and the Board of Parks Commissioners at their regular meeting.

18.    The minutes from that meeting show that the Board discussed that the City "needs to take the onus of funding [the project] to show the BIPOC community its commitment to equality and justice." [Dkt. 18-5 at 4.]

---

[2] The City renamed Jordan Avenue south of 17th Street, "Eagleson Avenue," in honor of four generations of the Eagleson family, including Halson Vashon Ealeson, who was born enslaved in 1851, and who arrived in Bloomington in the 1880s and became a prominent barber. Mr. Eagleson's five children all attended Indiana University. Jordan Avenue was previously named in honor of David Starr Jordan, whose "views … on eugenics and racial differences conflict … with the City's commitment to promote inclusion and equity in the community …." [Dkt. 7-14.]

19.     During that meeting, Sean Starowitz, who at that time was the City's Assistant Arts Director, stated that, in addition to the Elm Street mural and the "downtown mural," there was "a possibility of having three murals in the community, as there will be conversations with the County for possible partnerships, with [] Enough is Enough[], and with Indiana University." [Dkt. 18-5 at 5.]

20.     Mr. Starowitz informed the Parks Board that the Bloomington Arts Commission had invited several artists of color to submit mural proposals and that at that point the City had received six submissions from artists. [Dkt. 18-5 at 5.]

21.     Mr. Starowitz indicated that "due to [the] limited number, this may be extended," with a preference for Black artists on the project. [Dkt. 18-5 at 5.]

22.     The Parks Board recognized that the "funding mechanism is a bit of a challenge" and one member of the Board expressed that she believed there were "many hoops to jump through" and that "the process in general is a big hurdle." [Dkt. 18-5 at 5.]

23.     Following this discussion, the Parks Board unanimously approved the BCCAC's recommendation to proceed with the BLM street mural project. [Dkt. 18-5 at 6.]

24.     Although the possibility of three BLM street murals had arisen during the Parks Board meeting, the City adopted Resolution 20-16 on September 23, 2020 officially "endors[ing] the painting of two Black Lives Matter murals—one on Elm Street in front of the Banneker Center, or at such other nearby location as the City and the Banneker Community Center Advisory Counsel agree is appropriate, and one

at a downtown location to be determined, and support[ing] the City's use of existing funds to pay the artist(s) hired to design and paint the mural." [Dkt. 18-6.]

25.     Resolution 20-16 "call[ed] on the Board of Public Works to permit th[e] use of a public right of way and join in th[e] public display of support for [] Black and Brown residents who have been fighting for justice and equality for far too long." [*Id.*]

26.     On September 29, 2020, Mr. Starowitz presented the Board of Public Works with Resolution 2020-50 requesting approval of a right-of-way encroachment for the painting of a BLM mural on the surface of Elm Street between 7th and 8th Streets. [Dkt. 18-7 at 2.]

27.     Mr. Starowitz indicated that the BLM street mural project was a "collaboration between the Board of Parks Commissioners, Banneker Community Center Advisory Council, Bloomington Arts Commission, the Office of the Mayor, Community and Family Resources Department and Bloomington Common Council." [Dkt. 18-7 at 2.]

28.     He further stated that the "interdepartmental project [was] requesting the Board of Public Works to permit [the] use of the public right of way and join in this public display of support for our Black and Brown residents, who have been fighting for justice and equality." [Dkt. 18-7 at 2.]

29.     The Board of Public Works unanimously approved Resolution 2020-50 allowing for the encroachment of the first BLM street mural, which mural was painted on October 24, 2020. [Dkt. 18-7 at 3.]

30.     The City issued a press release on November 13, 2020, inviting community members to a virtual dedication ceremony for "the City's newly completed Black Lives Matter street mural project …." [Dkt. 18-16 at 2.]

31.     In that press release, Bloomington Mayor John Hamilton stated: "The City is proud that the words 'Black Lives Matter' live on our street …. We appreciate the residents who led this public art project and the many who helped bring it to life, and we look forward to continuing to engage with residents to live out the words in actions, to continue to address long-standing issues of racism and discrimination in our community." [Dkt. 18-16 at 3.]

32.     A few weeks later, on December 1, 2020, the City issued a press release announcing that "the City's second Black Lives Matter street mural will be installed in downtown Bloomington on West Sixth Street between College and Walnut (the north side of the square) in the spring." [Dkt. 18-17 at 2.]

33.     The December 1, 2020 press release indicated that funding for the first street mural had come from "unused municipal dollars originally budgeted and earmarked" for another project that was cancelled due to the COVID-19 pandemic and that the second street mural "will utilize material (such as paint) already purchased for the first mural; additional funds needed will come from the Department of Economic[] and Sustainable Development." [Dkt. 18-17 at 2.]

34.     On April 13, 2021, Mr. Starowitz presented a second proposal to the Board of Public Works authorizing the painting of the second BLM mural on 6th Street between North College Avenue and North Walnut Streets. [Dkt. 18-9.]

35. Since this was part of the same project previously approved by the Board of Public Works, consideration of Mr. Starowitz's Staff Report regarding the second mural and the requested Resolution for the encroachment of the right-of-way was addressed as part of the Board's consent agenda. [Dkt. 18-10 at 1.]

36. As with the first BLM mural, the second mural was identified as an "interdepartmental project" whose purpose was to display support for "our Black and Brown residents who have been fighting for justice and equality for far too long." [Dkt. 18-9.]

37. The Board of Public Works without further discussion approved Resolution 2021-10 authorizing the encroachment for the second BLM street mural. [Dkt. 18-10 at 1.]

38. The City issued a press release on April 14, 2021, informing the public that "[t]he City's second Black Lives Matter street mural was approved … by the Board of Public Works for installation on the north side of the downtown square," *i.e.* on 6th Street between North College Avenue and North Walnut Street. [3] [Dkt. 18-18 at 2.]

39. Mayor John Hamilton was quoted in the press release as follows: "The City is proud to welcome these murals to our public art landscape …. Putting the words Black Lives Matter at the heart of our downtown matches up with values at the heart of this community: equity, inclusion, and justice. The words on the street will serve as a constant reminder to combat the persistence of racism and

---

[3] *See supra* Finding ¶ 34.

discrimination in Bloomington and beyond." [Dkt. 18-18 at 2.]

40.    In June 2021, Mr. Starowitz transitioned from his position as the Assistant Arts Director for the City to a new employment opportunity outside City government, which created a temporary vacancy in that position until a new Assistant Director was hired three months later, in September 2021. [Dkt. 18-14 ¶¶ 6–7.]

41.    After Mr. Starowitz's departure, Mr. Wason assumed a "more active role in the selection and approval" of a third BLM street mural. [Dkt. 18-14 ¶ 9.]

### III.    The Black Collegians BLM Mural

42.    According to Adam Wason, Director of Public Works for the City of Bloomington, while Mr. Starowitz was transitioning from his position, "the City was working on the approval and installation of the third and final Black Lives Matter street mural." [Dkt. 18-14 ¶ 8.]

43.    Specifically, Mr. Wason, "worked with Indiana University and the Black Collegians for the installation of the third mural which was painted on Jordan Avenue, which is now known as Eagleson Avenue." [Dkt. 18-14 ¶ 10.]

44.    The Black Collegians is an Indiana University ("University" or "IU") Student Group, whose members included Tiera Howleit and Joa'Quinn Griffin. [*See* Dkt. 65 ¶¶ 41, 43.]

45.    In early June, Howleit and Griffin approached Public Works Director Wason about painting a Black Lives Matter mural (hereinafter the "BLM mural" or "Black Collegians' BLM mural"). [Dkt. 65 ¶¶ 21, 43; Dkt. 79-1 at 2–3.] On June 4, 2021, Wason told Adam Theis ("Theis"), an employee of IU, that "we'd certainly be

supportive." [Dkt. 79-1 at 2–3; Dkt. 79-13 (Wason Dep. at 25:19–23).]

46. On June 4, Mr. Wason emailed Adam Thies, an employee of Indiana University, stating that the City had been approached by the Black Collegians "regarding their desire to install a BLM mural on 7th Street during Juneteenth celebrations" and indicating that the City would "certainly be supportive" of such a project. [Dkt. 79-1 at 3.]

47. Mr. Thies, in turn, reached out to Indiana University's Vice President for Capital Planning and Facilities, Thomas Morrison, who informed Mr. Thies that he had earlier that day spoken with Tiera Howleit and Joa'Quinn Griffin, two members of the Black Collegians, regarding their proposed mural. Mr. Morrison advised them that their project would need further approval from Indiana University administrators as well as from the City and that the University would also require "a review of the design and installation methods/process to approve of the materials (type of paint) to be used on street project." [Dkt. 79-1 at 2.]

48. Mr. Thies forwarded Mr. Morrison's response to Mr. Wason.

49. On June 11, 2021, Gloria Howell, an Indiana University employee and Director of the Neal-Marshall Black Culture Center, emailed City employee Shatoyia Moss, who had worked with the organizers of the first BLM mural, to inquire whether Ms. Moss would be willing to speak with the Black Collegians' members who "are facilitating the creation of a BLM mural on campus … on Jordan Avenue." [Dkt. 79-2 at 3.]

50.    Ms. Moss responded, "[a]bsolutely" and agreed to meet to discuss the project. [Dkt. 79-2 at 3.]

51.    The Black Collegians' BLM street mural was painted on Jordan/Eagleson Avenue by volunteers on July 3–5, 2021. The mural was funded in part by Indiana University's funding board with funds from mandatory student fees as well as donations from individual community members and the Division of Student Affairs. [Dkt. 7-12 at 2.]

52.    The Black Collegians' BLM mural was painted on Eagleson Avenue between the Neal Marshall Black Culture Center and the IU Groups Building.[4]

53.    The Black Collegians' BLM mural design included letters that spelled "Black Lives Matter" and was also "inclusive of other marginalized communities." [Dkt. 7-12 at 2.]

54.    For example, the "L" in "Black" depicted an adult holding the hand of a child; the "A" included a rainbow-colored infinity symbol; the "K" was in the form of the letter K in American Sign Language; the "L" in "Lives" incorporated the pride flag; and the "M" in "Matter" incorporated the Jewish Star of David, the Muslim crescent moon, the Christian cross, and the yin and yang symbol. [Dkt. 7-13 at 2.]

55.    The BLM mural was funded in part by IU's funding board; those funds come from mandatory student fees, donations from individual community members, and the Division of Student Affairs. [Dkt. 22-13 ¶ 4; Dkt. 7-12; Dkt. 7-10 at 2.]

56.    The Staff Report for the Black Collegians' BLM mural was due to be

_____

[4] *See infra* Finding ¶ 64.

presented to the Board of Public Works for approval in June 2021. However, an oversight attributable to Mr. Starowitz's transition left the Staff Report unavailable for presentation to the Board of Public Works prior to the mural's scheduled installation. [Dkt. 18-14 ¶¶ 13–14.]

57.     Following discovery of this omission, Mr. Wason finalized and presented the Staff Report to the Board of Public Works at the next regularly scheduled board meeting on August 3, 2021, approximately one month following the painting of the Black Collegians' BLM mural. [Dkt. 18-12.]

58.     In that Staff Report, Mr. Wason stated that the mural had been endorsed by the City of Bloomington Economic & Sustainable Development Department, Office of the Mayor, Community Family Resources Department, and the Public Works Department and had been completed in partnership with Indiana University's Provost Office and the Black Collegians student group. The Staff Report further stated the this BLM street mural was a "community project" and requested after the fact that the Board of Public Works "permit this use of a public right of way and join in this public display of support for our Black and Brown residents who have been fighting for justice." [Dkt. 18-12.]

59.     The Staff Report explained that the request for approval was being made after the mural had already been completed "due to an oversight by staff as City personnel transitioned out of the organization," but that "[i]ntentions were always to work with IU and this student group, and have this before the Board in early June." [*Id.*]

60. As with the second BLM street mural, this request was included on the consent agenda of the Board of Public Works. On August 3, 2021, the Board retroactively approved the Black Collegians' BLM street mural's encroachment on Jordan/Eagleson Avenue. [Dkt. 18-13 at 1–2.]

61. On July 5, 2021, the Black Collegians posted on their Facebook page the following message about the third BLM street mural: "Construction begins for our Black Lives Matter Street Mural on Jordan Avenue this Morning. What an exciting time! #BlackCollegiansInc #blacklivesmatter." [Dkt. 7-16.]

62. Following completion of the mural, Indiana University referenced the mural on its website and official Twitter feed, publicly thanking "the Black Collegians group for bringing this mural to life on our campus." [Dkt. 7-17.]

63. The University's Provost tweeted, "[t]he Black Collegians finished the amazing Black Lives Matter mural on Jordan Ave. If you're on the @IUBloomington campus, check it out between @NMBCC_IU and @IU_Groups buildings!" [Dkt. 7-18.]

64. Several news articles published at the time the street mural was painted detailed the efforts of the Black Collegians group to bring the BLM mural to Indiana University's campus and the students' involvement with the University in choosing the mural's location on Jordan/Eagleson Avenue. [Dkts. 7-12, 7-13, 7-14.]

65. On August 5, 2021, Tiera Howleit of the Black Collegians applied for and obtained a permit to touch up the paint in the BLM mural installed by the Black Collegians. Dkt. 79-3 [Dkt. 79-3, Dkt. 79-4.]

66. By May 2022, the paint for the BLM mural had deteriorated. [Dkt. 22-

67.   None of the BLM murals presented a threat to public safety or otherwise interfered with any drivers' ability to successfully navigate the roads on which the murals were constructed.

68.   Given that the City has elected to open its streets as a public forum, the City is able to adequately address public safety in the use of City thoroughfares and the operation of motor vehicles on City streets through various considerations that do not require prohibiting all speech, such as the following:

> Art Installations may not mimic in whole or part traffic control devices including but not limited to a crosswalk, stop sign, stop bar, or similar traffic control device.
>
> Art Installation geometry should be such that drivers do not alter their course to drive around the art.
>
> Street paintings and street murals may only be placed on streets with a local or secondary collector functional classification under the City's Transportation Plan, where regulatory speed limits do not exceed 25 miles per hour.
>
> Street paintings and street murals may only be placed on pavement in adequate condition for materials to bond.
>
> Street paintings and street murals are not permitted on brick, paver, or other decorative surface materials (e.g., colored or stamped concrete). Street paintings and street murals are only permitted on standard non-decorative concrete or asphalt.
>
> A buffer of four feet must remain between street paintings and street murals and any crosswalk.
>
> Within an intersection, street paintings and street murals are only allowed where the intersection utilizes all-way stop control, unless the painting or mural is located on an apron.
>
> Street paintings and street murals may not be painted on

the side or top of any curb or any curb ramp.

Materials used must be approved by the City's Engineering Department.

Any paint or similar material utilized as part of any street painting or street mural must provide a non-slip surface for pedestrians and must be street-grade.

[Dkt. 79-8 at 3–4 (Sections III.C and V.).]

## IV. The City of Bloomington's Public Forum for Private Art in Rights-of-Way

69. In January 2015, several years prior to the events at issue in this litigation, the Bloomington Arts Commission, an entity established by the Bloomington Common Council, developed a Public Art Master Plan for the City that "articulate[s] not only the principles and guidelines for those public art activities with which [the Commission] has direct connection, but also to put forth a blueprint for the ideal public art environment for the city of Bloomington, recognizing that the arts exist within a physical, artistic, sociological, governmental and economic construct that is constantly shifting." [Dkt. 32-2 at 1.]

70. The term "public art" is defined by the Master Plan as "any mode of temporary or permanent artistic expression or process that is funded through any source and is produced with the intention of making it available to the public." [Dkt. 32-2 at 3.]

71. The "Objectives & Aspirations" for the City in establishing the Master Plan include creating "bold, innovative works of public art," having an "impact on city image and pride," and promoting a "higher level of community engagement." [Dkt. 32-2 at 5.]

72.    The Master Plan recognizes that "[a]rt created for the public sphere can give form to core values of the community, such as freedom of speech and expression, alongside respect for diverse viewers and users"; can "seek to balance issues of originality, artistic quality and intellectual provocation with a respect for the diverse activities that take place in the public domain"; "can reflect the history of the community, including the evolution of taste, values, and formal expressions as well as challenge previously held views"; and "can reflect the community's unique engagement with the world." [Dkt. 32-2 at 3.]

73.    The Master Plan lists several "Priorities for Public Art," including "[p]rovid[ing] resources, training and mentorship for public art project development and management to organizations, collectives, neighborhoods, students, individual artists and the general public," "[i]ncorporat[ing] works of public art and performance in high-traffic transportation corridors and pedestrian areas" by "[c]ontinu[ing] the placement of works of public art in roundabouts and intersections" and "[e]ncourag[ing] community-based works of public art and performance that support neighborhood cohesion and vitality" by "[o]ffer[ing] opportunities for citizens to work directly with providers to develop art projects for their neighborhoods." [Dkt. 32-2 at 6.]

74.    In August 2021, the Board of Public Works approved a Special Event Application from the Middle Way House, a nonprofit organization providing services for survivors of domestic abuse, sexual assault, stalking, and human trafficking, for its annual "wrapped in love public art display," beginning on October 1, 2021, and

15

ending on March 1, 2022. [Dkt. 65 ¶ 28.]

75.     This public art display involved community participants wrapping trees with tree sweaters and light posts with yarn. [Dkt. 65 ¶ 28.]

76.     On July 10, 2018, the Board of Public Works approved a Special Event Application from the Prospect Hill Neighborhood Association to host a "Street Mural Painting Party" that involved "paint[ing] and clos[ing] the intersection of Fairview and Howe Street to install a public art project in the street." [Dkt. 22-6 at 4–5.]

77.     In seeking approval, the Prospect Hill Neighborhood Association noted that "[a]t least one intersection mural has been painted in Bloomington before (at Fairview & Dodds St. in McDoel Gardens)." [Dkt. 32-1 at 8.]

78.     The Board of Public Works resolution approving this application states that "the Neighborhood" would be responsible for posting "no parking signs," developing a Maintenance of Traffic Plan to be approved by the Planning and Transportation Department, obtaining and paying for any required barricades, financing and obtaining any and all required permits and licenses, and notifying the public, public transit, and public safety agencies of the street closing. [Dkt. 22-5 at 5–6.]

79.     Prior to the presentation of this request to the Board of Public Works, the Prospect Hill Neighborhood Association had submitted an application and been awarded a Neighborhood Improvement Grant for the street mural project as public art subject to the design constraints of the City. The design that was ultimately selected and used for the project was called "Common Pollen" and consisted of a

circular shape with points suggesting radiating petals of a sunflower. [Dkt. 32-1 ¶ 29; Dkt. 32-1 at 8, 23, 27–28.]

80.    The mural was a semi-permanent public art installation painted on the surface of the street that was intended to create an opportunity for neighbor interaction and community gathering and to create a "sense of place" for the neighborhood residents. [Dkt. 32 at 5; Dkt. 32-1 at 8.]

81.    The design did not include any words or letters.

82.    On July 11, 2017, the Board of Public Works approved a Special Event Application from the McDoel Neighborhood Association subset "Dodds and Fairview Street Painting Group" to "paint and partially close the intersection of Fairview and Dodds Street" for a "Street Mural Painting Party." [Dkt. 22-3 at 4–5; Dkt. 22-4 at 6.]

83.    The Board of Public Works resolution approving this request states that "the Neighborhood" would be responsible for posting "no parking signs," developing a Maintenance of Traffic Plan to be approved by the Planning and Transportation Department, obtaining and paying for any required barricades, financing and obtaining any and all required permits and licenses, and notifying the public, public transit, and public safety agencies of the street closing. [Dkt. 22-3 at 4.]

84.    The design that was painted on the intersection was approved by the City's Traffic and Transportation and Planning and Transportation Engineers and consisted of colorful spiraling sections that formed a turtle in the middle of the circle. [Dkt. 22-3 at 11–12.]

85.    The street mural painting project was consistent with the City's goal of

encouraging and valuing activities for residents to get to know their neighbors. [Dkt. 22-3 at 4; Dkt. 32 at 4.]

86.     The design did not include any words or letters.

87.     On May 2, 2017, the Board of Public Works approved a request from the Westside Neighborhood Association in collaboration with the Department of Economic and Sustainable Development to hold "a neighborhood block party and traffic calming mural painting," on 7th Street Between Adams and Waldron Streets. [Dkt. 22-1 at 5–6; Dkt. 22-2 at 6.]

88.     The "traffic calming" devices referenced were concrete circles that surrounded planters located in the middle of intersections on 7th Street in Bloomington. [Dkt. 22-1 at 8.]

89.     The City hosted the event and was responsible for the posting of signs, developing a traffic plan, placing barricades it funded, obtaining all permits and licenses, notifying the public, public transit, and public safety of the event, and cleaning the street before and after the block party. [Dkt. 22-1 at 5.]

90.     The Department of Economic Sustainable Development worked with artist Emily Wilson to create a geometric design that was painted on the traffic calming devices during the block party. Specifically, the design included blue and yellow-colored petals painted around the traffic circle to form a flower. [Dkt. 22-1 at 7–8.]

91.     The design did not include any words or letters.

92.     Based on the City's prior permission granted to private groups to paint

non-government-speech murals on the surface of its streets with no specific restrictions on expressive content, the City created a designated public forum for painting on the surface of its streets. [Dkt. 89 at 35–36.]

## V. The City's Policy

93. On December 20, 2022, the Board of Public Works approved the "City of Bloomington Policy and Procedures on Public Art Installations Within the Public Right of Way" ("the Policy"), which authorizes two avenues for requests submitted by individuals and external groups to install public art in a public right of way in Bloomington: (1) the Neighborhood Improvement Grant Program; and (2) a Special Event Application. [Dkt. 79-8.]

94. Under both procedures, the Policy distinguishes between "Temporary Art," which is expected to remain in place within the public right of way for seven or fewer days, and "Semi-Permanent Art or Permanent Art," which is art expected to remain in the public right of way for more than seven days. [Dkt. 79-8.]

95. The Policy contains public safety provisions applicable to all private art installations, including provisions mandating that public art not mimic traffic control devices or cause drivers to alter their course as well as provisions restricting where public art can be installed and prohibiting public art from "depict[ing] activities, materials, images, or products that are not legally available to all ages." [Dkt. 79-8.]

96. The Policy sets forth additional criteria for Semi-Permanent and Permanent Art, including that "Semi-Permanent and Permanent Art Installations may not contain Speech." [Dkt. 79-8.]

97. "Speech" is defined under the Policy as "[w]ords, letters, numbers,

universally recognized symbols, or logos of any kind." [Dkt. 79-8.]

98.     The definition for the term "speech" in the Policy was consistent with what the City had applied to prior neighborhood street paintings. [Dkt. 77-6 ¶ 39.]

99.     For example, The City's records show that in 2017, when considering the proposed McDoel Neighborhood street mural, possibly the first street mural painted by members of the public on City streets, a neighborhood street painting, the City looked to Portland, Oregon's rules for street paintings and applied them to the 2017 request from the McDoel neighborhood. [Dkt. 77-6 ¶ 40.]

100.    The Portland, Oregon rules for street paintings included prohibiting speech as part of the painting, prohibiting copyrighted material as part of the painting, and prohibiting items that mimic crosswalks or traffic control devices. [Dkt. 77-6 ¶ 41.]

101.    The Portland, Oregon rules stated: "No speech. We do not want to regulate speech, so we don't allow speech. This means not words, letters, numbers, or universally recognized symbols like a peace sign. The painting can tell a story and be meaningful for the local neighbors. But, the general passer-by should not recognize it as a symbol with a specific meeting." [Dkt. 32-3.]

102.    Prior successful Applicants to paint street murals on City streets were instructed to initiate their requests through a special event application.

103.    While the City had applied the Portland, Oregon rules to earlier requests by the public to paint street murals, as the Court previously found, Dkt 35 FN 8, the City had not officially adopted or announced the criteria in a written City

policy.

104.    In response to the Court's prior Preliminary Injunction Order, the City put in writing the procedures and policies used by the City for placement of public art in the City's right of ways. [Dkt. 77-6 ¶ 35.]

105.    The City, when working to officially adopt its Policy after the prior Order officially adopted the criteria or similar criteria to the Portland, Oregon rules it had been applying since 2017. [*See* Dkt. 32-3.]

## VI.    Plaintiffs' All Lives Matter Mural Request

106.    Near the end of July 2021, a few weeks after the third BLM street mural was installed on Jordan/Eagleson Avenue, Plaintiff Kyle Reynolds, who was then a student attending Indiana University and residing in Bloomington, began sending emails to Indiana University and City officials on behalf of Plaintiff Indiana University Chapter of Turning Point USA, an official Indiana University student group, and non-party *The Crimson Post*, another Indiana University student-led organization with which Mr. Reynolds was affiliated, requesting approval for an "All Lives Matter" street mural. [Dkts. 7-5, 7-6.]

107.    In these communications, Plaintiffs stated that they believe that the "Black Lives Matter" statement is "highly divisive and not representative of all the groups on campus" and that they wished to express their own view that "all lives matter" by creating a mural setting out that message that would be similar in size and scope to the BLM mural painted on Jordan/Eagleson Avenue. [Dkt. 7-1.]

108.    On July 20, 2021, Mr. Reynolds reached out to Indiana University via email requesting permission to create an All Lives Matter mural on campus "[i]deally

… on a large street, such as the one utilized for the BLM mural, however, any large space with high visibility on campus should be adequate." [Dkt. 7-2.]

109. On July 27, 2021, Indiana University's Office of Student Involvement and Leadership directed Mr. Reynolds to IU Vice President Thomas Morrison. [Dkt. 7-2.]

110. Mr. Reynolds then emailed his request to Vice President Morrison, who replied that the "BLM mural was created on a street owned by the City of Bloomington. Thus, the City was the entity that ultimately approved the mural." [Dkt. 7-2.]

111. Accordingly, Vice President Morrison instructed Mr. Reynolds to contact the City for further inquiry. [Dkt. 7-2.]

112. On July 29, 2021, Mr. Reynolds sent an email to the Public Works Department's general email account (public.works@bloomington.in.gov) requesting approval to paint the All Lives Matter mural on the surface of a Bloomington street. The City's Assistant Arts Director position was vacant at that time due to Mr. Starowitz's transition out of the Public Works Department; thus, although Mr. Wason did not typically handle requests for street mural paintings, he agreed to respond to Mr. Reynolds's request and informed his City colleagues that he would handle any communications with Mr. Reynolds going forward. [Dkt. 79-13 (Wason Dep. at 42–44); Dkt. 79-5.]

113. On August 2, 2021, Mr. Wason emailed Mr. Reynolds stating that he "need[ed] to work with the IUB President's Office, as did the other group, in order to

get the concept for any murals approved for placement on any streets on campus." [Dkt. 7-4.]

114. After Mr. Reynolds conveyed this information to Vice President Morrison, Morrison replied that Mr. Reynold's request was now "delegated to [him]," "as it was with the BLM group." [Dkt. 7-2.]

115. Vice President Morrison requested that Mr. Reynolds submit location ideas and a proposed graphic for the All Lives Matter mural, which Mr. Reynolds did. [Dkt. 7-2.]

116. Upon review of the proposed mural design, which featured the phrase "All Lives Matter" with a thin blue line running through "All Lives" and a thin red line running through "Matter" to represent support for first responders, Vice President Morrison emailed Mr. Reynolds saying that, "the graphic and sizing look good on my end," and recommending that Mr. Reynolds "relay to the City that IU is ok with the East Kirkwood location," a public right-of-way adjacent to Indiana University's campus, for the All Lives Matter mural. [Dkt. 7-2.]

117. In that email, Vice President Morrison reiterated that "[it] is the City's ultimate approval" that was required and that his input mattered only because the City "consults with [the University] as an adjacent property owner." [Dkt. 7-2.]

118. On August 3, 2021—the same day Mr. Wason sought retroactive approval from the Board of Public Works for the Black Collegians' BLM mural— Mr. Reynolds informed Mr. Wason via email that the proposed All Lives Matter mural "was approved by the IUB President's Office, specifically … Thomas Morrison."

[Dkt. 7-4.]

119. On August 10, 2021, Mr. Wason responded to Mr. Reynolds instructing Mr. Reynolds to speak with "City Legal" about the mural and also informed Mr. Reynolds that "Mr. Morrison's office is also not in agreement with your take on IU 'giving permission.'" [Dkt. 7-4.]

120. That same day, Mr. Reynolds, as instructed, contacted City Attorney Michael Rouker by email to report on his conversations with Mr. Wason and Vice President Morrison. After Mr. Reynolds failed to receive a response from Mr. Rouker, he sent three follow-up emails on August 17, 18, and 19. [Dkt. 7-5.]

121. Mr. Rouker responded to these communications on August 23, 2021, informing Mr. Reynolds that it is "the City of Bloomington's Board of Public Works [that] approves the placement of art in the public right of way. The City does not take recommendations for art in its right of way from individuals, and, at this time, the City is not considering adding additional art within its right of way." [Dkt. 7-5.]

## VII. Defendants' Viewpoint Discrimination

122. Plaintiffs' request to install an "All Lives Matter" mural was denied by Mike Rouker in August 2021 because the "All Lives Matter" mural did not conform to the criteria the City had in place and had applied to public art installations since 2017, which is summarized in the Policy. [Dkt. 77-6 ¶¶ 33, 35.]

123. The "All Lives Matter" mural contained "speech" as defined by the Policy and violated the Policy's plain terms, namely it contains words letters and the universally recognized symbols of the thin red and thin blue lines, which represent respect for first responders. [Dkt. 7-2.]

124. Rouker and Wason knew that the Black Collegian's BLM mural violated the Policy's plain terms because it also contained "speech" as defined by the Policy.

125. Moreover, Rouker and Wason deliberately denied Plaintiffs the opportunity to present their ALM mural to the Board of Public Works because they knew it violated the Policy's plain terms.

126. Regardless of what the Policy said, Rouker and Wason did not agree with the message of the ALM mural.

127. The City disagrees with the message "All Lives Matter." [Dkt. 65 ¶ 119.]

128. Rouker and Wason disagree with the message "All Lives Matter."

129. All Defendants affirmatively supported the message of the BLM mural and approved the BLM mural because it was consistent with their beliefs.

130. The City, Rouker, and Wason disagreed with and rejected the message of the ALM mural and did not allow Plaintiffs request to install one to come before the Board of Public Works because it was inconsistent with their beliefs.

## CONCLUSIONS OF LAW

### I. The City Created a Designated Public Forum for Private Artists to Install Public Art in Rights-of-Way

#### 1. *Legal Standard for Forum Analysis*

"Courts recognize three types of forums: 1) the traditional public forum, 2) the public forum created by government designation, and 3) the non-public forum. *Educators' Ass'n*, 460 U.S. 37, 44 (1983)). Traditional public forums include "[s]treets, sidewalks, and parks, and the quintessential soap box in the public square." *Id.* Designated public forums are "public property that the state has opened for members

of the public to use as a place of expressive activity" based on the governments "inten[t] to designate a place not traditionally open to assembly and debate as a public forum." *Id.* at 565-66. Non-public forums are neither. *Id.* Regardless of the forum, the government may not engage in viewpoint discrimination: "regulating speech when the specific motivating ideology or the opinion or the perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

### 2. The City Created a Designated Public Forum for Private Entities and Individuals to Place Art Containing Expressive Content in City Rights-of-Way

Here, Defendants created a designated public forum through their 2015 Master Plan that encouraged citizens to express themselves on public property, including public rights-of-way [Dkt. 32-2], and through the City's repeated approvals of privately created art in rights-of-way without restrictions regarding expressive content. As the Master Plan states, public art "give[s] form to core values of the community, such as freedom of speech and expression, alongside respect for diverse viewers and users." [Dkt. 32-2 at 3.] The unwritten process by which the City implemented the Master Plan – the Encroachment Policy – was successfully executed by the City multiple times from 2017 to 2021 to approve murals in rights-of-way. [Dkt. 65 ¶¶ 29, 79.]

The designated evidence shows that street murals approved by the City from 2015 to 2021 contained expressive content. Whether it was the yellow and blue paintings that transformed pavement into flowers [Dkt. 22-1 at 7–8], colorful spiraling sections that formed a turtle in the middle [Dkt. 22-3 at 11–12; Dkt. 65 ¶ 29], a large pollen grain suggestive of a sunflower and the sun [Dkt. 32-1 at 27–28],

trees wrapped in tree sweaters [Dkt. 65 ¶ 28], or the one-of-a-kind BLM mural painted by the Black Collegians, [Dkt. 65 ¶¶ 51–53; Dkt. 7-13 at 2], the City created a designated forum that included street murals with expressive content without limitation on that content.

## II.     The City's Policy Violates the First Amendment

The government cannot discriminate against the speech of private actors based on a speaker's viewpoint. *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995). Viewpoint neutrality applies whether the speech takes place in a street, sidewalk, park, or even on non-public forums. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021).

Viewpoint-neutrality also requires Defendants to restrain the discretion of officials through "narrow, objective, and definite standards." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151 (1969). Once a forum is created the government may not exercise "unbridled discretion" over who speaks in that forum. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988); *Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002); *DeBoer v. Village of Oak Park*, 267 F.3d 558, 574 (7th Cir. 2001).

The City's Policy for the standards used to evaluate art for placement in public rights of way has been the same since 2017. This Policy is subject to strict scrutiny because it invites standardless and unbridled discretion. In addition, the Policy in place during 2017-2021 had another feature, it was unwritten, thereby making City employees the gatekeepers of whether to bring public requests for the placement of art forwarded to the Board. The City, however, provided its employees no standards

for how to evaluate whether to bring such requests forward. Finally, the Policy is a content-based restriction that discriminates on the basis of subject matter.

For these reasons, the Policy in place in 2021 is subject to strict scrutiny. It fails to satisfy strict scrutiny because it is not the least restrict means for advancing any compelling government interest.

### 1. Standardless Discretion

The Policy as implemented from 2017-present permits the use of standardless and unbridled discretion in the evaluation of art considered for placement in the City's designated public forum. *Shuttlesworth*, 394 U.S. at 151. Rouker, the City Attorney, said "there will be close cases on universally recognized symbols" but wasn't comfortable answering specific questions "without further discussion with the legal team." [Dkt. 79-7 at 1–2.] The president of the Board, Kyla Cox Deckard ("Deckard"), testified that "special event applications" – one of the ways to obtain a permit for installing *any* art under the Policy – has "a lot of factors" and "it would be hard for [her] to guarantee something would be approved." [Dkt. 79-18 (Deckard Dep. at 20:3–11).] The Assistant Director for the Arts, Holly Warren, with whom the Board consults when reviewing applications under the Policy, testified that "there are no rules" in the Policy, "only guidelines that we follow." [Dkt. 79-17 (Warren Dep. 18:15–18).] Warren went on to testify that applying the Policy meant asking "what is appropriate to our city? … does this reflect our community?" [*Id.* at 18:21–19:2.] In other words, the Policy invites viewpoint discrimination because it is not "narrow, objective, and definite," *Shuttlesworth*, 394 U.S. at 151.

## 2. The City's Policy Allowed Rouker, Wason, and Starowitz to Be the Gate Keepers Regarding Who Could Submit Requests for Approval of Public Art to the Board of Public Works Without Setting Standards for Such Determinations

The City has had a consistent policy of prohibiting speech in art placed in public right-of-ways since 2017. Until this Court's order requiring the City to put in writing its policy and the process for applying to the Board of Public Works, the City had a policy of leaving it to the particular City official(s) contacted, whether The Assistant Art Director for the City (Starowitz), The Director of Public Works (Wason), or the City Attorney (Rouker), to decide whether to bring forward to the Board of Public Works a request by a member of the public to paint a mural or place other public art in a City right-of-way. Thus, the custom and policy of the City until late 2021 was to give City employees the discretion whether to decide to bring a proposed art project to the Board of Public Works for approval. If the City employee thought the proposal worthwhile, they would encourage the applicant to use a "special event application" to seek Board approval on the placement of the proposed artwork. However, City employees where not required to bring proposals to place art forward to the Board. Rather, they could simply, as Mr. Rouker did in this case, not bring the proposal forward for review.

Thus, the City's custom and practice during at least 2017-2021 was to: (1) create a public forum for the placement of art in City right-of-ways, but (2) not announce or make public the standards applicable to that forum, or explain how to apply to place art in the forum, and (3) give individual City employees the discretion to choose whether to bring requests by members of the public to place art in the forum

to the Board. This aspect of the policy, giving employees discretion whether to bring forward requests or not, placed unfettered discretion in the hands of City employees such as Starowitz, Wason, and Rouker to use their own subjective judgment and engage in their own unguided analysis about whether to bring art proposals forward for consideration by the Board.

Therefore, the fact that Attorney Rouker was able to prevent Kyle Reynolds' requests to place art in the City's public forum was the result of a feature of the City's policy then in place, *i.e.,* the choice to make City employees the gatekeepers of whether to bring requests forward but not provide them written standards or procedures to use in fulfilling this responsibility. Board Member Beth Hollingsworth testified that she knew that the Board only considered applications to place art in public right-of-ways that were brought forward to the Board by City employees [Dkt. 79-14 (Hollingsworth Dep. 7:3–13)], and, as this Court has previously found, the City had a policy permitting the placement of art by members of the public, thereby creating a public forum. Thus, by creating a public forum while giving City employees the discretion to decide whether or not they would bring forward requests to place public art without confining that discretion by having standards by which projects were or were not brought forward to the Board, the City imbued its employees such as Starowitz, Wason, and Rouker with standardless discretion to bring proposed projects forward to the Board or not.

This custom and practice of the City to entrust to its employees the discretion to consider requests for entry into the public forum without any guidance as to how

to handle such requests or whether and how to bring those requests forward resulted in the denial of Kyle Reynolds' and IU-TPUSA's access to the forum. As the City has demonstrated by its subsequent actions, it was certainly possible for the City to adopt and announce a clear policy regarding access to the forum. Instead, however, from at least 2017-2021 the City chose not to announce its standards regarding the approval of public art or the process for seeking approval of public art placement by members of the public, instead giving City employees unfettered discretion to bring forward requests to the Board or not. This choice by the City was directly responsible for Kyle Reynolds and IU-TPUSA being denied access to the designated public forum in 2021 and not being given the opportunity to have their proposal considered by the Board.

### 3. *The Policy is Not Content-Neutral*

The Policy also fails to comply with the Constitutional standards for time, place, and manner restrictions. *Ward*, 491 U.S. at 791. The Policy discriminates based on content. Whether a restriction is "'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 169 (2015). "[L]aws that cannot be 'justified without reference to the content of the regulated speech,' or that were adopted by the government 'because of disagreement with the message it conveys'" are content based. *Id.* (quoting *Ward*, 491 U.S. at 791).

First, the Policy is content-based because City employees consider the content

of the proposed public art. [*e.g.*, Dkt. 79-7 at 2–3 ("Rouker stated that hate speech would not be permissible … [and] signs used in [American Sign Language] … would be impermissible"); Dkt. 79-17 (Warren Dep. at 20:20–21:13 ("We always say, Okay, what do people want to see here, but also what qualities of the history of this place could it potentially represent.")); Dkt. 79-18 (Deckard Dep. at 22:15–22 ("And so we as citizens would have a perception as to what that might symbolize.").]

Second, the Policy is content-based because the City cannot evaluate a proposed mural without considering its message and contents – namely whether it has words and universally recognized symbols or not under the anti-speech provision. The City necessarily discriminates between expressive content that uses words and symbols and content that does not. All art is expressive content, period. The First Amendment protects speakers' "autonomy to choose the content of [their] own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 569, 573 (1995). And the government "cannot foreclose the exercise of [First Amendment] rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). To discriminate between works of art based on its communicative content is, *per se*, content-based discrimination.

Third, the Policy allows the City to limit discourse based on the subject-matter of the public art. *Reed,* 576 U.S. at 169; *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1297 (7th Cir. 1996) (content neutrality "prevents the government from even limiting discussion in public fora to specific subjects. A content-neutral regulation is thus both viewpoint-neutral and subject-neutral."

(citations omitted)). The Policy's anti-speech provision permits the murals it has approved in the past, which included paintings of flowers, pollen and turtles. The City says these paintings convey a message regarding the "subject matter" of neighborliness and sense of place. [Dkt. 32 (Surreply) at 4–5.] But the facts show the Policy does not permit murals on the "subject matter" of robust cultural and political discourse that necessarily requires the use of words and symbols. This is subject-matter discrimination. Accordingly, "the [Policy] singles out specific subject matter for differential treatment," namely expressive content on neighborliness and sense of place but not on political or cultural issues, "even if it does not target viewpoints within that subject matter" on its face. *Reed*, 576 U.S. at 169.

### 4. *The Policy Fails to Satisfy Strict Scrutiny*

As a content-based restriction on speech, the Policy must satisfy strict scrutiny and be narrowly tailored to advance compelling ends. *Reed*, 567 U.S. at 163. The City cannot satisfy that standard here.

First, the Policy is not necessary to achieve public safety – which is the only conceivable public interest that might justify a restriction on speech. Defendants approved the Black Collegians' mural and two other BLM murals, all of which paint words and letters and symbols in public rights of way. There is no credible basis to find that BLM murals were materially different in their impact on safety or traffic flow than the proposed ALM mural. The facts show that none of the BLM murals presented a threat to public safety or otherwise interfered with any drivers' ability to successfully navigate the roads on which the murals were constructed. Thus, neither did the proposed ALM mural create a challenge to driver's safety.

The Policy's application of the anti-speech provision to semi-permanent and permanent art, but not temporary art, also shows that the City banning speech was not about safety. As the facts show, semi-permanent art can deteriorate quickly. The BLM mural needed touch up paint just a few weeks after it was installed. [Dkt. 79-11 & Dkt. 79-12.] And if the City is trying to promote safety by eliminating painted words on the street, it fails to achieve that objective by allowing local artists to write whatever they want on the street as long as it's only "temporary." If words are hazards, then temporary words are just as hazardous as semi-permanent words. The different rules for temporary and semi-permanent art make no sense.

Third, as the City's purposeful placement of the BLM murals suggest, it is possible to protect public safety while installing murals with words, letters and symbols. Many other considerations are sufficient to address public safety, as the Policy explains:

> Art Installations may not mimic in whole or part traffic control devices including but not limited to a crosswalk, stop sign, stop bar, or similar traffic control device.

> Art Installation geometry should be such that drivers do not alter their course to drive around the art.

> Street paintings and street murals may only be placed on streets with a local or secondary collector functional classification under the City's Transportation Plan, where regulatory speed limits do not exceed 25 miles per hour.

> Street paintings and street murals may only be placed on pavement in adequate condition for materials to bond.

> Street paintings and street murals are not permitted on brick, paver, or other decorative surface materials (e.g., colored or stamped concrete). Street paintings and street murals are only permitted on standard non-decorative

concrete or asphalt.

A buffer of four feet must remain between street paintings and street murals and any crosswalk.

Within an intersection, street paintings and street murals are only allowed where the intersection utilizes all-way stop control, unless the painting or mural is located on an apron.

Street paintings and street murals may not be painted on the side or top of any curb or any curb ramp.

Materials used must be approved by the City's Engineering Department.

Any paint or similar material utilized as part of any street painting or street mural must provide a non-slip surface for pedestrians and must be street-grade.

[Dkt. 79-8 at 3–4 (Sections III.C and V.).] There is no plausible explanation for how a street mural that satisfies these safety regulations but still contains speech, somehow jeopardizes public safety in any respect.

Fourth, the Policy provisions are also unreasonable and unworkable. Again, they invite standardless discretion. As Warren admitted, "there are no rules." [Dkt. 79-17 (Warren Dep. 18:15–18).] For example, City employees could not define a "universally recognized symbol" in a definite manner. The president of the Board of Public Works said as much when she testified that to define a universally recognized symbol "each of the board members would be reviewing this item. And so we as citizens would have a perception as to what that might symbolize." [Dkt. 79-18 (Deckard Dep. at 22:15–22).]

All told, the content restrictions and unreasonableness of the Policy highlight what the Policy both before and after 2021 was really about – enabling viewpoint

discrimination without expressly saying so and regardless of whether that was anyone's stated intent.

## III. The City of Bloomington is Liable Because It's Policy and/or Custom Caused the First Amendment Violation

A municipality can be held liable for constitutional violations through § 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Liability can be established when the injury is inflicted by the local government's official policy or custom. *Id.* at 694. "To establish that responsibility, and thus liability under *Monell*, a plaintiff must ultimately prove three elements: (1) a municipal action, which can be an express policy, a widespread custom, or an act by an individual with policy-making authority; (2) culpability, meaning, at a minimum, deliberate conduct; and (3) causation, which means the municipal action was the 'moving force' behind the constitutional injury. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404–07 (1997).

"The central question is always whether an official policy, however expressed … caused the constitutional deprivation." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017).

> A plaintiff might prove this essential element by showing that (1) the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, (2) the constitutional deprivations were visited pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels, or (3) the deprivation was made by its lawmakers or by those

> whose edicts or acts may fairly be said to represent official
> policy.

*Bradley v. Vill. of Univ. Park, Illinois*, 929 F.3d 875, 884 (7th Cir. 2019) (citations omitted); *accord Monell*, 436 U.S. at 690–691.

The *Monell* requirement can be satisfied by "a single decision attributable to a municipality." *Bryan Cty.*, 520 U.S. at 405. Causation requires a showing of "'direct causal link' between the municipal action and the constitutional injury," not simply but-for causation. *Ruiz-Cortez*, 931 F.3d at 599. "*Monell* does not subject municipalities to liability for the actions of misfit employees." *Id.* (citing *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc)).

### 1. The Content Aspect of the Policy in Force from 2017-Present Caused the Constitutional Violation

Plaintiffs' request for an ALM mural was denied because it violated the content aspect of the Policy and not because of the actions of a "misfit employee[]. *Ruiz-Cortez*, 931 F.3d at 599. It contained "speech" in the form of words, letters, and universally recognized symbols. This was a clear violation of the Policy. So, Rouker acted accordingly when he did not allow Plaintiffs' request to go before the Board of Public Works for consideration.

Rouker's purported ignorance of the City's prior instance of allowing private citizens to install murals in public rights of way does not eliminate *Monell* causation. Rouker is not a "misfit employee" who acted contrary to the City's Policy but the City's lawyer who has an affirmative obligation to know the City's policies and the law. Rouker cannot dispute that regardless of his purported ignorance, the Policy prohibits the ALM mural. Whatever reason he gave for denying the ALM mural

(pretextual or not), the City's Policy prohibits the mural based on its content. To hold otherwise would necessarily imply that Rouker was either a negligent attorney or was deliberately obfuscating the City's Policy because he disagreed with the message of the ALM mural. The Court should not find that a government employee can immunize the government from liability for an unconstitutional policy merely by claiming he was unaware of the policy thereby blocking a citizen's opportunity to seek review of the policy.

2.      *The Discretion Given to City Employees during 2017-2021 to Decide Whether to Bring Forward Public Requests to Place Art Caused the Constitutional Violation*

In the event the Court accepts the City's contention that Rouker unilaterally denied Kyle Reynolds' request to place art in a public right-of-way and was merely mistaken about whether the City was currently accepting applications to place art from private citizens this still does not exonerate the City from liability for its custom and practice which allowed City employees to decide whether to bring forward requests to the Board to place of such art. The existence of a policy which did not require City officials to bring such requests to the Board or provide any written standard for City employees to use to review, triage, or evaluate such requests and which did not require the requests to be officially processed in any is in itself an unconstitutional policy which save City employees standardless and unbridled discretion over access to a public forum in violation of the First Amendment.

3.      *The City's Constitutional Violations Were Deliberate*

The anti-speech rule of the Policy did not arise by happenstance. Again, Rouker is not a "misfit employee[]." *Ruiz-Cortez*, 931 F.3d at 599. In June and July 2017, City

officials discussed the Oregon rules for murals in public rights of way. These rules expressly prohibited "speech." This discussion reflects that the City's policy and custom of prohibiting speech is not an accident but the result of a deliberate attempt to regulate public forums. The City created a public forum and then deliberately chose a policy that crossed the line of the First Amendment rights of private citizens who wished to paint murals in public rights of way. The City continued to deliberately apply this anti-speech policy in approving only murals that omitted letters, words, and universally recognized symbols.

The City's approval of the Black Collegians' BLM mural – regardless of whether the City retroactively adopted the BLM mural as its own – confirms that the City's Policy is the result of viewpoint discrimination. The City picks and chooses what political messages it wants to endorse. Even if that endorsement is not itself unconstitutional, it is still evidence of an effort to stymie First Amendment activity for all messages that it does not endorse. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("Even if the hypothetical measure on its face appeared neutral as to content and speaker, its purpose to suppress speech and its unjustified burdens on expression would render it unconstitutional."); *Brown v. Kemp*, 86 F.4th 745, 783 (7th Cir. 2023) ("But where the text itself discriminates, legislative history that expresses an intent to discriminate bolsters the presumption of constitutional infirmity.").

Likewise, the City's effort to maintain a public forum during 2017-2021 without uniform standards for accessing that forum, while knowing that requests to access the forum would be made to City Officials who would then exercise their

discretion as to whether to bring the request to the attention of the Board, was a deliberate effort to use City employees as gatekeepers for access to the forum without giving those employees any standards to apply in deciding whether or not to bring forward requests. Two natural results follow from the City's decision to allow gatekeepers initial control over access to the forum without defining standards to guide the employee:

1.      the employee may choose to indulge in personal bias in evaluating requests to access the forum; and/or

2.      the employee may choose to deal with difficult, annoying, or problematic requests by denying that the forum exists.

The latter is exactly what happened here. Because the rules concerning the designated public forum were not in writing and available to the public, Mr. Rouker could tell Mr. Reynolds the forum did not exist, giving Mr. Reynolds no apparent recourse other than to sue the City because his attempt to access the public forum was denied.

Thus, whether Mr. Rouker intended to infringe on Mr. Reynolds' First Amendment rights or not he was able to deny Mr. Reynolds access to the forum precisely because the City's access point for the forum was City officials who had no guidance regarding how to handle access requests and who therefore exercised unbridled discretion to bring forward or not bring forward those requests for any reason whatsoever. In this respect as well Mr. Rouker was not necessarily a rogue employee, he was merely exercising the unlimited, unbridled, standardless discretion that the City, including the Board, knew that City employees had. This aspect of the Policy has been largely cured through the adoption of written policies in 2021 as

ordered by this Court, but that subsequent action does not absolve the City from its prior unconstitutional policy which prevented Mr. Reynolds from seeking access to the forum in 2021 and from having his request reviewed in a non-arbitrary fashion.

The City's deliberate attempt to shut down robust cultural and political discourse in its public forum through the Policy violates the First Amendment.

## IV. [Alternative Conclusion] Defendant Rouker Engaged in Viewpoint Discrimination in His Individual Capacity

In the alternative, if the Court finds that Rouker is a "misfit employee," who acted contrary to the City's Policy and custom in refusing to allow the ALM mural application to go before the Board of Public Works, then the facts show that he acted with intent to discriminate on the basis of Plaintiffs' viewpoint.

Rouker knew that the City had approved the Black Collegians' BLM mural. He knew that the City disagreed with the message "All Lives Matter." He shared the City's viewpoint. And he knew that the ALM mural communicated a political and cultural message that was contrary to the message of the BLM mural. He rejected the ALM mural because it was a different message with which he and the City disagreed.

## V. The Individual Defendants are Not Entitled to Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether an individual defendant is entitled to

qualified immunity, there are two relevant inquiries: (1) whether "the facts alleged show the officer's conduct violated a constitutional right," and (2) whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001), *modified on other grounds by Pearson*, 555 U.S. at 236.

Defendants do not need to be able to cite to the "exact article, section and clause of the Constitution," they offend to know that their conduct violated a plaintiff's rights. *Markham v. White*, 172 F.3d 486, 492 (7th Cir. 1999). Rather, the appropriate focus is "on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Harlow*, 457 U.S. at 819.

Critically, the Defendants' actual, subjective state of mind or knowledge of the law is irrelevant to whether the asserted conduct would have been legally reasonable. *Mitchell v. Forsyth*, 472 U.S. 511, 517 (1985). When inquiring into whether a right is clearly established, Courts look first to U.S. Supreme Court precedent, then Circuit precedent, and then all other relevant case law. *Jacobs v. City of Chicago*, 215 F.3d 758, 766 (7th Cir. 2000).

As explained above, Rouker violated the First Amendment by shutting down Plaintiffs' request to install an ALM mural because he disagreed with its message. To any reasonable city employee in Rouker's position – and particularly to a City Attorney – this is an obvious First Amendment violation. The government cannot

discriminate against the speech of private actors based on a speaker's viewpoint. *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995). Viewpoint neutrality applies whether the speech takes place in a street, sidewalk, park, or even on non-public forums. *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021). "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. As *Rosenberger* explained, "[i]f the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." 515 U.S. at 832.

## VI.    Plaintiffs Are Entitled to Relief

### 1. *Nominal Damages*

Plaintiffs are entitled to nominal damages for the Constitutional violations.

### 2. *Permanent Injunction and Declaratory Relief*

The City's First Amendment violations are clear. The Court therefore converts its preliminary injunction [Dkt. 35] into a permanent injunction under Rule 65 and 28 U.S.C. § 1343.  [Dkt. 62-1 at 51–52.]  *See, e.g.*, *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky, Inc. v. Comm'r, Indiana State Dep't of Health*, No. 1:17-CV-01636-SEB-MG, 2024 WL 1908110, at *8 (S.D. Ind. May 1, 2024) (granting summary judgment and permanent injunction). Specifically, the Court hereby issues a permanent injunction requiring all remaining Defendants to permit

Plaintiffs to paint a street mural depicting "All Lives Matter" in Bloomington, Indiana, on East Kirkwood Avenue.

The Court also enters a declaratory judgment against all remaining Defendants under 28 U.S.C. § 2201 because the First Amendment rights of the Plaintiffs are clear and the material facts undisputed. Specifically, the Court declares that

    a. the City of Bloomington, Matt Rouker, Adam Wason, and Kyla Cox Deckard violated the First Amendment to the U.S. Constitution by failing to permit Plaintiffs to paint a street mural depicting "All Lives Matter" in Bloomington, Indiana, on East Kirkwood Avenue because of viewpoint discrimination.

    b. the City of Bloomington had a Policy for installation of private art in public rights of way that prohibited "speech" and that this policy violated the First Amendment to the U.S. Constitution by authorizing unbridled discretion and content-based restrictions on "speech."

### 3. Attorneys Fees and Costs

Pursuant to 42 U.S.C. § 1988 Plaintiffs are entitled to their attorneys' fees and costs because they are the "prevailing party" in this lawsuit. *Lackey v. Stinnie*, 145 S. Ct. 659 (2025). Therefore, the Court orders Plaintiffs to submit a motion for attorneys' fees and costs within thirty (30) days of this Order.

## VII.  Judgment and Verdict

IT IS THEREFORE ORDERED: judgment is entered in favor of Plaintiffs and against Defendants.

\* \* \*

Date: October 21, 2025

Respectfully submitted,

**KROGER, GARDIS & REGAS, LLP**

*/s/ William Bock III*
William Bock III, Atty. No. 14777-49
Keith A. Butler, Atty. No. 27766-29
Justin R. Olson, Atty. No. 31450-49

ATTORNEYS FOR PLAINTIFFS

KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2025, I filed the foregoing *Plaintiffs' Trial Brief* electronically with the Clerk of the Court. Notice of this filing will be sent to the following by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Liberty L. Roberts
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
lroberts@cchalaw.com

*/s/ William Bock III*
William Bock III

KROGER, GARDIS & REGAS
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Phone: (317) 692-9000