UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA UNIVERSITY CHAPTER OF<br>TURNING POINT USA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BLOOMINGTON, INDIANA, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)     No. 1:22-cv-00458-SEB-TAB<br>)<br>)<br>)<br>)<br>) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH
TRIAL**

A one-day bench trial was conducted on November 17, 2025 to resolve the

remnants of a lawsuit that was substantially resolved on summary judgment to address

Plaintiffs' First Amendment viewpoint discrimination claims related to Defendants' denial

of their 2021 request to paint an "All Lives Matter" street mural in Bloomington, Indiana.

Plaintiffs Indiana University Chapter of Turning Point USA and Kyle Reynolds[1] seek

monetary damages and injunctive relief from Defendants City of Bloomington (the

"City") and Director of Public Works Adam Wason and former City Attorney Michael

Rouker, who were sued in their individual capacities.  Plaintiffs claim that their street

mural request was denied based on a policy or widespread custom of the City that gave

---

[1] Tim Wheeler was initially included as a Plaintiff during his tenure as President of the Indiana
University Chapter of Turning Point USA.  Mr. Wheeler has since graduated from Indiana
University, and Plaintiffs concede he is no longer a proper party.  Accordingly, Mr. Wheeler is
dismissed as a Plaintiff and the Clerk is directed to remove his name from the case caption.

1

City employees unbridled discretion in deciding whether to approve or deny individual requests to place art in the public right of way.

Following the trial, the parties submitted post-trial briefs, including proposed findings of fact and conclusions of law. Having considered the evidence along with those arguments and contentions, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## Findings of Fact

### I.      The Parties

In March 2022, when this lawsuit commenced, Mr. Reynolds was a student at Indiana University and a Board Member of Indiana University Turning Point USA. Mr. Reynolds graduated from Indiana University in 2023 but is authorized by the current Indiana University Chapter of Turning Point USA to continue to represent it in this lawsuit. Tr. at 8–9.

Defendant Adam Wason has served as the Public Works Director for the City of Bloomington since 2016. Tr. at 111–112. Defendant Michael Rouker served as the City Attorney from 2016 through November 2023. As City Attorney, Mr. Rouker provided legal advice, as needed, to the Board of Public Works as well as other City officials. Tr. at 173; Exh. 80.

### II.      Procedural Background

This lawsuit commenced in state court on March 2, 2022, naming as Defendants the City, Mr. Wason, and Mr. Rouker, along with three members of the City's Board of

2

Public Works who have since been dismissed.  The gravamen of the Complaint was that the City had allowed three "Black Lives Matter" street murals to be displayed while denying Plaintiffs' "All Lives Matter" mural, which action Plaintiffs alleged violated their rights under the First Amendment by discriminating against them based on the viewpoint of their proposed speech.  The case was removed to federal court on March 9, 2022.

Following the filing of this lawsuit, Mr. Reynolds's search of public records disclosed three prior instances when the City had permitted private neighborhood groups to paint designs on City-owned streets:  First, in 2017, the Board of Public Works had approved a Special Event Application from the McDoel Neighborhood Association's "Dodds and Fairview Street Painting Group" to "paint and partially close the intersection of Fairview and Dodds Street" for a "Street Mural Painting Party."  The design painted on the intersection consisted of colorful spiraling sections that formed a turtle in the middle of the circle.  Dkt. 113 at 6.  The design included no words or letters.

Second, in 2018, the Board of Public Works had approved a Special Event Application from the Prospect Hill Neighborhood Association to paint the intersection of Fairview and Howe Streets.  Prior to the presentation of this request to the Board of Public Works, the Prospect Hill Neighborhood Association had submitted an application and been awarded a Neighborhood Improvement Grant for the street mural project, as public art subject to the design constraints of the City.  The design selected and used for the project was titled "Common Pollen" and consisted of a circular shape with points suggesting the radiating petals of a sunflower.  *Id.* at 5–6.  The mural included no words or letters.

Third, in 2021, the Board of Public Works had approved a request from the Westside Neighborhood Association to hold "a neighborhood block party and traffic calming mural painting." The "traffic calming" depictions referenced were concrete circles that surrounded planters located in the middle of intersections on Seventh Street in Bloomington. The design consisted of blue and yellow-colored petals painted around the traffic circle to form a flower. *Id.* at 6–7. There were no words or letters incorporated in the design.

On March 10, 2022, Plaintiffs filed a motion for a preliminary injunction in which they sought an order enjoining Defendants from enforcing their "right-of-way art policy" against Plaintiffs and permitting Plaintiffs to paint their proposed "All Lives Matter" street mural. After briefing, the Court ruled that while the previously authorized "Black Lives Matter" murals were likely government speech, which would not create a public forum for citizens to paint on City streets, Plaintiffs were nonetheless likely to succeed in showing that the City had created a limited public forum by allowing the neighborhood groups to apply for and receive permission to paint on City streets. The Court therefore ordered the City to promulgate and disseminate the procedural steps whereby private individuals and groups, including Plaintiffs, could seek approval for an encroachment on the City's rights-of-way for the purpose of displaying public art and to permit Plaintiffs to access those procedures.

In December 2022, the City promulgated the City of Bloomington Policy and Procedures on Private Art Installations within the Public Right of Way (the "2022 Policy"). The 2022 Policy forbids "speech" in permanent or semi-permanent art

4

installations, which would include the street mural Plaintiffs sought to have painted. "Speech" is defined under the 2022 Policy as "Words, letters, numbers, universally recognized symbols, or logos of any kind." Exh. 66. Thereafter, Plaintiffs submitted a Special Event Application with a request to paint the words "All Lives Matter" on Kirkwood Avenue, a City-owned street. The design included a thin blue line and a thin red line that bisected the words. The Board of Public Works denied Plaintiffs' application on the grounds that their proposed mural constituted semi-permanent or permanent art that contained words and letters and thus violated the 2022 Policy.

All parties moved for summary judgment in response to which the Court has ruled that the three "Black Lives Matter" street murals authorized by the City constituted government speech to which First Amendment protections do not apply. The Court further held that the 2022 Policy was not unconstitutional as applied to Plaintiffs because the 2022 Policy's prohibition on the use of words and letters in semi-permanent and permanent art displayed in its public rights-of-way was content-neutral. Regarding Plaintiff's 2021 request to paint their "All Lives Matter" mural, the Court determined that no party had sufficiently briefed the issue of the City's culpability or the application of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Court also held that genuine issues of material fact remained regarding the motives of Mr. Wason and Mr. Rouker as well as questions regarding causation that were not properly fleshed out by any party, thus precluding summary judgment on Plaintiff's viewpoint discrimination claims against Defendants Wason and Rouker in their individual capacities.

Plaintiffs sought reconsideration of the Court's summary judgment order on two grounds: that the Court erred in finding that Plaintiffs' proposed street mural did not contain a universally recognized symbol, and that Defendants had denied Plaintiffs mural application in 2023 solely because it contained words and letters.  Plaintiffs argued that these alleged factual errors caused the Court to commit legal error by limiting the constitutional analysis solely to the "words and letters" portion of the definition of "speech" in the 2022 Policy, rather than assessing the constitutionality of the entire anti-speech provision as a whole, which also prohibits "universally recognized symbols" in semi-permanent and permanent art.  The Court denied Plaintiffs' motion for reconsideration, finding that Plaintiffs had failed to adequately develop such arguments in their summary judgment briefing, and, in any event, no evidence had been adduced on summary judgment that the City had at any point identified the red and blue lines of the design as being "universally recognized symbols" under the 2022 Policy or denied Plaintiffs' application on that basis.

On November 17, 2025, the Court conducted a bench trial on Plaintiffs' remaining First Amendment viewpoint discrimination claims based on Defendants' 2021 denial of Plaintiffs' request to paint their proposed "All Lives Matter" street mural.

### III.    City's Procedures for Seeking Approval for Private Art in Public Rights of Way Prior to December 2022

The City's Board of Public Works is the body that ultimately approves or disapproves requests to encroach in the public right of way, including requests to place art in the public right of way, such as a street mural.  Tr. at 244.  Prior to December 2022,

a private group or individual seeking to place art in a public right of way in the City could submit their request in one of two ways: (1) by completing and submitting a Neighborhood Grant application (if the request met the qualifications for a Neighborhood Improvement Grant),[2] which application would then be presented to the Board of Public Works for approval; or (2) by working with the staff of the Department of Public Works and the Economic Sustainable Development Department ("ESD") to complete a Special Event Application, which application would then be presented to the Board of Public Works for approval. Tr. 132–33, 178–79, 244–46. Kyla Cox Deckard, who served on the Board of Public Works in various capacities from 2016 to the present, testified that it would also have been possible for a private individual or entity to directly petition the Board of Public Works at a public meeting, but no witness at trial could identify an instance in which that method had ever been utilized. Tr. at 247.

During 2021, the Special Event Application was available on the City's public website, and contained a checklist of tasks an individual or group needed to complete prior to having their request submitted to the Board of Public Works for review and approval. The checklist included such items as providing a map of the proposed project, developing a maintenance of traffic plan, notifying adjacent business owners or residents, and obtaining any applicable permits. The Special Event Application also contained a checklist for the City's use to indicate the dates the submissions were received and ultimately approved by relevant City departments. Dkt. 132–36; Exh. 9.

---

[2] The Neighborhood Improvement Grant procedures are not applicable in this litigation, so we do not discuss them further.

City employees often worked with applicants in completing their Special Event Applications and provided guidance throughout the process, including advising applicants if their proposal was deficient in a way that made it unlikely to be approved by the Board of Public Works.  Tr. at 120–21, 246–48.  Special Event Applications would also be reviewed by the public safety department and the legal department, if necessary and as needed.  Tr. at 245–46.  City employees did not, however, have personal authority to approve or deny applications.

After a Special Event Application is submitted, City staff would place the request on the agenda of the Board of Public Works and include with the application any other documents relevant to the request, placing them into a packet of materials that was provided to the members of the Board for their review a few days in advance of the scheduled meeting at which the request was scheduled to be considered.  Tr. at 114–116, 128.  Determining which materials would be included in the packet was entrusted to the discretion of City staff, but Board members could request additional documents or information, if needed.  Tr. at 240–41.  Following review of the materials, the Board of Public Works would vote on whether to approve the Special Event Applications included on each meeting's agenda.

Prior to December 2022, the City had promulgated no written policy by which the Board of Public Works evaluated the content of the private art proposals for public rights-of-way.  However, pursuant to the unwritten policy or practice of the City prior to December 2022, public art proposals were evaluated on the basis of the same design

8

criteria as set forth in the written 2022 Policy, namely, that words, letters, and universally recognized symbols were not permitted.  Tr. at 190–93, 196–97.

### IV.    Plaintiffs' All Lives Matter Mural Request

In late July 2021, Mr. Reynolds, then a student attending Indiana University and residing in Bloomington, along with the Indiana Chapter of Turning Point USA sought to paint a 15' by 145' mural on the surface of a City-owned street containing the words "All Lives Matter" bisected by a thin blue line and a thin red line to symbolize Plaintiffs' support for first responders and law enforcement.  Tr. at 16–19, 52–53; Exh. 2 at 1, 7; Exh. 4 at 2; Exh. 6.  Mr. Reynolds, who a few weeks prior had seen a "Black Lives Matter" mural painted on a City-owned street within the Indiana University Campus by the Black Collegians, a campus student group,[3] was moved to seek permission to install an "All Lives Matter" street mural on the Indiana University campus.  Plaintiffs sought to paint an "All Lives Matter" mural because they believed their message was being suppressed, (Tr. at 18–19, 25–26, 31), and that "the [Black Lives Matter] moniker is highly divisive and not representative of all the groups on campus."  Exh. 2 at 1; Exh. 3 at 1; Exh. 5 at 1.

---

[3] As discussed above, in 2021, the City planned for three "Black Lives Matter" murals to be painted on its streets, including the mural painted by the Black Collegians.  The three murals were painted on City-owned streets and were completed by early July 2021.  We previously ruled in response to the parties' cross motions for summary judgment, that these murals constitute government speech, stating that "any argument that Defendants engaged in viewpoint discrimination in violation of Plaintiffs' First Amendment rights by approving the installation of the [Black Life Matters] murals on City streets while not permitting Plaintiffs to paint a similar [All Lives Matter] mural necessarily fails."  Dkt. 89 at 33.  Accordingly, we reference here the Black Lives Matter murals solely to contextualize the remaining claims at issue in this litigation.

On July 20, 2021, Mr. Reynolds, acting on his own behalf and as campus coordinator for the Indiana University Chapter of Turning Point USA, emailed a message to Thomas Morrison, Indiana University's Vice President for Capital Planning and Facilities, and Indiana University Student Involvement and Leadership containing on the subject line, "All Lives Matter Mural on Campus." Exh. 2 at 1. In that email, Mr. Reynolds requested permission to paint the words "All Lives Matter" on "any space with high visibility on campus." *Id.* Mr. Reynolds further stated that he was making this request in response to the "recent unveiling of the Black Lives Matter mural on campus." *Id.*

Mr. Morrison replied on July 27, 2021 by email to Mr. Reynolds's email, stating that the Black Lives Matter mural Mr. Reynolds had referenced "was not placed on Indiana University property nor the campus," but was instead on a City-owned street and that the City was the entity that ultimately approved the Black Lives Matter mural. Exh. 2 at 3. Mr. Morrison's email further stated that "IU does not permit mural type art on the Bloomington Campus," and directed Mr. Reynolds to confer with the City. *Id.* In response to Mr. Reynolds's inquiry regarding the proper City official for him to contact, Mr. Morrison stated that his "recommendation would be to begin with the Board of Public Works at the City" as he "believe[d] that they have a published process and staff who can assist." Exh. 2 at 4–5.

On July 29, 2021, Mr. Reynolds sent an email to the general email account of the City's Public Works Department (public.works@bloomington.in.gov) containing the

following subject line: "Permit for an All Lives Matter Mural on Campus."  Exh. 3.  In

his email, Mr. Reynolds stated as follows:

> I represent two student organizations at IU, Turning Point USA and *The Crimson Post*.  We're aware that the Bloomington Department of Public Works issued a permit for a Black Lives Matter mural to be painted on IU's campus.
>
> We feel that the BLM moniker is highly divisive and not representative of all groups on campus.  As such, we would like a road on campus to represent our views with an All Lives Matter mural.  Ideally, this would be on a large and highly visible street, although we are relatively open with regard to the mural's location.
>
> With the Fall semester starting in less than a month, we would like to get this process started as soon as possible.

*Id.*  On August 3, 2021, Mr. Reynolds followed up by sending a second email to the

general Public Works Department email account regarding his request, having not

received a response to his first message.  *Id.*

The City employee who ordinarily would have responded to a request such as Mr.

Reynolds's was the Assistant Arts Director.  However, because the Assistant Arts Director

position was vacant at that time, Defendant Adam Wason, the Public Works Director,

agreed to respond to Mr. Reynolds's request.  Mr. Wason testified that he agreed to handle

the request for the added reason that it involved high-level Indiana University officials

and it was unclear whether Mr. Reynolds's request implicated a City-owned or Indiana

University-owned street as both City-owned and University-owned streets exist on

campus.  Tr. at 137–39, 141–42.

On August 2, 2021, Mr. Wason emailed Mr. Reynolds a message bearing the

subject line, "Campus Mural."  Exh. 4 at 1.  Mr. Wason informed Mr. Reynolds that he

would "need to work with the [Indiana University] President's Office, as did the other group [the Black Collegians], in order to get the concept for any murals approved for placement on any streets on campus." *Id.* Mr. Wason testified that he had referred Mr. Reynolds to Indiana University because it was not clear where Mr. Reynolds was proposing the mural be placed; Mr. Wason assumed, based on Mr. Reynolds's references to "campus" and "campus streets," that he was seeking permission to paint a mural on a street owned by Indiana University. Tr. at 151.

Mr. Reynolds complied with Mr. Wason's directive to contact the Indiana University President's Office and again emailed Mr. Morrison that same day, on August 2. Exh. 1 at 4; Tr. 45–46. Mr. Morrison promptly responded, informing Mr. Reynolds that, although the City has "ultimate approval" for proposed art installations on its streets, the City "consults with [Indiana University] as an adjacent property owner," as it had regarding the location of the Black Lives Matter mural painted by the Black Collegians. Exh. 2 at 6. Mr. Reynolds responded by providing Mr. Morrison with a list of a few of Plaintiffs' preferred locations for the proposed All Lives Matter mural, including the intersection of East Kirkwood and Indiana Avenue in front of the Von Lee Building, as well as with information regarding the size and design of the mural. Tr. at 51–54, Exh. 2 at 7–8, Exh. 6. Mr. Morrison replied to Mr. Reynolds saying he should "relay to the City that IU is okay with the East Kirkwood location" and to "reach out with any further questions." Exh. 2 at 7–8.

On August 3, 2021, Mr. Reynolds informed Mr. Wason via email that the proposed All Lives Matter mural had been "approved by the [Indiana University] President's

Office, specifically by IU Vice President for Capital Planning and Facilities Thomas Morrison, for placement on E[ast] Kirkwood Ave[.] in front of the Von Lee building." Exh. 4 at 2. Mr. Reynolds attached a graphic of the proposed mural to the email and shared details regarding the mural's proposed size and dimensions. *Id.* Mr. Reynolds waited two days before sending a follow up email on August 5, 2021, after having not received a written response from Mr. Wason.[4] *Id.* at 3.

On August 10, 2021, one week after sending his initial email, Mr. Reynolds again sent an email message to Mr. Wason, stating, "I'm again contacting you in regards to my proposed mural as I have received permission from IU and would like to move forward with the project as quickly as possible." *Id.* at 4. Mr. Wason responded within a few minutes, instructing Mr. Reynolds to speak with "City Legal" about the mural and informing him that "Mr. Morrison's office is also not in agreement with your take on IU 'giving permission.'" *Id.* at 5. Prior to sending this email to Mr. Reynolds, Mr. Wason testified that he had spoken with Mr. Morrison, who agreed that the University could not "give permission" to a private individual to paint on a City-owned street, like East Kirkwood. Tr. at 150–151.

---

[4] Conflicting testimony was presented at trial as to whether Mr. Wason spoke with Mr. Reynolds on the phone on or before August 3, 2021, when he explained that Mr. Reynolds needed to contact the ESD to work through the procedures required to submit a Special Event Application, including explaining the project details—who was involved, who the artist would be, and what type of materials would be used—and completing a maintenance of traffic plan. Whether that phone conversation in fact actually occurred is not material to our resolution of the remaining legal issues.

Mr. Wason testified that had no personal disagreement with Plaintiffs' "All Lives Matter" message. Tr. at 158, 160. He was, however, at some point made aware of concerns within the City regarding the possibility that an "All Lives Matter" street mural would cause disruptions and protests in the community if it were permitted. However, Mr. Wason did not specifically recall whether he was aware of such concerns at the time he referred Mr. Reynolds to City Legal. Tr. at 159–60.

Mr. Wason did not provide Mr. Reynolds with the name of a specific contact for him to use at City Legal.[5] Mr. Reynolds testified that on the basis of his own internet search, he found an email address for Defendant Michael Rouker, who was at that time the City Attorney. Using that information, Mr. Reynolds emailed Mr. Rouker that same day after he had been instructed by Mr. Wason to contact City Legal, to wit, on August

---

[5] Mr. Wason testified at trial that the reason he had directed Mr. Reynolds to consult City Legal was because he had previously instructed Mr. Reynolds over the phone to contact ESD and Mr. Reynolds had not done so. At the conclusion of the bench trial, Plaintiffs sought to admit portions of Mr. Wason's deposition in which he had previously testified that his reason for sending Mr. Reynolds to City Legal was "at least in part due to staffing issues" in ESD, since the position of Assistant Arts Director (who typically dealt with requests such as Mr. Reynolds's) was vacant, although other ESD positions remained staffed. Plaintiffs sought to introduce the deposition testimony as an inconsistent statement. Defendants objected to the introduction of Mr. Wason's deposition excerpts on relevance grounds, namely, that the statements were not in fact inconsistent. In addition, Plaintiffs had not asked Mr. Wason about this alleged inconsistency during his testimony which denied him an opportunity to explain his prior testimony. Federal Rule of Evidence 613 does not require a party opponent witness to be given the opportunity to explain or deny a prior inconsistent statement in order for it to be admissible, so we <u>overrule</u> Defendants' objection on that basis. However, we agree with Defendants that this evidence, even if admissible, does not reflect an actual inconsistency. Mr. Wason did not testify either in deposition or at trial that he had only one reason for referring Mr. Reynolds to City Legal and Mr. Wason's proffered reasons, to wit, that the ESD office was understaffed, and, that when instructed to contact the ESD, Mr. Reynolds had failed to do so are not necessarily contradictory statements. Accordingly, we <u>sustain</u> Defendants' objection on that ground and hold that Mr. Wason's prior statement does not affect or analysis or view of Mr. Wason's credibility.

10, and copied Mr. Wason and Mr. Morrison on that communication. In his email, Mr.

Reynolds explained his request to install an All Lives Matter mural, summarized his prior

communications with Mr. Wason and Mr. Morrison, and expressed his desire to move the

project forward. Exh. 5 at 1; Stip. ¶ 12. Specifically, the email provided as follows:

> I represent *The Crimson Post* and Turning Point USA at IU, two student organizations at Indiana University. We're aware that the city permitted a "Black Lives Matter" mural to be painted this Summer.
>
> We feel that the [Black Lives Matter] moniker is highly divisive and not representative of all the groups on campus, as such, we would like a road on campus to represent our views with an All Lives Matter mural.
>
> After speaking with the director of the public works department, Adam Wason, we were informed that we would first need permission from the IU President's Office before such a project could proceed. The president's office then delegated the project to Thomas Morrison, the vice president for capital planning and facilities at IU. After submitting our proposed design, sizing, and locations to Mr. Morrison, we were told that graphic and sizing "look good" and that the university would "not have any objection to" a 15' x 145' mural on E Kirkwood in front of the Von Lee building. We were told by Mr. Morrison to "relay to the City that IU is ok with the East Kirkwood location."
>
> After again contacting Mr. Wason and informing him of IU's approval, we were told that we would have to contact the City's legal department. I have CC'd everyone that appears to be involved in the decision making process on this email in the hope of moving this project forward.

Exh. 5 at 1. There was no graphic of the proposed design attached to the email. *Id.*

When he did not receive a response to his email from Mr. Rouker, Mr. Reynolds

sent follow-up emails on August 17, 18, and 19. Mr. Reynolds's email on August 19

stated: "As I have yet to receive a reply, I am once again following up on this matter with

you. My next step will be to call your office and to get the national [Turning Point USA]

organization involved, as I have not been attempting to get a permit to create this mural for a month." Exh. 5 at 2–4.

At the time Mr. Rouker received these communications from Mr. Reynolds, Mr. Rouker testified that he was quite "busy" with other City business, including "filling in" for the outgoing Corporation Counsel as well as preparing for hearings on a significant municipal annexation proposal that was "drawing the majority of [his] time." Tr. at 204. Mr. Rouker eventually responded to Mr. Reynolds via email on August 23, 2021, stating only that "the City of Bloomington's Board of Public Works approves the placement of art in the public right of way. The City does not take recommendations for art in its right of way from individuals, and, at this time, the City is not considering adding additional art within its right of way." Ex. 5 at 5; Stip. ¶ 13.

In drafting his response to Mr. Reynolds, Mr. Rouker testified that he drew on his own knowledge and experience acquired over twelve years of working in municipal government which allowed him to know that Mr. Reynold's request to paint words on the surface of a City-owned street was "not the type of request that was susceptible to approval." Tr. at 229. He said he also relied on various communications he had had with unidentified City employees.[6] Tr. at 230. As City attorney, Mr. Rouker was "expected at times to independently make representations on behalf of the [municipal] corporation," and he believed that he was "acting in conformity with [his] job description" at the time

---

[6] Mr. Rouker invoked the attorney-client privilege in response to Plaintiffs' questioning regarding the identity of the City officials with whom he had spoken and the content of those communications. The Court ruled during the trial that Plaintiffs had failed to make a sufficient showing to warrant an order to pierce the attorney-client privilege.

16

he responded to Mr. Reynolds, such that his response was "the authoritative position." Tr. at 231.

Mr. Rouker testified that he had no personal concerns about the viewpoint of Plaintiffs' proposed "All Lives Matter" mural. Rather, he was concerned about the prospect of a policy allowing private individuals to paint any words on City streets, regardless of the content of the message. Tr. at 222. Based on his experience as a lawyer and public official in municipal government, he did not believe that any community would allow private individuals to paint their preferred words on a road surface thereby turning the streets into billboards. Tr. at 209. Mr. Rouker did not view the blue and red lines in the design as significant symbols at the time he informed Mr. Reynolds that the City did not take recommendations from private individuals for public art. Tr. at 214.

At the time Mr. Rouker responded to Mr. Reynolds's request to paint an "All Lives Matter" street mural in August 2021, Mr. Rouker did not recall any previous time that the City had taken a request from a private individual or external group to put art in the public right of way, nor had he ever personally received and responded to such a request. Mr. Rouker was also not aware of procedures the City had followed at that time in addressing requests from private individuals to paint on City-owned streets. Tr. at 201, 218–19. Only in the context of this lawsuit, did Mr. Rouker learn for the first time that, from 2017 through 2021, the City had approved Special Event Applications from three private neighborhood groups to paint designs on City-owned streets, as detailed above. Tr. at 218.

Mr. Rouker copied his immediate supervisor, Corporation Counsel Phillipa Guthrie, on his communication(s) with Mr. Reynolds regarding the All Lives Matter mural request. Mr. Rouker's typical practice was to make Corporation Counsel aware any time he had "some concern that something might be in a newspaper or something might come up that draws attention from the mayor's office or from some other source," so, he said, he looped in Ms. Guthrie on Mr. Reynolds's mural request because Mr. Reynolds had indicated to Mr. Rouker in the August 10 email that he (Mr. Reynolds) was involved in a publication that was circulated on campus. Tr. 205, 206. Mr. Rouker did not seek to, nor did he believe that he was "escalating" the importance of Mr. Reynolds's request by including Ms. Guthrie on his response. *Id.* at 206.

At the time he responded to Mr. Reynolds, Mr. Rouker was aware that the City "has a great deal of activism in its community" where "folks come and champion any number of or variety of political perspectives" with "counter protests" being "extremely common." Tr. 206. However, according to Mr. Rouker, he personally had no concerns that "something negative would happen in the [C]ity" if Plaintiffs' proposed All Lives Matter mural were installed. Tr. 207.

Approximately 20 minutes after receiving Mr. Rouker's August 23 email, Mr. Reynolds responded via email, copying Mr. Wason, Mr. Morrison, and Ms. Guthrie on his response, stating, "I would like to point out that the city approved a [Black Lives Matter] piece of art only a few months ago, and I and the organizations I represent will be pursuing legal action against the city if this mural doesn't receive approval. As an attorney, I'm sure I don't need to inform you that government entities cannot discriminate

18

in the viewpoints they allow to be expressed." Exh. 5 at 6. The lack of response from any City official to his email was interpreted by Mr. Reynolds as a denial of his request to paint an "All Lives Matter" street mural. Plaintiffs' 2021 request was never officially presented to the Board of Public Works for consideration or further action.

## Conclusions of Law

### I.    *Monell* Claim

Plaintiffs' viewpoint discrimination claim against the City is governed by the requirements set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978) and its progeny. Under *Monell*, "a municipal entity is not vicariously liable for the constitutional torts of its employees" and instead "may be liable only for conduct that is properly attributable to the municipality itself." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 826 (7th Cir. 2022) (internal quotations and citations omitted). Therefore, courts must apply "rigorous standards of culpability and causation" to prevent municipal liability from collapsing into *respondeat superior* liability. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

A constitutional deprivation may be attributable to a municipality only "when execution of a government's policy or custom inflicts the injury." *Houskins v. Sheahan*, 549 F.3d 480, 493 (7th Cir. 2008) (quotation marks and citation omitted). A plaintiff can show that a constitutional violation resulted from the execution of a municipal policy or custom in the following three ways: "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheahan*, 526

F.3d 973, 977 (7th Cir. 2008) (citing *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004)).  Additionally, the municipality's "official policy, widespread custom, or action by an official with policy-making authority [must be] the 'moving force' behind [the] constitutional injury."  *Dixon v. Cnty. of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)).

Here, the evidence adduced at trial establishes that, though the City did not have a written policy in 2021 that was specifically applicable to requests by private parties to install *art* in public rights-of-way, the City did have an unwritten policy or practice of considering such requests under its established procedures that were applicable to requests for *any* type of encroachment on the public rights-of-way.  Under these established procedures, a private party worked with the ESD and other City departments as necessary to complete a Special Event Application, which would then be presented to the Board of Public Works for approval.  With regard to art installations in particular, the City also had no written policy regarding design criteria, but had a custom of prohibiting, among other things, words, letters, and "universally recognized symbols" in art that were permitted to be displayed in its public rights-of-way.  Plaintiffs argue that these unwritten policies or customs of the City violated the First Amendment by requiring evaluation of the content of the private art, limiting discourse based on content and subject-matter, and permitting the use of standardless and unbridled discretion.[7]

---

[7] Plaintiffs do not contend that a person with final policymaking authority acting on behalf of the City caused the denial of their 2021 request to paint an "All Lives Matter" street mural.

Importantly, Plaintiffs' 2021 request to paint an "All Lives Matter" street mural was not denied pursuant to these City policies or practices. It is undisputed that Plaintiffs never completed a Special Event Application or had their proposal denied by the Board of Public Works in 2021. Both Mr. Reynolds and Mr. Rouker testified at trial that this was because Mr. Rouker in effect prematurely "denied" Plaintiffs' request when he incorrectly informed Mr. Reynolds that the City did not accept private proposals for art in public rights-of-way. And Plaintiffs have made no argument that Mr. Rouker, as City Attorney, was a policymaking official for the City nor is there any evidence to support such a conclusion.

The Court deems credible Mr. Rouker's explanation that, at the time he responded to Mr. Reynolds's request in August 2021, he was unaware that the City had established procedures in place for accepting proposals for private art in public rights-of-way or that the City had previously permitted any private individual or group to display art (specifically, painted street murals) in public rights-of-way. We also credit Mr. Rouker's testimony that his response to Mr. Reynolds was based on his own experience in municipal government and his opinion that there would not be "any community" that would permit private individuals or groups to transform city streets into billboards by allowing them to paint their desired message onto the surface of the street, regardless of the content of the message. Tr. at 209. While Mr. Rouker testified that he had consulted unnamed City employees in addition to relying on his own experience in municipal government in concluding that the City would not entertain Plaintiffs' request to paint

words on the surface of its streets, this fact alone does not establish that Mr. Rouker's response was the result of any established policymaking process attributable to the City.

Accordingly, in light of the documentary evidence and the testimony of the witnesses, we hold that Mr. Rouker did not render his admittedly incorrect opinion based on an unwritten policy or widespread City custom of denying private requests to paint words on City streets. In addition, Mr. Rouker's personal doubts about a practice of permitting private individuals or groups to paint words on City streets, which informed his reaction to what he regarded as a novel question, does not establish, for purposes of *Monell*, that a City policy or widespread custom or practice was the "moving force" that caused Plaintiffs' alleged constitutional injury, namely, the denial of their request to paint an "All Lives Matter" street mural.[8]

The fact that Mr. Rouker's opinion that the City would not permit private parties to paint written messages on the surface of its streets happened to align with the City's unwritten policy, custom, or practice in 2021 of prohibiting private art containing words

---

[8] To the extent that Plaintiffs argue that the City had a widespread custom or practice of allowing City employees to act as "gatekeepers" in deciding who could access the Special Event Application process that caused the denial of their 2021 street mural request, the adduced evidence does not support such a conclusion. The most Plaintiffs have shown is that City employees had input in setting the agenda and exercised discretion in preparing the information packets provided to the members of the Board of Public Works for their review before Board meetings, but this is not evidence of a widespread custom or practice of allowing City employees to "gatekeep" the Special Event Application process. Beyond Mr. Rouker's response to Mr. Reynolds's request, Plaintiffs have presented no evidence of any other instance in which a City employee prevented any group from accessing the Special Event Application process and "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985). No such showing has been made here.

or letters does not alter our conclusion that Mr. Rouker's response cannot be attributed to the City for purposes of *Monell*. Even if it could, the Court previously determined that an identical ban on private art containing words or letters in the City's 2022 Policy did not implicate First Amendment concerns as applied to Plaintiffs. That same analysis applies here. Plaintiffs ask the Court to reconsider that ruling based on testimony from Mr. Rouker and the City's current Assistant Director for the Arts Holly Warren[9] regarding what Plaintiffs contend is the standardless and unbridled discretion City employees exercised under the 2022 Policy to interpret what constitutes an "universally recognized symbol," which discretion they contend City employees likewise exercised in 2021 in considering private art proposals. However, Plaintiffs have adduced no evidence that their proposed "All Lives Matter" mural was denied in 2021 because it contained universally recognized symbols. To the extent that Mr. Rouker was aware of the red and blue lines in Plaintiffs' design at the time he responded to Mr. Reynolds, the Court deems credible his testimony that he did not recognize those lines as being significant symbols in responding to Mr. Reynold's 2021 request. Thus, whatever discretion City employees may have exercised in considering "universally recognized symbols" in 2021, it is not relevant to our analysis here.

---

[9] The Court reserved a ruling on Defendants' objection at the bench trial to the admissibility of Ms. Warren's deposition testimony. Specifically, Defendants objected on the grounds that Plaintiffs had not established that Ms. Warren was an unavailable witness, and further, that her testimony was irrelevant to the legal issues remaining because she did not begin working for the City until September 2021, after Plaintiffs' 2021 street mural request had already been denied, and thus, has no personal knowledge of the manner in which the City considered encroachment requests prior to her tenure. The Court agrees that Ms. Warren's deposition testimony, even if admissible, is not relevant to the remaining legal issues.

For these reasons, we hold that Plaintiffs have failed to establish that any policy or widespread custom or practice of the City was the "moving force" behind any constitutional deprivation related to the denial of their 2021 request to paint an "All Lives Matter" street mural.  Their *Monell* claim therefore must be denied.

## II.    Individual Defendants

Plaintiffs' post-trial briefing was limited only to their *Monell* claim against the City and does not address any claims against Mr. Wason and Mr. Rouker in their individual capacities or respond to Defendants' arguments on these claims.  As the Seventh Circuit has frequently observed in reviewing summary judgment rulings, "[j]udges are not like pigs, hunting for truffles buried in [] the record."  *Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (internal quotation marks and citation omitted); *see also Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 510 (7th Cir. 2020) ("[A]s we have said on many other occasions, it is not the role of the court to search the record to find support for a party's assertion."); *Corley v. Rosewood Care Ctr., Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir. 2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make up the record here to make [a party's] case for him.").  "This observation applies equally to bench trials."  *ProBatter Sports, LLC v. Sports Tutor, Inc.*, 172 F. Supp. 3d 579, 588 (D. Conn. 2016).

It is beyond the purview of the Court to sort through the trial transcript and the (voluminous) record to frame Plaintiffs' arguments in support of their individual capacity claims against Mr. Wason and Mr. Rouker.  Accordingly, we construe Plaintiffs' omission

of any discussion of these claims in their post-trial briefing as signaling their abandonment of such claims.

Even if not abandoned, Plaintiffs' individual capacity claims would fail on their merits. Regarding Mr. Wason, Plaintiffs did not establish that he caused their claimed injury, to wit, the denial of their request to paint an "All Lives Matter" street mural. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994). The evidence adduced at trial establishes that Mr. Wason never denied Plaintiffs' request to paint their "All Lives Matter" street mural, nor did he possess the discretion to do so. Having failed to show that Mr. Wason took any action that caused the denial of their request to paint their "All Lives Matter" street mural, Plaintiffs claims against him must be denied.

Regarding Mr. Rouker, Plaintiffs similarly have failed to prove that he took any action based on any viewpoint expressed in the proposed "All Lives Matter" mural. We credit Mr. Rouker's testimony that at the time he provided what amounted to an offhand response to Mr. Reynolds's request, he was unaware of the prior instances when neighborhood organizations had been permitted to paint on City streets and he harbored the opinion, based on his knowledge and experience as a lawyer, that Plaintiffs' street mural request was something that the City would not allow, regardless of the message they sought to express. We regard Mr. Rouker's testimony as credible that his response to Plaintiffs was based only on his concern that permitting private individuals to paint *any*

written message would transform the surface of the City's streets into billboards, and that his response to Plaintiffs would have been the same regardless of the message they sought to express.  In fact, Mr. Rouker emphatically denied having taken any action or influencing any of his opinions based on his possessing a viewpoint contrary to the proposed "All Lives Matter" message.

Accordingly, Plaintiffs have failed to prove their individual capacity viewpoint discrimination claims against both Defendant Wason and Defendant Rouker, dictating that these claims also be denied.

## III.    Conclusion

For the reasons detailed above, we rule that Defendants are <u>NOT LIABLE</u> to Plaintiffs.  Accordingly, final judgment shall enter against Plaintiffs and in favor of Defendants.

IT IS SO ORDERED.

Date: _____3/12/2026_____          _Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

William Bock, III
KROGER GARDIS & REGAS
wbock@kgrlaw.com

Keith Andrew Butler
Kroger Gardis & Regas, LLP
kbutler@kgrlaw.com

Cassie Nichole Heeke
Church, Church, Hittle and Antrim
cheeke@cchalaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com